Sean D. Schwerdtfeger, Esq. (SBN 179521)
Catherine L. Coughlin, Esq. (SBN 295812)
Sara K. Richards, Esq. (SBN 317603)
SCHWERDTFEGER LAW GROUP
501 West Broadway, Suite 2040
San Diego, CA  92101
Telephone: (619) 595-3403
Facsimile: (619) 595-3404

Attorneys for Cross-Defendant and Counter-Claimant CTE CAL, INC.

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| .UNITED STATES OF AMERICA, For the Use and Benefit of:<br><br>McCULLOUGH PLUMBING, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>HALBERT CONSTRUCTION COMPANY, INC. a California corporation; WESTERN SURETY COMPANY, a South Dakota corporation; and DOES 1-100, inclusive,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTIONS. | **CASE NO. 3:17-CV-00803-CAB-WVG**<br><br>**CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART**<br><br>**[OPPOSITION 2 OF 3]**<br><br>Assigned to:<br>Hon. Cathy Ann Bencivengo,<br>        Courtroom 4-C<br>Hon. William V. Gallo, Second Floor<br><br>Date: June 21, 2019<br>Time: 2:00 PM<br>Complaint filed: April 20, 2017<br>Trial date: July 8, 2019 |

1

**CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART**

# I.

# INTRODUCTION

Defendant and Counterclaimant Halbert Construction Company, Inc.'s ("Halbert") motion to exclude the expert testimony of Douglas Barnhart ("D.Barnhart") amounts to nothing more than editorial plainly contradicted by D.Barnhart's written expert opinions and testimony provided at deposition. Indeed, the editorial is so divorced from the clearly written and well-reasoned expert opinions of D.Barnhart that merely reading the written opinions exposes Halbert's tactic as nothing more than misdirection.  Nevertheless, since Halbert has made factual inaccuracies and editorial misdirection a hallmark of its *Daubert* motions, CTE offers this response.[1]

# II.

# LEGAL STANDARD

Under Federal Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] In order to avoid redundancy, each of CTE's three oppositions to Halbert's *Daubert* motions are sequenced as Opposition 1, 2, and 3 so that each factually build on the other.  In this manner, the factual explanations provided in Opposition 1 will apply equally to Oppositions 2 and 3.  It is, therefore, recommended that review of CTE's three opposition proceed in the sequential order of Opposition 1 preceding Opposition 2, etc.  It is hoped that the Court appreciates this approach.

**CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART**

In determining the admissibility of expert testimony, "the Rules of Evidence—especially Rule 702— assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993). In other words, the Court must undertake a two-step assessment of whether: "(1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevancy prong)." *Johns v. Bayer Corp*., No. 3:09-CV-1935-AJB-DHB, 2013 WL 1498965, at \*6 (S.D. Cal. Apr. 10, 2013).

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). "District courts must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach outlined in *Daubert*." *United States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997) (citation omitted). The "test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id*. at 564-65 (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). Put differently, "[t]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are

CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART

impeachable." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (internal quotation marks omitted); see also 29 Fed. Prac. & Proc. Evid. § 6262 (2d ed.) ("Assuming the expert testimony has the earmarks of reliability, the evidence is then admitted and subjected to the kind of adversarial attack that facilitates the jury's central functions of deciding what weight to attribute to evidence and which witnesses to believe.").

## III.

## FACTUAL BACKGROUND

On September 30, 2013, the United States Army Corp. of Engineers ("USACE") contracted with Halbert, as the prime contractor, to build a large dining facility ("DFAC") and administration building ("ADMIN" collectively with the DFAC "the Project") at the United States Army Garrison, Presidio of Monterey ("Presidio").  Per the Project specifications, Halbert was responsible for, *inter alia*, (i) developing and implementing a Quality Control Plan administered by a Halbert Contractor Quality Control Manger ("CQC Manager"), (ii) staffing the Project with a Halbert Superintendent who has ultimate responsibility for the quality of the Project, and (iii) determining the sequencing of the construction work performed.[2]

A Quality Control Plan is a written instrument prepared by a general contractor and approved by the USACE to govern quality control on a Federal military construction project. Division I General Requirements, Section 01 45 00 Quality Control ("Quality Control Specifications") required Halbert to prepare a Quality Control Plan that, *inter alia*, identifies each of the quality control

---

[2]  To avoid redundancy, CTE does not repeat the detailed explanation of the documentary and photographic evidence compiled during the course of construction, via the daily reports of the Halbert Superintendent, Halbert CQC Manager, and subcontractors.  The informational significance of these reports is discussed at length in the opposition to Halbert's motion to exclude the expert testimony of Rod Ballard (Opposition 1 of 3), and such discussion is incorporated herein by reference.

CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART

personnel, the specific discipline of each quality control personnel (e.g., civil, mechanical, electrical, structural, architectural, etc.), the qualification for each quality control personnel, and the means of implementing the Quality Control Specifications.  The USACE had to approve the Quality Control Plan, and once approved, the Quality Control Plan governed the quality control program for the Project. (NOL at **Exhibit O** [Halbert Quality Control Plan].)

The Quality Control Plan occupies a central role in this litigation not simply because it controlled the quality control program for the Project, but also because it belies significant aspects of Halbert's claims against CTE.  In concert with the rather glaring errors in Halbert's sequencing of construction, one can understand why problems arose with the Project construction and who is responsible for the ensuing damage.  The expert opinions developed on behalf of CTE well explain this process, which is likely why Halbert literally seeks to exclude the totality of CTE's expert opinions by way of meritless arguments.  The approach is suspect in its efforts to stop what well explains the genesis of and party responsible for the problems on this Project.

## IV.

## ARGUMENT

### A. D.Barnhart Is An Exceptionally Well Qualified Expert, Who Provided Clearly Defined Written And Testimonial Expert Opinions.

Halbert makes the nonsensical assertions that with respect to D.Barnhart's expert opinions "no basis is offered to establish the witness has specialized knowledge or experience in Quality Control ("QC") inspections or what the standard of care is in that industry.  Nor does Mr. Barnhart demonstrate how being a general contractor makes him qualified in this field." (Halbert P&A at 6:4-7.)  These assertions are curious given that D.Barnhart's resume and experience in

military contracting far exceed those of any other expert designated in this litigation.[3]  Indeed, D.Barnhart's accomplishments include without limitation:

- Former Navy Civil Engineer Corps Officer, responsible for US Government administration of construction and contracts and public works administration and Navy shore installations;

- Past Chairman of the California Contractors State License Board;

- Former Commissioner of the California Uniform Public Construction Cost Accounting Commission;

- Former Executive Board Member of the Regional San Diego Chamber of Commerce;

- Past Chairman of the Qualcomm Stadium Board;

- Past Chairman of the National AGC (Associated General Contractors) Heavy Federal Division; and

- 2008 President for the AGC of America. (NOL at **Exhibit N** [D.Barnhart Resume].)

Halbert's assertions expose that it has either not read the D.Barnhart's written expert opinions or has consciously elected to ignore those opinions. Merely reading D.Barnhart's expert opinions reveals their well-reasoned nature. The opinions literally start with an explanation and analysis of the governing Quality Control Specification for the Project and sequentially progress through a well-reasoned analysis of the contractual relationship between Halbert and CTE, and the operation of the Quality Control Plan along with its nexus to the quality

---

[3]  Halbert designated Michael Patterson, as a general contracting expert, and Penny Newcomb Kronberg, as an architect, to opine in a duplicative manner that the Halbert Superintendent and CQC Manager were *not* competent to conduct plumbing inspection; yet neither of these experts offers any responsive to the opinions to those provided by D.Barnhart.  Similarly, neither possess comparable experience or credentials.

CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND
TESTIMONY OF DOUGLAS BARNHART

control personnel prior to engaging in a lengthy analysis of why Halbert's errors proximately caused the damage of which it complains. (NOL at **Exhibit P** [D.Barnhart opinions].)  Halbert neither retained an expert to address these opinions nor has any rational response to D.Barnhart's well-reasoned analysis. Rather Halbert apparently believes that by engaging in unsustainable editorial it can exclude well-reasoned analysis explaining why Halbert is at fault for the damages of which it complains.  This is neither a good tactic nor effective under Rule 702 to exclude expert testimony.

### B. D.Barnhart Rendered Well-Reasoned Opinions On Halbert's Failure To Competently Administer The Project.

Halbert indisputably maintained absolute control over the construction sequencing of the Project.  Construction sequencing is the process by which the general contractor (e.g., Halbert) determines which trades precede and follow any element of work on a construction project.  In this litigation, construction sequencing occupies a central role by virtue of significant construction sequencing errors proximately causing the damage of which Halbert complains.  The two most notable instances of such errors involve the location of the interior radial walls in the DFAC and the significant damage caused to the shallow underground plumbing in the DFAC.  D.Barnhart explained why these errors proximately cause the damage at issue in this litigation in his well-reasoned expert analysis.

### 1. D.Barnhart Well Explains How And Why Halbert's Construction Sequencing Errors Proximately Caused A Damage Of Which It Complains.

The DFAC contains a series of radial walls.  A radial wall is a curved wall, whose curvature is defined by the radius of a circle.  A good way to envision a radial wall is a curved wall that represents part of a circle.  The radial wall in the

7

DFAC is an architectural feature against which the restaurant equipment is located, so the Army personnel can walk along the perimeter of the curved wall serving themselves from the restaurant equipment.  These walls are an important feature because the plumbing must be laid out in a manner that matches the precise location of the radial wall with the restaurant equipment adjacent to it.[4]  In order to locate the radial wall, Halbert had a survey point staked at the center point of the circle forming the radial wall.[5]  The subcontractors, such as plumbers and electricians, had responsibility to measure from the survey point (i.e., radius/center of the circle) to the radial wall.  The survey point was located on the exterior of the DFAC; however, Halbert sequenced construction such that the walls of the DFAC were constructed prior to the plumber and electrician being able to locate the radial wall from the survey point.  In other words, Halbert literally built a wall between the survey point and radial wall location, thereby making it impossible to "pull a line" from the survey point to the location of the radial wall.

The building of a wall between the survey point and radial wall location created significant problems with locating the radial wall, and Halbert would not pay to locate the wall via GPS survey.  Instead, Halbert contends that it moved the survey point to the inside of the DFAC.  However, because the curvature of a radial wall is defined by the radius of the circle, moving a survey point to the inside of the DFAC shortened the radius of the circle.  This is significant because a

[4]  In commercial establishments, such as a 7/11, one might notice that the Slurpee machine or soda fountain drains into a floor sink located in the floor immediately in front of or next to the Slurpee machine or soda fountain.  Those floor sinks, like the 40+ floor sinks at issue in this litigation, must be located immediately adjacent to the machines that they service.  Therefore, if one does not accurately identify the location of the wall against which the machines reside, the floor sink location will likely be wrong – just as occurred in this case.

[5]  The radius of a circle is the distance from the center of the circle to any point on its circumference.  In other words, because a circle is round, the distance from the center of the circle to any point on the circumference is equal.

CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND
TESTIMONY OF DOUGLAS BARNHART

shorter radius renders the radial curve tighter.  This geometric principle can be visually seen in Exhibit 369/**NOL at Exhibit L**, and it is explained in the declaration of Rodney Ballard submitted herewith.

D.Barnhart recognized this essential problem, explained it in his written opinions, and again answered questions concerning it in his deposition.  It is not incumbent upon D.Barnhart to explain basic principles of geometry to counsel for Halbert, particularly when counsel does not inquire.  Paragraph 9 of D.Barnhart's written opinions provides an articulate explanation of the problem created by Halbert's construction sequencing error and how it should have been resolved. (NOL at **Exhibit P** [D.Barnhart opinions]; see also **Exhibit Q** [D.Barnhart Depo].) The fact that Halbert disagrees is both geometrically incorrect and a question of fact.

### a.  Raymond Gonzalez, An MPI Employee, Failed To Correctly Locate The Radial Walls.

It is odd for Halbert to rely on the testimony of Raymond Gonzalez to substantiate its claim that the radial wall location could have been accurately determined without the assistance of GPS survey technology, particularly given that Mr. Gonzalez incorrectly located the radial wall and associated plumbing improvements.  Indeed, Mr. Gonzalez's deposition testimony describes the unusual means by which the radial wall was located and Halbert's involvement therein.

> **Q.** Was it difficult for you to conduct the work around the semicircular walls?
> **A.** No.  I figured out how to get it.  Ron[6] was in touch with the engineer[7], and he told him how to get these circular walls but he

---

[6] Mr. Gonzalez is referring to Ron Kelly, who was the CQC Manager for Halbert, at the time Mr. Gonzalez incorrectly located the radial wall, and consequently incorrectly laid out the plumbing to it.  This resulted in a number of incorrectly placed plumbing features, such as floor sinks.

[7] Mr. Gonzales reference to "engineer" refers to the USACE.

CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART

> was wrong.  I pointed that out.  And Ron understood why the engineer was wrong and I was right.
> So I actually laid out the walls for Halbert, and they went with that, and said that that was correct and the engineer was wrong. (NOL at **Exhibit R**, 78:24-79:8.)

It was most unusual for Mr. Gonzalez, who has neither any college nor engineering training, to have overridden the USACE's assessment and recommendations to remedy the error, just as it was odd for Halbert to accept such approach. (*Id.* at 10:3-17.)  The outcome of such decision was a variety of plumbing elements (e.g., floor sinks) being improperly located.

### b.      Halbert's Reliance On Its Plumbing Expert, William Ivey, Is Misplaced

Reading the portions of Mr. Ivey's deposition testimony touted by Halbert does not reveal any substantive methodology for locating the radial walls after Halbert's construction sequencing error.  Mr. Ivey does, however, agree that a survey would have been an accurate means of locating the radial walls. (NOL at **Exhibit S**, 145:5-149:23.)  He also agrees that Halbert had sole control over construction sequencing, as well as that Halbert agreed with Mr. Gonzalez's incorrect methodology. (*Ibid.*)

> **Q.** Who was responsible for sequencing of the trades that built the Presidio project?
> **A.** Halbert.
> **Q.** That's solely the responsibility of Halbert; correct?
> **A.** Yes. (*Id.* at 148:24-149:4.)

Halbert errs in it its belief that disagreement among experts as to how to locate the interior radial walls in the DFAC requires or even should result in the exclusion of D.Barnhart's opinion pertaining to the use of GPS survey to definitively locate the radial walls.  Indeed, Halbert's point of view is particularly perplexing given that Mr. Ivey agrees that survey would have been an accurate means to identify the location of the radial walls.

CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART

### C. The Saturated Soils Conditions And Ensuing Damage Caused by WCI To The Underground Plumbing Are Indisputably Documented By Copious Documentary, Photographic, And Testimonial Evidence.

As explained at length in opposition to Halbert's motion to exclude the expert testimony of R.Ballard[8], no reasonable debate exists as to the cause of primary damage to the shallow underground plumbing in the DFAC. The structural steel erector, West Coast Iron, Inc. ("WCI"), indisputably damaged the shallow underground plumbing while driving heavy machinery over it in the course of setting the structural steel joists for the roofing system in the DFAC. In fact, the plumbing damage was documented by email, written report, and photographically literally while it was occurring, and it continued to be documented in writing and photographically thereafter during repair. (See NOL at **Exhibits A – E**.)

D.Barnhart does a remarkable job in his written report explaining how constructions sequencing errors by Halbert created the situation in which WCI damaged the shallow underground plumbing during the setting of the structural steel joists for the roofing system in the DFAC. He further explains with actual rainfall records how the adverse weather conditions exacerbated the damage to the underground plumbing by saturating the soil, all of which is corroborated by, *inter alia*, Halbert's Superintendent reports, QC Manager reports and photographs. As an accomplished and seasoned military general contractor, D.Barnhart is well within his scope of his expertise to opine on, *inter alia*, construction sequencing, quality control, and influence of inclement weather on unprotected work. Indeed, an accomplished and seasoned military general contractor is particularly well

---

[8] For purposes of brevity, CTE does not repeat the extensive discussion and evidence unequivocally documenting the cause and extent of the damage to the underground plumbing in the DFAC. (See Opposition 1 of 3.)

qualified to render opinions on the topics addressed by D.Barnhart because that is the job of a military general contractor under the rules and regulations governing military contracting.

Halbert is doing nothing more than attempting exclude well-reasoned expert opinion because it is detrimental to Halbert's litigation position, and Halbert has neither any general contracting expert rebuttal opinion nor rational explanation for its poor construction sequencing and decision making. Not only is Halbert's approach in this motion proceeding an ineffective litigation tactic, it is inconsistent with Rule 702 and interpretive case law.

## D. The Claims Made In Halbert's Motion Are Simply Belied By D.Barnhart's Written Opinions And Deposition Testimony.

It is understandable that Halbert does not appreciate D.Barnhart's well-reasoned expert analysis, but it is unproductive for Halbert to engage in what is plainly editorial contradicted by the record. Halbert also errs in its belief that D.Barnhart's expert opinions are borne out of any psychological assessment of Halbert employees. Halbert repeats the error with a series of bogus claims such as: "A third approach employed to judgment competency is based on a person's salary." (Halbert P&A at 7:7-8.) Merely reading the plain language of D.Barnhart's written expert opinion well illustrates the difference between the actual expert opinion and Halbert's unsustainable editorial:

> The owner's contract with Halbert thru Amendment A00033 was $28,864.359.26. It is my opinion that the site management team for a contract of this magnitude requires the deployment of significant more assets than Halbert allocated. The undersigned believes that the project should have been staffed with a full time onsite a Property manager, two Field Engineers, a Field Office Manager, two Superintendents, a Safety Officer in addition to Quality Control personnel. Halbert's Project Manager was not only not on site but had responsibility for other projects. The onsite management team was too thin in my opinion to effectively manage the project. In addition, in looking at the burdened wages

**CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART**

identified in the Halbert prepared McCullough Daily Impact Cost Calculation, the compensation for the Halbert managers is significantly below what the undersigned would expect given the complexity of the project.  This is a strong indication that the selected Halbert Management team was under qualified.  The results are an onsite management that lost control of the project and was ineffective in all areas of performance including Quality control.  The project management arrangement employed by Halbert was a contributing factor in the pluming issues encountered.  In my opinion, Halbert did not understand the staffing requirements to manage a project of this magnitude.

D.Barnhart's above-quoted expert opinion is not only well-reasoned, it differs substantially from Halbert's portrayal of the opinion.  This tactic is not limited to either D.Barnhart or the above-quoted opinion, it permeates all of Halbert's *Daubert* motions.

Simply reading D.Barnhart's written expert opinions and deposition make clear that the few short deposition excerpts relied upon by Halbert have nothing to do with D.Barnhart's "methods" in formulating his expert opinions. (Halbert P&P at 7:21-8:9.)  For instance, Halbert considers it nefarious that D.Barnhart thinks that the Halbert Project Manager was unqualified, even though D.Barnhart explained the rationale for his opinion.  Similarly, there is nothing wrong with D.Barnhart opining that the person at Halbert responsible for sequencing the structural steel joists work in the DFAC made a poor decision that indisputably resulted in the destruction of the shallow underground plumbing.  D.Barnhart explained his rationale for all of the short deposition excepts relied upon by Halbert, but Halbert pretends no such explanation exists because the explanations contradict their motion to exclude the expert testimony.  For this reason, CTE lodges a complete copy of D.Barnhart's deposition testimony as **Exhibit Q**.

///

///

///

**CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART**

**V.**

**CONCLUSION**

For the aforementioned reasons, CTE respectfully requests this Court to deny Halbert's motion to exclude the expert opinions of D.Barnhart.

Dated: May 17, 2019                         Respectfully Submitted,


                                    By:    /s/ *Sean Schwerdtfeger*
                                           Sean D. Schwerdtfeger, Esq.
                                           Catherine Coughlin, Esq.
                                           Sara K. Richards, Esq.
                                           Attorneys for Cross-Defendant and
                                           Counter-Claimant CTE Cal, Inc.

**CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART**

CERTIFICATE OF SERVICE

CASE NAME:      *United States of America for the Use and Benefit of McCullough Plumbing, Inc. v. Halbert Construction Company, et al.*
CASE NO:         3:17-cv-00803-CAB-WVG
District Judge:      Hon. Cathy Ann Bencivengo      Ctrm: 4C, Suite 4165
U.S. Magistrate Judge:   Hon. William V. Gallo   Ctrm: Suite 2125, 2nd Fl.

     I, the undersigned, declare that I am over the age of 18 and not a party to this action. My business address is located at 501 W Broadway, Suite 2040, San Diego, CA 92101.

     I declare that on May 17, 2019, I served the following document(s)
- **CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS BARNHART**
via the court's CM/ECF system:

| | |
|---|---|
| Kevin T. Cauley<br>SCHWARZT SEMERDJIAN CAULEY & MOOT, LLP<br>101 West Broadway, Suite 810<br>San Diego, CA 92101<br>Tel:   (619) 236-8827<br>Fax:  (619) 236-8827<br>Email: Kevin@sscmlegal.com<br>kristenb@sscmlegal.com<br>daphne@sscmlegal.com<br>***Attorneys for Plaintiff/Counter Defendant  UNITED STATES OF AMERICA for the Use and Benefit of McCULLOUGH PLUMBING, INC., and Third Party Defendant THE GUARANTEE COMPANY OF NORTH AMERICA USA*** | Jason R. Thornton<br>MARKS FINCH THORNTON & BAIRD, LLP<br>4747 Executive Drive, Suite 700<br>San Diego, CA 92121-3107<br>Tel:   (858) 737-3101<br>Fax:  (858) 737-3101<br>Email: jthornton@ftblaw.com<br>pmcmanus@ftblaw.com<br>aabbey@ftblaw.com<br>***Attorneys for Defendant/Counter Claimant/Third Party Defendant HALBERT CONSTRUCTION COMPANY, INC., and Defendant WESTERN SURETY COMPANY*** |
| Charles A. Alfonzo | |

15

BURNHAM BROWN
1901 Harrison Street, 14th Floor
Oakland, CA 94612
Tel: (510) 444-6800
Fax: (510) 835-6666
Email: calfonzo@burnhambrown.com
***Attorneys for Defendant/Counter***
***Claimant/Cross-Defendant HALBERT***
***CONSTRUCTION COMPANY, INC.***

Dated: May 17, 2019                    Respectfully Submitted,

                                       By:    _/s/ *Sean D. Schwerdtefger*_____
                                              Sean D. Schwerdtfeger

16

**CTE CAL'S OPPOSITION TO HALBERT'S MOTION TO EXCLUDE THE EXPERT REPORTS AND
TESTIMONY OF DOUGLAS BARNHART**