Sean D. Schwerdtfeger, Esq. (SBN 179521)
Catherine L. Coughlin, Esq. (SBN 295812)
Sara K. Richards, Esq. (SBN 317603)
SCHWERDTFEGER LAW GROUP
501 West Broadway, Suite 2040
San Diego, CA 92101
Telephone: (619) 595-3403
Facsimile: (619) 595-3404

Attorneys for Defendant and Cross-Claimant CTE CAL, INC.

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, For the Use and Benefit of: <br><br> MCCULLOUGH PLUMBING, INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> HALBERT CONSTRUCTION COMPANY, INC., a California corporation; WESTERN SURETY COMPANY, a South Dakota corporation; and DOES 1-100, inclusive, <br><br> Defendants. <br><br> AND RELATED CROSS ACTIONS | Case No. 17CV0137-BTM-JLB <br><br> **DECLARATION OF PETER ALBERS IN OPPOSITION TO HALBERT CONSTRUCTION COMPANY'S MOTION TO EXCLUDE EXPERT OPINIONS OF PETE ALBERS** <br><br> Assigned to: <br> Hon. Cathy Ann Bencivengo, Ctrm. 4C <br> Hon. William V. Gallo, 2nd Floor <br><br> Complaint Filed: April 20, 2017 <br> Trial Date: July 8, 2019 |

I, Peter Albers, declare as follows:

1. I am a construction professional formerly and separately employed by both CTE CAL, Inc. ("CTE") and Halbert Construction Company, Inc. ("Halbert") during the construction of the dining facility ("DFAC") and administration building ("ADMIN" and collectively with construction of the DFAC, the "Project") on the United States Army Garrison Presidio of Monterey. I have personal knowledge of the facts and conclusions stated herein so that if called as a witness, I could, and would, testify competently thereto.

2. I have over thirty-five years of experience in the private, commercial and federal military construction industry. From 1993 through 2001, I owned and operated my own construction contracting company, Albers Construction, in Monterey, California under B-1 (general contracting) and C-20 (mechanical/HVAC) licenses issued by the California Contractors State License Board ("CSLB").

3. In 2011, I was certified in construction quality control ("QC") and site safety by the United States Army Corps of Engineers ("USACE") via coursework and an attendant examination. I was re-certified in 2016. Over the last decade, I have worked on dozens of federal military construction projects with both the USACE and the Naval Facilities Engineering Command ("NAVFAC") in a superintendent, QC manager, and/or site safety officer capacity.

4. My USACE training stressed the critical importance in federal military construction on quality control management. Moreover, experience has taught me that paramount in the quality control arena is the proper execution of an approved quality control plan designed to ensure proper construction sequencing and coordination amongst the prime contractor, the various trades, and the Government through the implementation of structured and phased meetings and communications. Military construction projects in particular can be complex and very large scale, such that the failure to coordinate and communicate can cause

problems ranging from low morale on site to faulty construction sequencing and deviation from plans and specifications.

5. I am registered with a construction broker for placement on large scale commercial and military construction projects. The broker specializes in matching me with contractors in need of qualified construction quality control ("CQC") managers, site safety and health officers ("SSHOs"), construction superintendents, and other specialized construction workmen. The broker has placed me with numerous federal contractors on construction projects throughout the country in need of superintendent, quality control, and site safety personnel at various stages of construction, including several projects deemed problematic due to lack of adequate quality control. In those latter scenarios, I am typically assigned late in the construction progress to assist in getting the project "back on track" through re-introduction and implementation of stringent quality control measures and open lines of communication amongst the contractor, the Government, and the various trades.

6. In March of 2017, I was placed by my broker, and approved by the USACE, to work for CTE as an inspector on the Project. I was qualified for such position by virtue of my experience and training, particularly in the area of quality control, since third party inspectors were designated by the Project specifications as a critical aspect of the quality control plan. In addition, my prior experience working on problematic construction projects made me a well-suited candidate for the inspector position with CTE.

7. On March 21, 2017, I started working for CTE on the Project. I had already been informed by CTE personnel that the Project was over budget and behind schedule, and that extensive plumbing remediation was underway in the DFAC. As a member of the quality control team, it was important that I determined at the outset of my time on the Project, to the extent possible, the reason or reasons for delay, budgetary overruns and remedial work on new

3

DECLARATION OF PETER ALBERS IN OPPOSITION TO HALBERT CONSTRUCTION COMPANY'S MOTION TO EXCLUDE EXPERT OPINIONS OF PETE ALBERS

construction (which is atypical). In other words, any attempt to correct the problems with the Project required an analysis and understanding of what had already gone wrong.

8. Accordingly, I spent some time at the outset of my work on the Project getting acquainted with the subcontractors and with various members of Halbert's team. I asked questions about the status of the work, in particular the plumbing remediation investigation in the DFAC, which was a major undertaking at the time I came on the Project. I was particularly interested in learning what had caused the damage to the plumbing, since I was informed upon inquiry that the DFAC plumbing had already been repaired once after being damaged during installation of the structural steel joisting for the roof on the DFAC. As an inspector under the quality control plan, part of my responsibility was to investigate the scope of the problem, determine the cause of the problem, and devise a plan to rectify the problem that would not be repeated in the future. This was especially so in light of the fact that the DFAC plumbing was undergoing remediation for the second time; two rounds of repairs is indicative of either incomplete repair the first time or a repeated mistake after a total remediation.

9. The 2017 plumbing remediation included, without limitation: (i) extensive saw cutting of concrete around the floor sinks in the DFAC to change their elevation and location to ensure proper functioning with the restaurant equipment to be located along the radial walls of the DFAC; and (ii) the repair of plumbing lines showing signs of distress and separation after placement of the structural steel joisting for the DFAC roof. I determined that in order to adequately ensure the proper integration of various construction trade improvements involved with the radial walls, including plumbing, electrical and restaurant equipment installation, the various trades would need to understand the connectivity of the location of the radial wall as it related to the plumbing remediation, which was

impossible without proper sequencing and coordination among trades facilitated by proper management through quality control measures.

10. My assessment at the time, informed in part by the general consensus among various subcontractors, was that as a result of lacking coordination (quality control), a decision had been made and carried out to install the rough plumbing and electrical before – instead of after – setting the structural steel. Such faulty sequencing, in turn, caused damage to the plumbing, and such plumbing damage was either not fully rectified during the first remediation or was damaged a second time in the same manner. In other words, a failure in execution of quality control measures seemed to be a cause of the plumbing problems on the Project. My assessment informed the going forward plumbing remediation, which ultimately passed inspection.

11. In October of 2017, CTE left the Project. Halbert's management team requested that I stay on the Project as a Halbert employee to continue inspection work, and I was ultimately elevated to assistant superintendent of quality control for Halbert. In this capacity, I worked closely with other Halbert employees, including Daniel Crnkovic and John Brannon, as well as various subcontractors and Government employees.

12. I worked on the Project as a Halbert assistant superintendent until completion of close out and punch list work on the Project in late May of 2018. During that time period, my focus was primarily working with the various subcontractors and Halbert personnel to identify and remediate unresolved issues throughout the Project site and carry out the remaining work on the Project to completion.

13. In addition, since the Project was so far behind schedule, the USACE personnel initially working on site had moved on to new assignments. Accordingly, I was required to interface directly with USACE representatives to report on identified problems with work, the scope of such problems, and the plan

for remediation and prevention of recurrence in the future. I reported to the USACE representatives my assessment of the reason for and scope of a given problem. Based on such assessment, I then formulated and reported to the USACE a remediation plan that would both rectify the problem and prevent its recurrence in the future.

14. Throughout my time on the Project, I observed an unfortunate level of animus among Halbert personnel and the subcontractors, which only added to the already existing problems on the Project. I was already familiar with some of the more difficult personalities on the Project such that I was confident that I could navigate around tensions to get the job done. For example, I had worked with Halbert's superintendent, Daniel Crnkovic on multiple prior occasions, and I knew he was difficult to work with in a cooperative manner. I had also had occasion to work previously with Bob Logan, a Halbert employee up from San Diego assigned to quality control on closing out the Project. Bob and I worked quite well together and I felt that on balance, we could work together to navigate the tension and bring the Project to completion.

15. I agreed to and did finish out the Project as an assistant superintendent for Halbert because, quite simply, the Project was in trouble and I knew that I could help based on the experience and training I have been fortunate to acquire over the last three decades.

16. The various assessments, impressions, opinions, and conclusions discussed herein were made during the course of my time in the Project and in furtherance of my inspection and quality control responsibilities on the Project. I have not formed any opinions for the purpose of the trial of this dispute.

///
///
///
///

1  ///
2  ///
3  ///
4  ///
5      I declare under the penalty of perjury under the laws of the State of
6  California that the foregoing is true and correct.
7      Executed this 16th day of May, 2019 in the City of Monterey, State of
8  California.

                                                  Peter Albers

7

DECLARATION OF PETER ALBERS IN OPPOSITION TO HALBERT CONSTRUCTION COMPANY'S MOTION TO EXCLUDE EXPERT OPINIONS OF PETE ALBERS