1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA, for
     the Use and Benefits of
5    McCULLOUGH PLUMBING, INC., a
     California corporation,
6
                    Plaintiff,
7
           vs.                          CASE NO. 3:17-cv-
8                                       00803-CAB-WVY
     HALBERT CONSTRUCTION COMPANY,
9    INC., a California
     corporation; WESTERN SURETY
10   COMPANY, a South Dakota
     corporation; and DOES 1-100,
11   inclusive,

12                  Defendants.

13   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

14   AND RELATED CROSS-ACTION

15   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

16

17                  DEPOSITION OF

18                   PETE ALBERS

19

20                March 23, 2019

                    10:08 a.m.

21

22          101 West Broadway, Suite 810
               San Diego, California

23

24      Renee Kelch, RPR, CLR, CSR No. 5063

25



```
 1                      APPEARANCES OF COUNSEL

 2        For the Plaintiff and Counter-Defendant McCullough
          Plumbing, Inc.:
 3
               SCHWARTZ SEMERDJIAN CAULEY & MOOT, LLP
 4             KEVIN T. CAULEY, ESQ.
               Suite 810
 5             101 West Broadway
               San Diego, California 92101
 6             619.236.8821
               619.236.8827 Fax
 7             kevin@sscmlegal.com

 8
          For Defendant and Counterclaimant and
 9        Counter-Defendant Halbert Construction Company, Inc.:

10             BURNHAM BROWN
               CHARLES ALFONZO, ESQ.
11             14th Floor
               1901 Harrison Street
12             Oakland, California 94606
               510.444.6800
13             510.444.6800 Fax
               calfonzo@burnhambrown.com
14
               FINCH, THORNTON & BAIRD, LLP
15             PATRICK W. McMANUS, ESQ.
               Suite 700
16             4747 Executive Drive
               San Diego, California 92121
17             858.737.3100
               858.737.3101 Fax
18             pmcmanus@ftblaw.com

19
          For the Cross-Defendant CTE Cal, Inc.:
20
               SCHWERDTFEGER LAW GROUP
21             SEAN SCHWERDTFEGER, ESQ.
               Suite 2040
22             501 West Broadway
               San Diego, California 92101
23             619.595.3403
               619.595.3404 Fax
24             sds@sdsattorneys.com

25
```



```
1                    INDEX TO EXAMINATION

2    WITNESS: PETE ALBERS

3

4    EXAMINATION                                    PAGE

5    BY MR. McMANUS                                   5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



PETE ALBERS                                          March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                 4

```
 1                    INDEX TO EXHIBITS

 2   EXHIBITS              DESCRIPTION            MARKED

 3   Exhibit 342    CTE Cal, Inc.'s Report of       15
                    Unretained Expert Pete Albers
 4
     Exhibit 343    Inspection reports, test reports, 86
 5                  and other documents

 6   Exhibit 344    Plan Sheet P-101, HAL005474    116

 7   Exhibit 345    Plan Sheet P-101, HAL005472    155

 8   Exhibit 346    Plan Sheet P-103, HAL005475    164

 9   Exhibit 347    Plumbing specifications,       168
                    HAL025133 through 25235
10

11   (Original exhibits attached to original

12   transcript)

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1        DEPOSITION OF PETE ALBERS

2             MARCH 23, 2019

3

4             PETE ALBERS,

5    having been first duly sworn, testifies as follows:

6

7             EXAMINATION

8  BY MR. McMANUS:

9    Q.  Good morning, Mr. Albers.

10   A.  Good morning.

11   Q.  We met off the record, but my name is Pat

12 McManus.  I represent Halbert Construction Company and

13 Western Surety Company in this action.  I'll be taking

14 your deposition today.

15        So just a few preliminary matters before we get

16 started.  A lot of times today I'll be referring to the

17 construction project involving the construction of an

18 administration building and a dining facility at the

19 Presidio of Monterey in Monterey, California.  Just to

20 dispense with the formality, I'll probably refer to it

21 as "the project" many times.  So if you hear me say "the

22 project," will you know that I'm referring to the

23 Presidio of Monterey project?

24   A.  Uh-huh.

25   Q.  Great.  So have you ever had deposition taken?



1      A.   I've had one deposition.

2      Q.   One deposition?  Was that in a state court or a

3  federal court action?

4      A.   It was the school district, so it would be

5  state.

6      Q.   Okay.  So you generally know the procedure.

7  But I'm just going to go over a few of the little ground

8  rules.  First, probably the most important one is that

9  everything you're saying here today is under oath as

10 you're testifying under penalty of perjury, as if you

11 were in a court of law.

12         The court reporter is taking down all my

13 questions and all of your answers.  Everything's going

14 to be transcribed into a little booklet that will be

15 provided to you after the deposition.  And your

16 signature under penalty of perjury.  You'll have the

17 opportunity to review that booklet and make any changes

18 to your testimony.

19         Now, I will tell you that if you change

20 something minor, like the spelling of something, then

21 that's -- there's no problem there.  But if you make a

22 material change, for example, if you tell me that you

23 were driving and you went through a green light, but

24 later you changed and said that it was a red light,

25 that's something that we call a material change.  And if

1   you do make that type of change, later an attorney such

2   as myself or anybody else would be able to use that at

3   trial to comment upon your credibility.  Do you

4   understand all of that?

5       A.  Uh-huh.

6       Q.  Today you can take breaks; just let me know

7   when you want to take a break.  I'm more than happy to

8   stop.  And we can get back on the record whenever you're

9   ready.  A lot of times today we're going to be talking

10  about events that occurred a couple years ago.  So it

11  might not be the freshest in your recollection when

12  you're trying to remember what I'm asking you.  So I

13  don't want you to guess.  But I am entitled to your best

14  testimony.  So to the extent you can give me your best

15  estimate, I would like you to give me an estimate and

16  not a guess.

17          And do you know the difference between a guess

18  and an estimate?

19      A.  Uh-huh.

20      Q.  Okay.  If you ever don't understand any of my

21  questions, please just let me know.  I'm not perfect.  I

22  think most of my questions are pretty good.  But

23  everyone makes mistakes.  So if you don't understand the

24  question, please just let me know, and I'm happy to

25  rephrase it.  Don't answer a question if you don't



1  understand it.  Because we don't want to you do that.

2        For the benefit of our court reporter, I'll try

3  not to talk over you.  Please don't talk over me.  For

4  example, if I'm asking you a question that you generally

5  know the answer to, please just let me finish.  Because

6  it will be very confusing on the record and difficult

7  for her to take down my questions.  And I don't want her

8  to get mad at me, so.

9        A.  Me neither.

10       Q.  And to that same vein, please give me verbal

11  answers, "yes" or "no."  No head nods or shaking your

12  head.  Just for the record.

13       So do you understand all that?

14       A.  Uh-huh.

15       Q.  Is there any reason --

16       A.  I should -- yes.  No, I just nodded my head.

17       Q.  Is there any reason we can't proceed today?

18       A.  No.

19       Q.  And are you on any medication that inhibits

20  your ability to recall information?

21       A.  No.

22       Q.  Okay.  Great.  So I understand you've been

23  designated as unretained expert witness in this case; is

24  that correct?

25       A.  Yes.



1    Q.  Have you ever --

2    A.  Can I ask a question?

3        What is your function here, if may ask?

4        MR. CAULEY:  I'm in charge.  I'm like the

5    judge.  I rule on -- no.  I am the lawyer for McCullough

6    Plumbing.

7        THE WITNESS:  You're the lawyer for McCullough

8    Plumbing.

9        MR. SCHWERDTFEGER:  And this is another lawyer.

10   This is Chuck.  He is a lawyer for Halbert appointed by

11   the insurance company.

12       THE WITNESS:  Okay.

13       MR. ALFONZO:  Nice to meet you.

14   BY MR. McMANUS:

15   Q.  We represent Halbert.  He represents

16   McCullough.  And you understand Sean represents CTE.

17   A.  Okay.

18   Q.  Prior to this case have you ever provided

19   services as an unretained expert witness before?

20   A.  No.

21   Q.  Have you ever provided services as a retained

22   expert witness before?

23   A.  No.

24   Q.  Can you please tell me, what is your highest

25   level of education?



1     A.  Some college.

2     Q.  What's that?

3     A.  Some college.

4     Q.  How do you spell that?  Oh, some, s-o-m-e?

5     A.  Some, s-o-m-e.

6     Q.  And did you obtain a degree?

7     A.  No.

8     Q.  What college did you attend?

9     A.  San Jose City College, De Anza College,

10   Monterey Peninsula College, Hartnell College.  Some

11   classes at Texas A & M.

12    Q.  Did you specialize in any type of coursework?

13    A.  Some was code and trade related.  Others was

14   just general.

15    Q.  Any specific code?  Building codes or --

16    A.  Mechanical codes.

17    Q.  Mechanical, okay.  Great.

18    A.  Some fabrication, you know, like vocational,

19   welding, sheet metal, that sort.

20    Q.  Approximately what time frame were you

21   attending these institutions?

22    A.  From the '70s to the -- I don't know when my

23   last classes were.  '90s, I guess.

24    Q.  So you would go to university or college for a

25   bit, and then take a break, and then go back again?



1   Generally like that?

2       A.   Yeah.   Night classes.

3       Q.   Understood.   And do you hold any licenses?

4       A.   Not anymore.

5       Q.   You --

6       A.   I did.

7       Q.   What was your previous license?

8       A.   Two licenses.   One was a B license, State of

9   California.   A B-1 to be specific.   And a C-20.   So

10  that's a mechanical/HVAC license and a general license.

11      Q.   How long has it been since you were licensed?

12      A.   Guesstimate, 20 years or so.   18, 20 years,

13  something like that.

14      Q.   Have you ever taken any coursework or other

15  training relating to special inspection?

16      A.   No.

17      Q.   Have you ever taken any courses or training

18  provided by the United States Army Corps of Engineers?

19      A.   I've taken courses for Army Corps work, if that

20  answers the question.   In other words, CQC, and

21  construction coordination for Army Corps, NAVFAC work --

22      Q.   Can you --

23      A.   -- as a QC.

24      Q.   So generally can you tell me a little bit about

25  what that training for the CQC training entails?



1    A.  Yes.  CQC is construction -- basically

2    construction manager of a project, whereby they're

3    involved in everywhere from design-build aspects.

4    That's what the coursework says.  It may not be true in

5    the real world.  But they're involved in design,

6    specifications, submittals, submittal review.

7    Q.  Are you familiar -- I'm sorry?

8    A.  -- and -- go ahead.

9         MR. SCHWERDTFEGER:  Anytime, if he asks you a

10   question but you're not finished, just let him know.

11        THE WITNESS:  Okay.

12        MR. SCHWERDTFEGER:  Take as much time as you

13   need to to complete your answer.

14        THE WITNESS:  One of the other aspects of the

15   CQC is the management of the project.

16        And basically the Army Corps, NAVFAC, military

17   projects, use three phases of construction, which would

18   be preparatory, initial, and follow-up.

19        In those meetings is probably the crux of their

20   coordination of a project, where they'll take the

21   components that I mentioned before, which would be

22   submittals, schedule, submittals, plans, specifications

23   sheet numbers, compile those and bring the appropriate

24   people together to prepare for a new function.  What is

25   defined -- defined feature work.

1    Q.  Okay.

2    A.  So there's a crux of what a CQC does.

3    Q.  Great.

4    A.  And at that point they bring everybody

5    together, coordinate.  Usually they'll bring in a

6    superintendent and all the necessary people surrounding

7    that trade to plan -- a pre-plan, prepare a pre-plan, a

8    function of work.

9        I think that's probably the biggest -- that's

10   what I took away from those classes.  The class itself

11   covers a huge range of things that really don't always

12   apply.  But the core and what should happen on every

13   project is those three things:  Prep, initial, and

14   follow-up.  Follow -- I think it's called follow-up.

15       And there's a lot more to it.  It's a two- or

16   three-day course.  And it's hundreds of questions.  And

17   it's pretty thorough.  That's the core of the training.

18   Q.  Have you received that training -- is it on a

19   project basis?  For example, that you receive it per

20   project.  Or you just need it to be certified once --

21   A.  It's certified.  Every five years.  Every five

22   years you need to be recertified.  And last December, or

23   the December before, I was recertified for my second

24   time.

25       Before I started on a project, I was named



1  probably as -- I didn't have my cert unless it was

2  required.  Even if you're an associate or assistant or

3  secondary CQC you have to have -- have to go through the

4  course.

5      Q.  When were you first certified under this CQC

6  training?

7      A.  Approximately -- I don't have the dates.  But I

8  went through one five-year span, and then I was

9  recertified about two years ago.  And it was in

10 December, so.  I don't know if it was -- December before

11 last.  So it should be seven years.

12     Q.  Okay.

13     A.  Seven years ago, I think, was the first time

14 I -- we have certs, and I can provide them if I needed

15 to, to be definitive.

16     Q.  Were you recertified in 2017, during that

17 calendar year?

18     A.  It's 2016, I think it was.  But like I said, I

19 don't know which December it was.  But if it's

20 important, we could find it.

21     Q.  I just wonder if there was any gaps in your

22 certification, for example --

23     A.  No gaps.

24     Q.  Okay.

25     A.  Well, there was a gap -- we went to certify for



1    a project, I found out that I needed to be recertified,

2    and I recertified immediate.

3        Q.   Okay.

4        A.   In order to do another project, I had to be

5    recertified.

6        Q.   So since you've been certified, every project

7    that you've worked on in this capacity as QC, you've

8    been certified under the Army Corps?

9        A.   Yes, sir.

10           MR. McMANUS:   Okay.   Great.   Thank you.

11           All right.   I'm going to mark as Exhibit 342.

12           (Exhibit 342 marked)

13   BY MR. McMANUS:

14       Q.   This is CTE's report of its unretained expert

15   Pete Albers.

16           Take as much time as you need to look through

17   this document, familiarize yourself with it, and just

18   let me know when you're ready.

19           (The witness conferred with counsel)

20           THE WITNESS:   I don't think that I was ever

21   officially acknowledged --

22           MR. McMANUS:   Did you get that?

23           (Record read)

24           THE WITNESS:   See --

25           MR. SCHWERDTFEGER:   Well, he's going to ask you



```
 1   a question first.  There's no question pending.  Wait

 2   for his question.  Provide an answer.

 3            THE WITNESS:  Let me finish, then.

 4            Okay.

 5   BY MR. McMANUS:

 6      Q.  Ready?

 7      A.  Yes.

 8      Q.  Before we get started on that, I believe you

 9   made a comment a few minutes ago.  Was it never -- I

10   heard, "I was never designated as CQC manager."  Is that

11   correct?

12      A.  Yes.

13      Q.  I just wanted to clear that up.

14            Are you familiar with this document?

15      A.  This one?

16      Q.  Yes, Exhibit 342.

17            MR. SCHWERDTFEGER:  Objection.  Vague.

18            THE WITNESS:  I just read it.

19            MR. SCHWERDTFEGER:  Yes.  Vague and ambiguous.

20            Have you read this document before it being

21   handed to you?

22            THE WITNESS:  No.

23   BY MR. McMANUS:

24      Q.  Do you know what this document is?

25            MR. SCHWERDTFEGER:  Calls for a legal
```



PETE ALBERS                                                  March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                                    17

 1  conclusion.

 2  BY MR. McMANUS:

 3      Q.  He'll object a few times today.  But unless he

 4  instructs you not to answer, I'm entitled to your

 5  answer.

 6          It doesn't have to be specialized.  Just if

 7  have you any idea what this document is you can tell me.

 8          THE WITNESS:  It --

 9          MR. SCHWERDTFEGER:  Same objection.

10          THE WITNESS:  Okay.

11          MR. SCHWERDTFEGER:  So what I'll do, I'm going

12  to make objections for the record.  So as part of the

13  process, he'll ask you questions.  The question that he

14  asks, if I believe it's objectionable, then I'll make an

15  objection.  Then you can go ahead and answer his

16  question.  The only time you would not answer the

17  question is if I were to specifically instruct you not

18  to answer the question.

19          THE WITNESS:  Okay.

20          MR. SCHWERDTFEGER:  The reason I make the

21  objection, it goes to a specific legal point and that's

22  something that would be determined at the time of trial.

23  So for purposes of the deposition, don't worry about my

24  rational for making the objection.

25          THE WITNESS:  Okay.



```
 1          MR. SCHWERDTFEGER:  Just allow it to occur.

 2    Following which, if you can answer the question, answer

 3    the question.  If you can't answer the question because

 4    you forgot it based on my objection, then just ask the

 5    lawyer to repeat the question, and he will do that for

 6    you.

 7          THE WITNESS:  Okay.

 8          It's an overview of my capacity as a witness.

 9    What is it called?  A percipient.  That's what I see

10    this as.

11    BY MR. McMANUS:

12       Q.  Great.  Did you participate in the preparation

13    of this report?

14       A.  No.

15       Q.  After you've reviewed this report, does this

16    report contain all of the opinions that you intend to

17    offer at trial?

18          MR. SCHWERDTFEGER:  Objection.  Improper

19    question.  The report that's provided is counsel's

20    assessment of what is anticipated as testimony.  It's

21    not an expert report per the rules.

22          MR. McMANUS:  I'm asking him if there's

23    anything he expects to testify about that's not in this

24    report.

25          MR. SCHWERDTFEGER:  Misstates --
```



 1              THE WITNESS:  I don't know what --

 2              MR. SCHWERDTFEGER:  -- the document.

 3              THE WITNESS:  I don't know what I'm --

 4              MR. SCHWERDTFEGER:  He's a percipient.

 5              MR. McMANUS:  Right.

 6              MR. SCHWERDTFEGER:  Right.  As a percipient,

 7   you would ask him questions as a percipient.  He can

 8   testify in an expert capacity only related to his

 9   percipient experience.

10              But go ahead and ask your question.

11   BY MR. McMANUS:

12       Q.  Same question.  Do you have any opinions that

13   relate to your percipient knowledge that you expect to

14   offer at trial that you do not see in this report?

15       A.  Based on the project, I could have.  Depending

16   upon how it goes and what we talk about, I can certainly

17   have different opinions -- or additional opinions.

18       Q.  Do you have any --

19       A.  Unless you're -- I'm confined --

20              MR. SCHWERDTFEGER:  You're not --

21              THE WITNESS:  -- to this.  Am I confined

22   to this?

23              MR. SCHWERDTFEGER:  You're not.  And that's

24   what's --

25              THE WITNESS:  Okay.



 1          MR. SCHWERDTFEGER:  -- creating the confusion.

 2   You're a percipient.  You're entitled to be asked any

 3   percipient question, that you would answer.  And then

 4   for purposes of the deposition, you're entitled to use

 5   your experience in the construction trades to answer

 6   questions that would be put to you by the lawyer.

 7          MR. McMANUS:  All right, Sean, you're coaching

 8   a little bit.

 9          MR. SCHWERDTFEGER:  That's not coaching.  It's

10   just that I consider this an inappropriate tactic.  But

11   we'll take it up later.  Proceed.

12          MR. McMANUS:  Right.

13   BY MR. McMANUS:

14      Q.  So just to make it clear, that at the time of

15   trial there may be some opinions not contained in this

16   report that you may intend to offer.  And that would be

17   based upon the specific facts that we're discussing?

18      A.  Yes.

19      Q.  Okay.  Have you reviewed any documents or

20   deposition transcripts related to this case before you

21   came here today?

22      A.  No.

23      Q.  Have you discussed your deposition with anybody

24   before -- to prepare before you came today?

25      A.  We've had conversations yesterday.



1        Q.   And generally can you tell me about what those

2    conversations entailed?

3            MR. SCHWERDTFEGER:   No.   Objection.

4    Attorney-client privilege.   I'm instructing him not to

5    answer that.

6    BY MR. McMANUS:

7        Q.   Does Mr. Schwerdtfeger represent you?

8            MR. SCHWERDTFEGER:   Yes.

9    BY MR. McMANUS:

10       Q.   Do you have a written fee agreement with

11   Mr. Schwerdtfeger?

12       A.   No.

13           MR. SCHWERDTFEGER:   He's a former employee of

14   CTE.   I'm representing him.   If you have a problem with

15   that, we can take it up with the magistrate.

16           MR. McMANUS:   Okay.   I'll make a record, on the

17   record, that we will come back and revisit this with the

18   magistrate later.

19           MR. SCHWERDTFEGER:   Fair enough.   Proceed.

20   BY MR. McMANUS:

21       Q.   All right.   I'd like to turn your direction to

22   page 2 of the report.

23           If we go down to the second paragraph, it's a

24   list of some of your relevant experience.   I see here

25   "Halligan Hall - Naval Post Graduate School; China Lake

1    Naval Weapons Station; Dudley Knox - Naval Post Graduate

2    School; Renovation of Pacific at Monterey, California;

3    Modernization of Steinbeck School at Salinas,

4    California; Del Monte Shopping Center Projects at

5    Monterey, California; a Pool and Locker Room Project at

6    California State University in Monterey Bay."

7         Can you tell me out of those projects I just

8    listed which of them were federal military construction

9    projects?

10        A.  Sure.  Halligan Hall is NAVFAC project.

11        MR. ALFONZO:  What type of project?

12        THE WITNESS:  NAVFAC, Navy.  NAVFAC, Navy

13   Facilities administrative.

14        MR. ALFONZO:  Thank you.  I didn't hear the

15   acronym.

16        THE WITNESS:  Sorry.

17        China Lake is a NAVFAC.  Dudley Hall -- Dudley

18   Knox is Navy.

19        Renovation of Pacific Hotel is a private

20   project.

21        Steinbeck School was a state project.

22        Del Monte Shopping Center was a private

23   project.

24        Pool and Locker Room is a state -- was a state

25   project.



PETE ALBERS                                          March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                          23

1  BY MR. McMANUS:

2      Q.  Thanks.

3      A.  And that's just a partial -- very, very small

4  list of all the work that I've done in the last few

5  years.

6          The list is way beyond that.  But this probably

7  gives some federal -- inkling of the federal type work

8  that I've done.

9      Q.  So other than Halligan Hall, China Lake, and

10 Dudley Knox, can you tell me the other federal military

11 construction projects that you've worked on during your

12 career?

13     A.  To be complete, I'd probably have to look at

14 list.  There's been HVAC projects.  Currently working on

15 a Navy project.

16     Q.  What's the current Navy project you're working

17 on?

18     A.  Navy Lodge.

19     Q.  Where is that located?

20     A.  Monterey.

21     Q.  Are there any federal military construction

22 projects you can tell me about today without having to

23 look at a document?

24     A.  HVAC on 32nd Street, San Diego.

25          Reroofing of project at DLI, Defense Language



 1  Institute, Monterey.

 2        Over here on Balboa Street, San Diego, this

 3  year I was working on a reroof and HVAC and renovation.

 4        Kansas City, Missouri was an Army Corps

 5  project.  I went back for a bit.  That was like an

 6  emergency center facility, where they had ambulance,

 7  police, fire, 911 call center.  And that was in Kansas

 8  City.  It was a project that I went in after it was --

 9  it wasn't quite finished, so.

10        And others.  I don't know all of them.

11     Q.  Okay.

12     A.  I mean, it's -- it's a partial list.

13     Q.  Great.  So I'm going to turn to each project

14  that you've told me about, kind of just get a little

15  information on it.

16        So I'll start with Halligan Hall, the Naval

17  post graduate school.  Can you tell me what was the

18  dollar value of that project?

19     A.  Not specifically.  But probably 7 to 10.  Just

20  a guess.  Sorry.  7 to 10 million.

21     Q.  Million?

22     A.  Yeah.

23     Q.  And when I say project price, I mean the total

24  project price.  Not just for one subcontractor to a

25  general contractor?



1      A.   No.   I understand.   Total dollar.

2      Q.   For China Lake Naval Weapons Station, can you

3   tell me dollar value of that project?

4      A.   Only guesstimates.   I'm not privy --

5      Q.   Estimates are fine.

6          MR. SCHWERDTFEGER:   This would be area -- what

7   he's asking you is -- in order to give an estimate, you

8   would have had to have known what the total project

9   value is.   In other words, if you have some basic

10  understanding as to what the total value project was,

11  please answer it.   If you just have no idea whatsoever,

12  then you'd be guessing.   Let him know that.   But

13  wherever you can give an estimate, please do.

14          THE WITNESS:   Guess, 500,000.

15  BY MR. McMANUS:

16     Q.   Estimate; right?

17     A.   Oh, there was another one, another project too,

18  I think.   I was a renovation of some offices in that

19  same China Lake.

20          Oh, another one.   Renovation of a facility on

21  China Lake that was -- it was also going to be a

22  ambulance center of sorts.

23     Q.   Okay.

24     A.   So there's a few of them --

25     Q.   But those --



1    A.  -- that come to mind as I --

2    Q.  Oh, yes.

3    A.  -- review here.

4    Q.  Thank you.  I appreciate that.  While we're

5    speaking, if anything comes to mind, please just let me

6    know.  I appreciate that.

7         So those two that you just mentioned, the

8    office renovation and the renovation of the other

9    facility, are those separate from the China Lake Naval

10   Weapons Station?

11   A.  They're on that base, but they are separate

12   projects.

13   Q.  Understood.  So then I just wanted to make it

14   clear for the record.  For the China Lake Naval Weapons

15   Station project, you estimated that project's value was

16   $500,000?

17   A.  Uh-huh.

18   Q.  Okay.  Great.  Thank you.  For the Dudley

19   Knox - Naval Post Graduate School, can you please tell

20   me the estimate of the dollar value of that project?

21   A.  Another guess.  Because as superintendent of

22   safety or QC I'm not always privy to those, to the

23   contract value, I'm not.  It's above my pay grade, as

24   they say.

25        That was probably a $2 million project.  HVAC



1  renovation.

2      Q.  Great.

3      A.  Like I said, that's a guess.

4      Q.  So how about the Naval Lodge at Monterey, could

5  you tell me the dollar value of that project?

6      A.  Guess, 6 million.

7      Q.  What about the HVAC on 32nd Street, here in

8  San Diego, the dollar value?

9      A.  Probably around 100,000, guess.

10     Q.  The DLI at Monterey, the same question for the

11  dollar value.  It's not in here.  One of the ones you

12  mentioned to me previously.

13     A.  You know, it was rerooffing of a bunch of

14  barracks.  I don't know what the value was.

15     Q.  Okay.

16     A.  Just another guess.  Probably multi million

17  dollar project.

18     Q.  And for the Balboa, the rerooffing and HVAC

19  renovation, do you know?

20     A.  Another guess.  That could be under a million.

21     Q.  Okay.  Can you tell me dollar value of the

22  Kansas City, Missouri, Army Corps project?

23     A.  No.  It was a major facility.  Its value, I

24  don't know.

25     Q.  That's fine, if you don't know.



1    A.  Multi million.  I mean, probably $20 million
2  project.
3    Q.  Okay.  What about the office renovation at
4  China Lake?
5    A.  In the 100-, $150,000 range.  Guess.
6    Q.  And then the other renovation of the facility
7  that you mentioned at China Lake?
8    A.  That was probably around a million dollars.
9    Q.  Okay.  Thank you for that.
10        In your experience working on federal military
11  construction projects, have you ever worked on a project
12  valued between 25 million and 35 million dollars?
13    A.  The facility at Kansas City, potentially.  I
14  think I said it was 20 million.
15    Q.  Okay.  So for Halligan Hall, can you tell me
16  time frame you were working on that project?
17    A.  Only a guess.  No.  I'd have to go back in my
18  records.
19    Q.  Was it more than 10 years ago?
20    A.  No.  It was under 10.
21    Q.  Under 10?
22    A.  Probably over 5, under 10 --
23    Q.  Okay.
24    A.  -- if we can speak in that.
25    Q.  That's fine.  In the past five to 10 years?



1      A.  Oh, yeah.

2      Q.  What about the China Lake Naval Weapons

3   Station?

4      A.  Within five years.

5      Q.  Dudley Knox - Post Graduate School?

6      A.  Within five.

7      Q.  Okay.  The Navy Lodge at Monterey?

8      A.  Current.

9      Q.  That's right, you said you were working there

10   right now.  Thanks.

11          HVAC for 32nd Street?  San Diego?

12      A.  Yes, within two year.

13      Q.  Within two years?

14      A.  Yes.

15      Q.  DLI at Monterey?

16      A.  That was all within five.

17      Q.  The Balboa reroof and HVAC renovation?

18      A.  Just last year.  Previous project, before I

19   came on to this Navy Lodge.  I started there.  They

20   pulled me off to put me on this project.  So back to

21   back project, so.

22      Q.  Okay.

23      A.  Just weeks ago, or couple months.

24      Q.  What about the Kansas City, Missouri project?

25      A.  That was under five years.



1     Q.   The office renovation at China Lake?

2     A.   Under five.

3     Q.   And then the other -- the renovation of the

4  facility at China Lake you mentioned?

5     A.   That was all about the same period.

6     Q.   Okay.  Thank you.

7          For Halligan Hall, did you work as a special

8  inspector on that project?

9     A.   No.

10     Q.   Did you work as a CQC manager?

11     A.   No.

12     Q.   In what capacity did you work on the Halligan

13  Hall project?

14     A.   I started there as a night shift safety

15  officer, SSHO 4.

16     Q.   Did your position change while you were there?

17     A.   Yes.  Shortly after that I became a

18  superintendent.

19     Q.   So you were working for the general contractor?

20     A.   Yes.

21     Q.   Who was the general contractor on that job?

22     A.   Souza.

23     Q.   S-o-u-z-a?

24     A.   S-o-u-z-a.

25     Q.   Okay.  How about the China Lake Naval Weapons



1  Station; in what capacity were you working on that

2  project?

3      A.  Superintendent, safety officer.  A small

4  project, working as a triple hatter QC.

5      Q.  And you were working for the general contractor

6  on that job also?

7      A.  Yes.

8      Q.  Who was the general contractor?

9      A.  Same.

10     Q.  Souza?

11     A.  Yes.

12     Q.  How about Dudley Knox - Post Graduate School?

13     A.  Another Souza project.

14     Q.  And you were the superintendent, safety

15  officer, and the QC manager?

16     A.  Yes.  Well, no.  That one I was a

17  superintendent of safety.

18     Q.  Okay.  The QC was --

19     A.  Another guy.

20     Q.  -- handled by a separate individual?

21     A.  Yes.

22     Q.  Thank you.  So right now on the Navy Lodge at

23  Monterey, in what capacity are you working on that

24  project?

25     A.  Started as a triple hatter, okay?  And they



1  just brought in an alternate -- or they just brought in

2  a primary SSHO and QC.  So I'm the alternate.  So I'm

3  the superintendent and alternate safety QC.

4      Q.  And you're working for the general contractor?

5      A.  Same.

6      Q.  Is it Souza?

7      A.  Yes.

8      Q.  How about the HVAC at 32nd in San Diego; in

9  what capacity were you working on that project?

10     A.  Triple hatter.

11     Q.  So superintendent --

12     A.  Superintendent.

13     Q.  -- QC and safety?

14     A.  Yes.  In the smaller projects, they have

15 capacity to do that.  In the larger projects, they're

16 separate.

17     Q.  Were you working for Souza on that job also?

18     A.  That one's also a Souza job.

19     Q.  Okay.  For the DLI in Monterey, were you a

20 triple hatter on that job?

21     A.  Superintendent, safety.  I don't recall if I

22 was the QC on that one or not.  I think I was.  We had

23 two people on it, so those functions were shared.

24     Q.  And were you working for Souza on that job

25 also?



PETE ALBERS                                                    March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                                  33

1       A.   Uh-huh.

2       Q.   Great.  For the Balboa reroof and HVAC

3   renovation, were you working superintendent, safety, and

4   QC?

5       A.   Yes.

6       Q.   For Souza?

7       A.   Yes.

8       Q.   For Kansas City, Missouri was it the same, the

9   superintendent, safety, and QC?

10      A.   Superintendent.

11      Q.   Just superintendent?

12      A.   Just superintendent.

13      Q.   Because a bigger job?

14      A.   That was not for Souza.  That was for a federal

15  contractor out of Cleveland Ohio.  I can't remember the

16  acronyms for it.  TMI -- no, not TMI.  I can -- I can

17  gather that for you and let you know who the general was

18  on it.

19      Q.   It's okay.  But I'm mainly concerned that

20  you're working for the general contractor.  And I'm

21  guessing because that was a larger job, you said 20

22  million, that's why you were just the superintendent?

23      A.   Yes.

24      Q.   Okay.

25      A.   The project was one that had gone south, and



1  then they brought me in with another guy to go through

2  the project to see -- kind of like to repair all the

3  things that were wrong with it, to help get -- getting

4  it back on track, put it that way.

5      Q.  Great.  For the office renovation at China

6  Lake, were you the triple hatter on that job?

7      A.  Yes.

8      Q.  For Souza?

9      A.  Yes.

10     Q.  And then for the renovation facility at China

11 Lake -- I'm sorry, renovation of the facility at China

12 Lake, were you triple hatter for that job?

13     A.  Uh-huh.

14     Q.  For Souza?

15     A.  Yes.

16     Q.  Okay.  Great.  Thanks.

17         Have you ever served as a special inspector on

18 a federal military construction project?

19     A.  No.

20     Q.  All right.  So now I'm going to turn to the

21 project we're here to talk about today, the Presidio of

22 Monterey.

23     A.  Uh-huh.

24     Q.  Can you tell me, when did you start working for

25 CTE on that project?



 1      A.   March of last year.

 2      Q.   Of 2018?

 3      A.   Yes.

 4      Q.   Do you think, could it be 2017?  I just ask

 5   because the report says March of 2017.

 6      A.   Yeah, okay.  Correct.

 7      Q.   Just want to make sure.

 8      A.   Yes.

 9      Q.   At the time you started working for CTE, were

10   you certified under the Army Corps' CQC plan?

11      A.   Yes.

12      Q.   And how did you come to start working for CTE

13   on this project?

14         MR. SCHWERDTFEGER:  Objection.  Vague and

15   ambiguous.

16         You can answer.

17         THE WITNESS:  Okay.  I worked through a broker.

18   And a broker -- this broker places CQC, SSHO,

19   superintendents, and other workmen.  And that company is

20   the same guy that I've been doing all of this Souza work

21   with.  Okay?  So he's a broker.  Souza's the general.

22         And he said he had a project here at home for

23   me.

24      Q.   Did he put you in contact with somebody working

25   for CTE?



1     A.  I think he arranged -- he arranged the work.

2   And then I was introduced.

3     Q.  Who did you meet with from CTE?

4     A.  Kurt.

5     Q.  Kurt Lamb?

6     A.  Kurt Lamb is who I think I was talking to.

7     Q.  Did you ever have any communications with an

8   individual by the name of Rodney Ballard?

9     A.  Not initially.  I don't -- well, I don't know.

10   I don't think so.  I think -- I remember working with

11   Kurt.

12     Q.  Okay.

13     A.  But I don't know that I ever talked with Rod.

14     Q.  Okay.  During the whole course of the project

15   you never spoke with Rod?

16     A.  No.  I think -- we're talking about the

17   beginning of the project, when I was hired and who I

18   talked to when I was hired.

19     Q.  Okay.

20     A.  So I didn't talk to him then.

21     Q.  Got you.  So --

22     A.  I may have had cursory conversations somewhere

23   along the line.  I don't recall.

24     Q.  Okay.

25     A.  He's a principal.  I might have talked to him.



1  Most of my work was through the local office manager,

2  which was Kurt, and then -- it was Kurt.

3      Q.  But eventually while you were working on the

4  project you had some communications with Mr. Ballard?

5      A.  I must have.  I don't think I had any lengthy

6  conversation.  I don't recall.  Just put that.  I don't

7  recall.

8      Q.  That's fine.  I appreciate that.

9      A.  Yeah.

10     Q.  Did you form any opinions of Mr. Ballard while

11  you were working on the project?

12     A.  No.

13     Q.  Okay.

14     A.  Like I said, I don't even know if I even talked

15  to him, so.

16     Q.  Do you know why you were brought on to work on

17  the project?

18     A.  Primarily the purpose was to inspect as a

19  plumbing inspector.  And then also, I also did some

20  concrete construction inspections, rebar.

21         I didn't do the slump tests and the canisters

22  and all that, but I would inspect concrete prior to

23  being poured.

24     Q.  Had you ever worked as a plumbing inspector

25  prior to working on the project?



 1      A.  No.

 2      Q.  So what did you understand to be your scope of

 3  work that you were supposed to provide as a plumbing

 4  inspector on the project?

 5          MR. SCHWERDTFEGER:  Objection.  Vague as to

 6  time.

 7          THE WITNESS:  Inspect the remedial plumbing

 8  that was being performed.

 9  BY MR. McMANUS:

10      Q.  And did you inspect remedial plumbing during

11  your entire tenure on the project?

12      A.  No.  Once it was completed, naturally, I

13  wouldn't.  At that point it became finished.  The

14  remedial part of that was ended --

15      Q.  Do you --

16      A.  -- to be specific, I guess.

17      Q.  Thank you.  Do you --

18      A.  Later on I more or less worked as a

19  superintendent to finish out the project after I

20  finished with CTE.  So I worked as a -- to help finish

21  out the project and to do punch lists, and all those

22  other -- and the entire project.  Not related just to

23  remedial plumbing.

24      Q.  Do you recall when the remedial plumbing work

25  finished on the project?



1    A.   No.  I'd have to -- I'd have to look.

2    Q.   But generally --

3    A.   I mean, it -- we had repair plumbing to do in

4  -- not just in the DEFAC, but there's other work that

5  had to be repaired in other parts of the building.  So

6  there was some repair work that was ongoing.

7    Q.   Is it fair --

8    A.   You know, like if you go to set -- if near the

9  end of a project you go to set a urinal or something and

10 the piping was too low or too high or some, you know,

11 minor, minor thing, then, you know, we went ahead and

12 repaired that.  We popped tile or whatever.  So that

13 remedial, not in the sense that we had to tear out major

14 portions of work.  So I wouldn't call that remedial.

15 But still plumbing work.

16   Q.   Yeah.

17   A.   Still repair.  And we did that through all

18 trades throughout as we tried to finish up the project,

19 as all trades had major and minor grief.

20        So at that point as to superintendent, or just

21 a punch list.  You know, we worked through almost every

22 trade to try to resolve the major problems that all the

23 subs had.

24   Q.   So is it fair to say that for -- from when you

25 started working on the project in March of 2017 for a



 1   certain time frame -- we can touch on that later -- but

 2   you were working as a plumbing inspector, and your scope

 3   of services included inspecting the remedial plumbing

 4   work?

 5          MR. SCHWERDTFEGER:  Objection.  Misstates the

 6   deponent's testimony.

 7          THE WITNESS:  I did -- yeah, I did that.

 8   BY MR. McMANUS:

 9      Q.  Okay.

10      A.  And more.

11      Q.  I see in the report here that in the beginning

12   were you working with an individual named Dana Clark.

13   Is that correct?

14      A.  Uh-huh.

15      Q.  Do you know why Dana Clark stopped working on

16   the project?

17      A.  Not entirely.  Not entirely.  He may have not

18   have been as familiar with piping as he -- but

19   specifically, no.

20      Q.  Did you form any opinions of Mr. Clark while

21   you were working with him?

22      A.  Uh-huh.  I did.

23      Q.  Can you tell me what those were?

24      A.  His work was thorough.  His recordkeeping was

25   thorough.  And mapping, plotting of areas, concrete that



PETE ALBERS                                                March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                                41

 1  needed to be removed and graphing.  So my impression was

 2  he was thorough.  And his reports were inclusive, so.  I

 3  would say he was -- I would say he was a good hand, like

 4  we say in the field.

 5      Q.  Based on your understanding when you came onto

 6  the project, did you understand that Mr. Clark was also

 7  providing pluming inspection services?

 8      A.  Uh-huh.

 9      Q.  Do you think he was qualified to provide

10  plumbing inspection services?

11      A.  I think he probably was.  The problems were

12  obvious beyond -- I think he was more qualified than he

13  probably thought he was.  That's just my opinion.

14      Q.  Okay.  So when you start working on the project

15  in March of 2017, what did you understand CTE's scope of

16  services on the project to be?

17      A.  Inspection, plumbing inspections, testing.

18      Q.  Was there any other trade contractor work that

19  you were responsible for inspecting?

20      A.  Like I said earlier, rebar, concrete.

21      Q.  And can you tell me why you were observing the

22  remedial plumbing work, why you were brought on to do

23  that?

24      A.  Was my job.

25      Q.  I mean, I'm guessing -- did you observe the



1   existing plumbing installations at the dining facility

2   in the administration building?

3          MR. CAULEY:  Objection.  Vague and ambiguous.

4          MR. SCHWERDTFEGER:  Join.

5          One of the aspects of this process too is if

6   for any reason you don't understand what he's asking,

7   you can ask him to repeat it or ask a different

8   question.  But if you understand, answer, please.

9          THE WITNESS:  Did I look at the plumbing, is

10  that what you're asking me?

11  BY MR. McMANUS:

12      Q.  Yes.

13      A.  I was the plumbing inspector.  Yes.

14      Q.  And you were observing remedial work because

15  there was repair work going on, is what I'm trying to

16  get to --

17      A.  Oh, yes.

18      Q.  -- right?

19      A.  Yes.

20      Q.  Okay.  Thank you.

21          But are you familiar with an entity called

22  McCullough Plumbing, Incorporated?

23      A.  Yes.

24      Q.  How did you first hear of -- I'm going to call

25  them McCullough.  How did you first hear of McCullough?



1    A.  They were the plumbing contractor that was on

2    the -- that was previously on the job.  So I had no

3    contact with McCullough.  They had already -- they had

4    already left the project.  I think they had one mechanic

5    that was still -- that went to work for Certified.  I

6    don't recall the guy's name, but.  So, no, I didn't know

7    anybody from McCullough, technically.

8        Q.  So then also in your report states you

9    interacted with John Brannon and Danny Crnkovic from

10   Halbert Construction; is that true?

11       A.  Yes.

12       Q.  While were you working with Mr. Brannon, did

13   you form any opinions of him?

14       A.  Yes.

15       Q.  Can you tell me what those were?

16       A.  Belligerent.  Hostile.  Those are two pretty

17   good adjectives for him.

18       Q.  And how about Mr. Crnkovic; while you were

19   working with him, did you form any opinions of him?

20       A.  Yes.  He was pretty hostile as well, I would

21   say.  I've known Danny for a long, long time.  And the

22   joke on the field was that he was like a little Hitler,

23   so.  He was -- but I think "hostile" would probably be a

24   good adjective for him.  And real quick too.

25       Q.  Quick as in --



1   A.  Quick tempered.  His way, the highway.  "Do it

2  my way."  Not real conducive to building a team and

3  producing a -- I think just kind of continued to

4  dysfunction, seemingly dysfunctional the way that that

5  proceeded, so.  Probably a lot of problems from that

6  point on.  I mean, he didn't -- he didn't have anything

7  to do with the remedial plumbing because I think he

8  started December, just before me.  But kind of -- I

9  think sort of perpetuated the management that they

10  previously had.

11   Q.  Besides Mr. Brannon and Mr. Crnkovic, did you

12  interact with any other Halbert personnel while were you

13  working on the project?

14   A.  I did.  I had quite a bit of contact with

15  Mr. Halbert.

16   Q.  Is that Mr. Halbert senior?

17   A.  Mr. Halbert senior.

18   Opinion, you need?

19   Q.  Yeah, sure.

20   A.  Thought he was a gracious man.

21   I don't think they were quick to see and

22  resolve sub problems, other than to, you know, just

23  force them to do what they wanted to do when they wanted

24  to do it.  I think that the way he took his opinions

25  were -- was in that manner.



1           But he was -- but you could talk to him.  He

2   was seemingly a reasonable, reasonable man.

3       Q.  Any other Halbert personnel that you interacted

4   with?

5       A.  Brannon and junior.

6       Q.  Mike junior?

7       A.  Michael P. -- yeah.

8       Q.  Did you ever form an opinion of Mike junior?

9       A.  Well, I was on a number of conference calls to

10  try to get punch lists done.  And I didn't see anybody

11  that was really very effective in -- as a principal.  He

12  just didn't impress me as a principal type character,

13  had the character to be a principal in a major -- these

14  major construction firms.

15          And the lack of management from there might

16  have been the reason why both of those projects that he

17  was running went south.  I don't think he was -- I don't

18  think he was there to effectively manage.

19          And those impressions come -- not -- those come

20  from, you know, what the people in the field were

21  talking about.  And just my interactions in trying to

22  perform some of the punch list items.  Not impressed.

23      Q.  So overall, while you were working with CTE on

24  the project, how would you describe Halbert Construction

25  Company as a company?



PETE ALBERS                                          March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                           46

1       A.   Well, when I got -- when I got there, it didn't

2   take long to determine that there was an adverse

3   condition.  In fact, it just took really a short period

4   of time in talking to subs, and try to understand, I'm

5   coming on to a project that has major problems.

6       And if you come on to a project that's five

7   years old, that should take a year and a half, if it was

8   run, and conditions were conducive to that -- two years

9   maybe in an El Nino rainy year -- then that -- there's

10  something seriously wrong with the project.  Something.

11  Has to be.  Don't know.  You deal with government

12  entities, you never know what that potential problem

13  could be.

14       But if it's a private sector, you see something

15  like that, it's almost always money.  Somebody ran out

16  of money, and this thing died.  Anytime a project, you

17  go by a project and you see that it's just languishing,

18  or it's just a certain stage and doesn't progress, it's

19  typically money is when this happens.

20       But the federal government has the ability to

21  print their own.  So money -- as I've looked at it,

22  money is not the problem here, so.  And the only other

23  option is either an interaction between management and

24  the Army Corps, management and subs, mismanagement

25  between those entities.



1           So it was -- so getting aboard onto that, it

2    looked like there were some serious problems right from

3    the get-go.  And my estimation was it was -- that it

4    was -- you know, Army Corps is difficult to begin with.

5    I mean, they're just not an easy entity to deal with.

6           And they don't -- federal government doesn't

7    have the overwhelming desire to complete projects, like

8    the private sector.  So granted, there's more time

9    involved.  Because they don't have a burning desire to

10   finish anything.  There's no profit incentive to, "Let's

11   finish this project so we can start making some money so

12   we can sell it," whatever.  It's quite the opposite.

13          But five or six years is beyond the pale when

14   it comes to putting the blame on the Army Corps.  Not

15   that it's not part of their -- they might have sat on

16   equipment.  They might have had some disputes.  Those

17   are things I don't know.  They may have gotten into --

18   excuse the expression, little pissing matches with the

19   corps.  I don't know.

20          But five years is beyond what any project

21   should be.  And I came to the conclusion at that point

22   it was most likely mismanagement from Halbert's point of

23   view.

24   Q.  So I want to take a look at your report now.

25   We're going to go to page 4.  If we go to the second



 1   full paragraph down, "After CTE left the project for

 2   lack of payment, Halbert employed Mr. Albers directly to

 3   perform testing and inspection services."  Is that

 4   correct?

 5          MR. SCHWERDTFEGER:  Objection.

 6   Mischaracterizes the document.

 7          MR. McMANUS:  Well, I just read what it says.

 8          MR. SCHWERDTFEGER:  It's not his report.

 9          MR. McMANUS:  I'm asking him if something in

10   the document is correct.  He doesn't have to write it.

11   He can just tell me if that's a true statement or it's

12   not a true statement.

13          MR. SCHWERDTFEGER:  And that's not the point of

14   my objection.  The point of my objection is how you

15   characterized in the question.

16          MR. McMANUS:  I read what it says.

17          MR. SCHWERDTFEGER:  I think the record will

18   reflect.

19          MR. McMANUS:  Yeah, me too.

20          MR. SCHWERDTFEGER:  Go ahead.

21          Do you remember the question?

22          THE WITNESS:  Yes.

23          MR. SCHWERDTFEGER:  Okay.  Answer.

24          THE WITNESS:  I worked as a superintendent at

25   that particular point in time.



1   BY MR. McMANUS:

2       Q.  For Halbert?

3       A.  For Halbert.  That was primarily my function,

4   is getting punch lists done.  But elevator inspections,

5   they're done by a separate inspector.  Fire sprinkler,

6   separate inspector.

7           The plumbing, as far as all of that testing,

8   was done.  I mean, I was no longer the -- that remedial

9   work was done and the testing for that had been done.

10          Inspections, in a sense that I used the example

11  earlier that an outlet for setting finish was too low,

12  too high; to make it work, we did what we had to do.

13  That's not technically a plumbing inspection process.

14  It's a matter of doing punch lists and completing

15  whatever work was necessary.

16          So I -- so you look at all trades, whatever

17  that you're given the task to do, so.  Technically, no,

18  I was not a plumbing inspector after being employed by

19  CTE.

20      Q.  So why did you go to work for Halbert if you

21  thought that they had some mismanagement problems?

22      A.  When you start a project, and you commit to a

23  project, and you commit to an employer, which is Dally,

24  and they asked me to.  And I thought I could be of some

25  service, which I was.  Because there was a variety of



1    things you could do.  Even as a CTE inspector, you have

2    eyes that are bigger than a CTE's vision.  Okay?

3            And having been a CQC and superintendent, and

4    all the rest of it, you see things that you can help.

5    And plus I've known Danny, in spite of my opinion of

6    Danny, I've known Danny for a long time.

7            So I pitched in and I helped with Bob Loban.

8    Bob Logan was another guy who came from Halbert, came

9    out from San Diego to finish out -- finish out the

10   project, even before Danny had left.  An outstanding --

11   outstanding person.  I would say of great integrity.

12   And probably because he was there, I stayed on.

13           But basically when you start a project, you

14   know, if you're superintendent, right, and you have

15   problems with subs, right -- I've done this the whole

16   entire time.  It's like something probably Danny could

17   not do.  If I have a dispute with a sub, right, and I

18   don't like that sub, that doesn't matter, you know.  The

19   project is to finish the project in spite of

20   personalities.  Because by the time you finish that

21   project, you will no longer have to deal with them.

22           But to bring animus into those personalities --

23   and it's not easy to do, because as superintendents

24   we're not always dealing with -- dealing with all sorts

25   of personalities, put it that way.



1        So you gut it out and you finish it.  You don't

2   take personal retribution.  You don't discredit.  You

3   work around and with people.  And I think that was

4   probably one of the biggest flaws of the management in

5   the project in perhaps preceding me, in listening to the

6   subs as we went and seeing that they didn't have the

7   capacity to work with people.

8        And that -- that's probably one of the most

9   important things.  That and those basic template that

10  the CQC operates within.

11       And if the CQC incorporates the inspectors, the

12  superintendent, the appropriate subs, and wants to

13  complete that, there's really not much room for that

14  sort of animus, if you will, in my estimation.  But

15  that's just my philosophy.  I get past those difficult

16  personalities, and incorporate help with offices above

17  me to help get those things resolved.  And don't try to

18  just destroy people or have people removed because of --

19  because of personal vendetta or view.

20       And like my opinion of Halbert was not a very

21  good management company for that particular job, that

22  doesn't mean this job over here doesn't run -- or they

23  don't have a whole history of -- you know, the jobs are

24  based on the people who are performing them, and

25  that's -- although Halbert may have a good reputation, I



1    think the old man is -- I like the old man.

2        Q.   Me too.

3        A.   Yeah.  He's a likeable guy.

4            But this project is not, you know, a 40-year

5    history of Mr. Halbert, so.

6            I think it might be junior that has his imprint

7    on this one.  It's just an impression, so.  But why I

8    stayed on, because I committed.

9        Q.   I appreciate that.  And did you eventually

10   leave the employment of Halbert?

11       A.   We were near the end of the project finally,

12   yeah.

13       Q.   So --

14       A.   And another project came up.  But it was at a

15   point -- it was at a point where punch list was

16   completed, and there was really -- it was done.  For all

17   intents and purposes, it was completed and done.

18           Although it lingered and languished for -- I

19   don't know even -- actually, I don't even know if it's

20   even still occupied.  I don't think it is even now.  So

21   we're into year six or something.  But at some point the

22   corps didn't want to get into the building or -- there

23   was still lots of other problems, perpetuated them from

24   get into the project.  But I think the corps had a lot

25   to do with that at that late date.  And I don't know.  I



 1   haven't called anybody over there to see if -- see if

 2   it's open.  I would hope so.

 3        I mean, I got some calls the other day about

 4   some leaks and stuff, you know, roof leaks and stuff.

 5   So Gwen had called me on that, and reviewed that with

 6   her.  She's the Army Corps person.  I still have some

 7   contact, because I live right there.

 8        Q.  All right.  I want to turn to page 3 of this

 9   report.  At the bottom of this first paragraph -- it's

10   not the first full paragraph, because it extends from

11   the prior page.  But at the bottom of this paragraph it

12   says, "Mr. Albers is expected to testify as to his

13   analytical thought process concerning causation for the

14   observed remediation work along with the rationale for

15   his analytical thought process in observing along with

16   assisting in identifying plumbing remediation work."  Do

17   you now what that means?

18        A.  Yes.

19        Q.  Can you tell me what that means?

20        A.  You're looking for my -- it says thought

21   process in observing the remediation work, and why and

22   how it happened.  Is that what that means?  Why and how?

23        Q.  I don't know.

24        A.  Okay.

25        Q.  If that's what you understand it to mean, then



1  that's what's important to me.  So what was your thought

2  process in observing remediation?

3      A.  Are we -- okay, we're talking about the

4  specific underground plumbing that was removed in the

5  DEFAC building.

6      Q.  Did you work on other plumbing besides that?

7      A.  Well, there's another whole building.

8      Q.  Okay.  So I'd like to know about --

9      A.  There's another whole other building.  But the

10 primary concern when I got there was not the other

11 building.  Was not the admin building.  But it was for

12 DEFAC.

13     Q.  Okay.

14     A.  Primarily for the underground, the underground

15 work.

16     Q.  So for the DEFAC underground work, what was

17 your thought process in observing the remediation?

18     A.  Numerous problems.  Unusual to have that many

19 problems and in that magnitude.  So it was -- to me it

20 was highly unusual.

21         And the -- it appeared as though that the

22 sequence of construction prior to my ever being there,

23 long before I got there, got out of sequence.  Got out

24 of sequence.  Because in all construction that I've

25 observed or seen, I've never seen a sequence where you



1   put in your rough plumbing, put in your rough

2   electrical, then put in your steel on top of that.

3         There are instances where some fast track

4   Kmarts, or whatever, do in that process, and they will

5   pour their concrete through the roof.  But not -- that

6   wasn't the intent, I don't think.

7         I think they got there -- what I heard is that

8   their steel arrived, they wanted to force the issue of

9   installing the steel, the structural steel.  And that

10  was -- that's basically the causation for all the

11  plumbing -- the plumbing is installed because the steel

12  was delayed.  So they said, "Oh, screw it, we're going

13  to get out of sequence."  They made a choice to go out

14  of sequence and put in the plumbing and the electrical.

15        And then the steel comes and is sitting.  And

16  there's a lot of money wrapped up in steel.  I heard it

17  was a million dollars worth of steel sitting.  And with

18  a big storm coming in or some decision, they made the

19  decision to go ahead and throw up the steel.  In that

20  process, the plumbing was destroyed, and the electrical

21  as well too.  I wasn't brought in for electric.  But the

22  same thing happened to electrical, trenching and piping

23  and all that.

24        So at that point it was ran over with -- with

25  the improper equipment.  You probably could have flown



PETE ALBERS                                          March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                        56

1   in the steel with a crane and maybe worked around the

2   plumbing, the stub-ups.  Maybe.

3         But to drive over it with all the equipment

4   necessary to lift steel caused it to break and buckle

5   and all the other -- the major problems, you know.

6   There may be some incidental items to the plumbing.  But

7   that's not the causation of having to restore it and

8   remove it.

9         So that -- it's my understanding that that's

10  how the initial plumbing needed to be repaired by

11  McCullough.

12     Q.  Do you know if the underground plumbing was

13  ever repaired prior to your coming onto the project?

14     A.  Yes, it was.  Yes.

15         In some negotiation between Halbert and

16  McCullough, and this is -- of course I'm not on the

17  site.  This is what I'm understanding.  That they were

18  paid to partially repair the existing plumbing.  And

19  those repairs, partial repairs were made.

20         It was said at that point they should have just

21  maybe taken it all out and restarted all over again.

22  But I don't know what happened there.  But they did

23  partial -- partial repairs.  It was tested.  That was

24  before I got there.  CTE tested it a second time.  I

25  think even McCullough put some cameras through it.  And



1  so it was -- so it was repaired.

2      Q.  So then in the dining facility did you observe

3  any remedial plumbing work related to plumbing

4  installations other than the underground plumbing that

5  we've just been speaking about?

6      A.  Yes.

7      Q.  Can you tell me about your thought process?

8  And what plumbing work was that?

9      A.  We looked at gas lines, water lines, plumbing

10  fixtures.

11      Q.  Floor sinks?

12      A.  Pardon?

13      Q.  Floor sinks?

14      A.  Yes, we looked at floor sinks.  That was really

15  part of rough.  Floor sinks and drains.  Floor drains

16  and floor sinks.

17      Q.  And for those items that you just mentioned,

18  what was your thought process in observing the

19  remediation as to those items?

20      A.  A lot of them were broken, chipped, wrong

21  elevations, wrong locations.  And that was -- so between

22  that and either broken pipes or pipes that are not to

23  grade that are holding water, and those -- those were

24  reasons for the remediation.

25      Q.  And what do you base that opinion on?



1   A.  On --

2   Q.  For what you told me about the reasons for the

3   remediation.  What do you base that on?

4          MR. SCHWERDTFEGER:  Objection.

5          MR. CAULEY:  Objection.  Vague.  As to what he

6   just described?

7          MR. McMANUS:  Yes, as to what he just

8   described.

9          MR. SCHWERDTFEGER:  I'm going to say vague and

10  ambiguous.

11         MR. CAULEY:  Join.

12         THE WITNESS:  Floor drains being damaged?

13  BY MR. McMANUS:

14  Q.  Right.

15  A.  Chipped, broken.  Not the proper elevation or

16  location.

17  Q.  How did you know that the floor sinks were not

18  at the proper elevation or location?

19  A.  Once the slab was in -- once the slab was in, a

20  floor sink would be above finish floor, not below finish

21  floor.

22         Floor trough would be -- according to the rough

23  grade, it wouldn't be sloped.

24         Chipping would be obvious.  Chipping.

25  Q.  So is it that -- for example, when you talk



1   about the height of the floor sinks, is that the height

2   was not in compliance with the project specifications?

3       A.  Right.

4       Q.  And you reviewed the plumbing specifications

5   prior to engaging in these inspections?

6       A.  Uh-huh.

7       Q.  Before you mentioned that when you were

8   inspecting the plumbing work, you thought it was

9   unusual?

10      A.  Uh-huh.

11      Q.  What did you mean by that, that it was unusual?

12      A.  Well, you usually don't go in and remodel an

13  existing building.  You know, you don't.  You don't tear

14  out -- it was almost a joke in the field, "We're going

15  to -- let's go remodel this new building."

16          It's -- that's highly unusual, you know.  And

17  to that magnitude.

18      Q.  All right.  Next I want to turn to the bottom

19  of this page, about five lines up.  "Mr. Albers would

20  document his observations along with testing results in

21  daily reports, and is expected to testify as to his

22  observations along with analytical thought process

23  associated with those observations."

24          So with respect to your "observations along

25  with analytical thought process associated with those



1   observations" is that going to be different from the

2   bulk of what we've just been speaking about, about your

3   thought process in observing remediation?

4        MR. SCHWERDTFEGER:  Objection.  Vague and

5   ambiguous.

6        THE WITNESS:  There's more to it than -- that

7   thought process went to a certain point in time.  Okay?

8   BY MR. McMANUS:

9     Q.  What point in time was that?

10    A.  The point in time where CTE inspected the

11  repair work that was done by McCullough.

12    Q.  What were your observations and analytical

13  thought processes?

14    A.  That from that time, where the plumbing was

15  repaired by McCullough and tested by CTE, and the

16  remedial work was discovered, or they ran cameras or

17  whatever and found broken pipes and all the rest of it,

18  that the work that McCullough had done was damaged in

19  the process again.  That re-scarifying the slab or doing

20  some major earthwork within the confines of,

21  particularly Area A, where all the plumbing and piping

22  work, the thoroughfare, the only access to the project

23  for heavy equipment to move, was over the top of the

24  plumbing.  Not once, but twice.

25        I mean, that's the only conclusion I can come



 1  to when there is a sheared pipe, bellies in pipes.  A

 2  lot of the floor sinks are moved or pitched or whatever.

 3  Wrong location is a different story.  They're going to

 4  be where they're going to be, where they put them.

 5      Q.  They meaning McCullough?

 6      A.  They meaning McCullough, yeah.

 7          But that isn't why we remodelled the entire

 8  plumbing, or went in to do a re-pipe on a project.  It

 9  was pipe that was bellied or not to slope or, you know,

10  cracked, or elevations.  Sheared, literally sheared.

11  Sheared pipe.  Offsets, you know.  So -- and it was

12  tested.

13          And you can't -- they had some leaks

14  apparently, is what I heard, and they chased them down

15  for a while.  And then ultimately they found -- they

16  found some leaks.

17          So they -- you know, McCullough and CTE did

18  what they could to resolve the first fix, so.  And my

19  only conclusion is it had to be driven over again,

20  broken, sheared, pushed, offset.  When you're running --

21  I don't know specifically the equipment, but if

22  you're -- the thing about the dining facility is that

23  the piping is extensive.  I mean, take a look at set of

24  plans in Area A.  You can't move 10 feet -- you can't

25  put your hands out and do a circle without hitting



 1  something, hitting some piping, electrical that's

 2  protruding.  Those trades are ultra intense in a

 3  facility like that.

 4        And you know, from -- whether it's water lines,

 5  gas lines, electrical, plumbing, piping, sewer, sanitary

 6  sewer, roof drains -- although roof drains are minimal

 7  compared to all the rest of stuff -- you can't move

 8  equipment in and out unless you're really

 9  extraordinarily careful.  And the operator of the

10  equipment I don't think was very careful.

11        I watched the -- I forget the guy's name.  But

12  he was a real cowboy on the equipment.  It was full

13  bore, 100 miles an hour.  And it takes a little finesse

14  around that kind of equipment.  Not the equipment, but

15  around the site.  Because there's so much -- so much

16  piping protruding.

17        I think I saw in a report where they had to

18  remove major portions of dirt down two feet or more in a

19  20-, 25-foot circle or so.

20        It's real hard not to -- like I said, you

21  couldn't turn circle without hitting some plumbing, so.

22     Q.  So --

23     A.  My only conclusion is that it was damaged at

24  least again.

25     Q.  After the --



1      A.  After.  Yeah.  And there was a lot of equipment

2   moving around inside there.  Even top-out.

3      Q.  Do you have any idea what entity or individual

4   may have caused this second damage that you're

5   discussing?

6      A.  CTE did -- I'm sorry, whoops.  Not CTE.

7   They're not a contractor.  Halbert.  I believe Halbert

8   did the ground work.  I believe they did the dirt work,

9   so.  I haven't checked that out.  I haven't looked at

10  anything, but I believe that Halbert was who was

11  responsible for the earthwork.

12          And they really had to do earthwork on top

13  of -- in my opinion, they had to do earthwork on top of

14  existing plumbing piping and electrical, because the

15  soils were saturated to the point even then that they're

16  not workable.

17          So they had to remove a lot of soil to bring

18  in, I don't know, probably Class II soil and sand, or

19  whatever, to get rid of the muck, so.  That's the

20  conclusion.  The only reason they would move a lot of

21  dirt is if it was still saturated.  Otherwise you'd

22  have -- otherwise you would have sanded it and

23  Visqueened it, whatever, protected it, and probably

24  beyond -- beyond that.

25      Q.  Have you --



1    A.  Some of this is, of course, guesswork on my

2    part.  Not -- I wasn't there at that time.  But that's

3    my only conclusion, it could have been damaged at least

4    a second time, which is -- it's baffling that that could

5    happen again.  But pipe doesn't shear itself.

6    Q.  Is your conclusion based on review of any

7    documents, such as daily reports or production reports,

8    anything like that?

9    A.  No.  No.

10   Q.  Is it based on your conversations or

11   communications with any other contractors on site?

12   A.  Yeah.  This came over a period of time that --

13   because it's so unusual that -- not only was it

14   repaired, but it was screwed up.

15   Q.  Who did you speak with on site regarding this

16   issue of the second damage that you've been referring

17   to?

18   A.  I didn't speak to anybody's -- I talked to them

19   about what happened on the project.  The conclusion is

20   mine.  Nobody told me that this is what happened and why

21   it happened.  It was -- it was an observation based on

22   being there for a while and talking about site

23   conditions and what was the process.  And, yeah, they

24   came in and repaired it.  Those are -- those are

25   observations of what's on site.  And then the conclusion



1  is my own.

2         I didn't talk to anybody specifically about,

3  put in anybody's head, this was -- that someone else

4  came in and damaged it a second time.  That's my own.

5  The only conclusion I could come up with.

6      Q.  Based on your own thoughts?

7      A.  Based on my own thought process.  Site

8  conditions, operators, testing twice, and then sheared

9  pipe.  You can't have a sheared pipe and do any sort of

10  testing whatsoever.  It just won't hold water.  And the

11  fact that they did have -- they did have some leaks and

12  they pursued them.  Right?  So that they -- there were

13  some leaks.  They couldn't find the plumber.  And CTE

14  stayed with that, and it took awhile apparently.  And

15  those are from records and from Rod that they stayed

16  with those and they repaired those.

17         And then months later they camera it and they

18  have sheared pipe and have a host of other problems.

19  But obviously the killer is sheared pipe and bellied

20  pipe, and those sorts of things.  Those are things that

21  made the remedial necessary.

22         MR. SCHWERDTFEGER:  We've been going an hour

23  and a half.  I need to use the restroom.

24         MR. McMANUS:  Yes.

25         MR. SCHWERDTFEGER:  Thank you.



 1          MR. McMANUS:  Perfect.

 2          (Recess)

 3          MR. McMANUS:  Back on the record.

 4    BY MR. McMANUS:

 5      Q.  Okay.  So Mr. Albers, before we get on to the

 6    next topic, I just want to revisit this issue we were

 7    talking about before with your opinion of the second

 8    phase of damage to the plumbing work that was separate

 9    from the ironworkers.

10      A.  Yes.

11      Q.  I just want to confirm that that observation is

12    just based on your own thoughts after looking at the

13    site, but it's not based on a review of documents or

14    something like that?

15      A.  No.

16      Q.  Okay.

17      A.  It's an analytical thought process associated

18    with observations.

19      Q.  So next I'd like to turn to page 4.  And the

20    first full paragraph, the last sentence, "Mr. Albers is

21    expected to testify as to the observed deficiencies and

22    scope of services owed by a third-party inspector."

23          So can you please tell me what your opinion is

24    regarding the scope of services and duties owed by a

25    third-party inspector?



1    A.   It's the observation of work performed per --

2    oh, I see, this is "observed deficiencies."  It's the

3    observation of a third party, someone who is not an

4    owner or contractor within the job, to observe and test

5    work.  In this case plumbing.

6    Q.   What does observing work entail?

7    A.   That -- do you want examples?

8    Q.   Sure, that would be great.

9    A.   For example, piping is at a certain grade.

10   That waste pipe would have a quarter inch per foot.

11   Observe that a 10-foot head test, that the system holds

12   water per tests described by the specifications to

13   perform.  Like all the piping would have a 10-foot head

14   test.  You fill the pipe within 10 feet, and then you

15   hold it there for a minimum period of time.  I think we

16   did at least a half an hour or even an hour.  If I had a

17   problem with a section, I would extend that time, make

18   sure we didn't have anything.

19        And those observations are reported via test

20   results or daily reports.  And reported to the QC

21   manager.

22        The manager -- the QC manager in this case,

23   would tell them we're about to do a specific test.  And

24   we'd agree on how long that test would be, whether it

25   would be an hour, overnight, or whatever it was.  And



1  then we would observe -- sometimes he would observe a

2  mark at the beginning of the test.  Other times he'd

3  just observe it -- he would observe if the water level

4  was at the same level, or the gauge was at that.

5       So it's a process that if separate from -- as a

6  third party, separate from Halbert, or the QC manager.

7  But the QC manager is an integral part of reporting,

8  verifying, confirming that those -- one of his many

9  duties that those processes are done.

10     Q.  Does -- observing the work, does that include

11 noting deficiencies?

12     A.  Yes.  Well, deficiency notices, though, are

13 also a performance of QC managers, SSHO.  They all have

14 deficiency -- they have a deficiency log that they --

15 that they track.  So deficiencies are much more than

16 just my observations of a deficiency, yes.

17     Q.  But as a third-party inspector for observing

18 work, if you had observed a deficiency with trade work,

19 would that be something you would note in a report?

20     A.  Yes.

21          MR. SCHWERDTFEGER:  Objection.  Vague and

22 ambiguous.

23          THE WITNESS:  Yes.

24 BY MR. McMANUS:

25     Q.  And you would send that report to the general



1  contractor's quality control manager?

2      A.  Yeah.  He should be reviewing all of those.

3      Q.  And for your opinion that you've given me

4  regarding the duties of third-party inspector, is that

5  based on your experience in the construction industry?

6      A.  Uh-huh.  Yes.  Sorry.

7      Q.  Thank you.

8      A.  "Uh-huh" are not --

9      Q.  I want you to turn to this same first

10 paragraph.

11          MR. SCHWERDTFEGER:  Continue.  I can hear.

12          I'm just going to get a cup of coffee.

13          MR. McMANUS:  Take your time.

14          We can go off the record.

15 BY MR. McMANUS:

16     Q.  Okay.  So I want to go to page 4, to the first

17 full paragraph.  There's a sentence here that says,

18 "Plumbing deficiencies were identified relating to

19 issues beyond the standard of care and reasonable scope

20 of services to be provided by a third-party inspector,

21 such as CTE."

22          Can you tell me, what do you believe is the

23 reasonable scope of services to be provided by a

24 third-party inspector such as CTE?

25          MR. SCHWERDTFEGER:  Objection.  Vague and



PETE ALBERS                                      March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                        70

1   ambiguous.

2          THE WITNESS:  I can answer that.  I think I

3   alluded to it earlier, that I have QC certs and been an

4   inspector for a long time and run, you know, relatively

5   large jobs.  And in that process, you view a job, you

6   view a construction process from a superintendent's

7   point of view, or QC.

8          So if I'm inspecting plumbing and I see a

9   foreign project -- a foreign product or something, I may

10  report that to QC or whomever.  It's not -- not in the

11  scope of say -- or if you see a problem with an

12  elevator, you see a problem with -- unrelated to

13  plumbing or something.

14         It's just a matter of a conscience.  Sometimes

15  if you're operating as an inspector, and an overall

16  helper.  You know, I've known Danny for years, and the

17  QC was a good guy.  You want to try to have a team

18  effort, which was sorely lacking, so.  I think it's just

19  -- I guess just what I do, observation.

20     Q.  With a third-party inspector such as CTE, would

21  their scope of services include noting noncompliant work

22  if observed on site?

23         MR. SCHWERDTFEGER:  Objection.  Overbroad.

24  Vague and ambiguous.

25         THE WITNESS:  Related to?



PETE ALBERS                                    March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                      71

```
 1    BY MR. McMANUS:

 2        Q.  Plumbing.

 3        A.  Yes.

 4        Q.  It would?

 5            MR. SCHWERDTFEGER:  He's asking you

 6    specifically like regarding what is the scope --

 7            MR. McMANUS:  Actually, it's not my question.

 8    BY MR. McMANUS:

 9        Q.  I'm asking you if a third-party special

10    inspector, such as CTE, was on a project such as this

11    one, would their scope of services include observing and

12    noting deficient plumbing work, if observed?

13            MR. SCHWERDTFEGER:  Same objections.

14            THE WITNESS:  It would be.

15            MR. SCHWERDTFEGER:  In other words, like the

16    location of the plumbing fixture, the location of the

17    lines.

18            MR. McMANUS:  That's not --

19            THE WITNESS:  No.

20            MR. McMANUS:  I'm asking --

21            MR. SCHWERDTFEGER:  All right.  Go ahead.  Next

22    question.

23            THE WITNESS:  If something was tested and was

24    found to be deficient, yes.

25    ///
```



```
 1   BY MR. McMANUS:
 2      Q.  What if it was observed as deficient, not just
 3   tested, but --
 4      A.  You'd have to be specific.  I don't quite know
 5   what that means.
 6      Q.  So say that you are walking past a plumbing
 7   installation in the wall, and you see that a shield is
 8   installed backyards, would you note that in an
 9   inspection report?
10      A.  I may or I may not.  Maybe I just call the
11   plumber and say, "Hey, you got shields on," or "you
12   don't have this, or you don't have --" or maybe it's
13   not -- doesn't have a enough screws in it, or something.
14   So it depends.
15          You know, if it's a fatal thing like, you know,
16   the plumbing is cracked, and it's not going to work,
17   yes.
18      Q.  Say you saw a floor sink that was installed to
19   the top of concrete rather than to the top of finish
20   floor, is that something that you would note in a
21   report?
22          MR. CAULEY:  Objection.  Incomplete
23   hypothetical.  Vague and ambiguous.
24          MR. SCHWERDTFEGER:  Join.
25   ///
```



1    BY MR. McMANUS:

2       Q.   You can answer.

3       A.   Well, it was -- that was noted.  Actually,

4    prior to me being there most of those were noted that

5    they were.  Okay?

6            MR. ALFONZO:  I'm sorry, is that a yes to his

7    question that it would be noted if it was observed?

8            THE WITNESS:  That particular case, they were

9    noted by somebody else, so.

10           When I saw a trough drain or something that was

11   not level or the finish floor could not -- it was -- it

12   was tilted and could not -- I couldn't work with the sub

13   or the tile guy to try to figure out how we -- if we

14   could make it work, then I reported it, yes.

15           In that case that trough was cut out and

16   leveled, or put at the proper height.  So yes.

17           MR. ALFONZO:  I'm not trying to tag team you.

18           THE WITNESS:  No, I got you.

19           MR. ALFONZO:  I just wanted to be clear with

20   the question.

21   BY MR. McMANUS:

22      Q.   So would a third-party inspector such as CTE in

23   performance of their scope of services, would there ever

24   be a situation -- that's a bad question.

25           So before you said that you may or may not



 1  report an issue such as a backwards shield.  When would

 2  you not report a deficiency that you observed on site?

 3         MR. SCHWERDTFEGER:  Objection.  Vague and

 4  ambiguous.

 5         THE WITNESS:  It's not that's not noted.

 6  It's -- I could report it to the workman and have it

 7  repaired, so.

 8         And in the course of working, you know, all the

 9  trades, it's easier to just say, "Hey, you got --" as

10  inspector, "Hey, you got a little problem right there.

11  Why don't you fix it before we get --" lots of times a

12  lot of those deficiencies are repaired within a short

13  period of time.  It's a good way to work with people

14  to see that repairs are completed.

15  BY MR. McMANUS:

16     Q.  So next I want to turn to this next sentence.

17  "Third-party inspectors have no responsibility for

18  location of the DFAC radial walls for purposes of laying

19  out the electrical, plumbing, and equipment work

20  associated therewith."  Is that your opinion?

21     A.  Yes.

22     Q.  And what do you base that opinion on?

23     A.  The function of builders, plumbers, contractors

24  is to build a facility per plans and specifications at

25  the locations of the plans, specifications, unless



```
 1   there's some changes.

 2          So I'm not contracted to employ laser levels or

 3   surveys or -- it's the contractor who contracts for this

 4   particular portion of work.  So it would be -- if they

 5   had problems determining where the radius wall was, it's

 6   up to them to resolve that particular issue and get that

 7   wall in the proper place and work with the plumbers to

 8   see that they're in the location that -- the specified

 9   location that they're required to put them in.  I

10   wouldn't have responsibility for, like I said, getting,

11   laser levels.

12          I mean, we take levels to determine pipe,

13   slope.  But definitive locations within a wall, no.

14   We're not the builder.

15      Q.  Would it be a third-party inspector such as

16   CTE's responsibility to note a deficiency with the

17   layout if observed?

18          MR. SCHWERDTFEGER:  Objection.  Vague and

19   ambiguous.

20          MR. CAULEY:  Join.

21          THE WITNESS:  Yeah, I suppose.  If observed.

22   BY MR. McMANUS:

23      Q.  Okay.  Thank you.

24      A.  It may not be the third party.  But it may be

25   the builder's superintendent, say, "Hey, you might have
```



1  a problem."

2       But I don't know that it's an inspector's

3  responsibility to lay out, to find the -- use laser

4  levels or survey equipment or to -- location.  Location

5  is strictly the function of the coordination between the

6  builder, the plumber, the mechanical, the electrical.

7  Not -- I have no contracting building responsibilities.

8       Q.  So then for this radial wall issue addressed in

9  this sentence, did you -- in the dining facility did you

10  observe any deficiency in the location of items that

11  were not associated with the radial wall?

12       A.  Yeah, there was some floor drains, floor

13  troughs that were not at -- not level or not -- yeah.

14       In one case one was outside of -- outside of a

15  wall that needed to be moved, so.

16       Q.  How did you know that the floor drains and

17  floor troughs were not level?

18       A.  A level.  The plumber put a level on it if we

19  look at it.  Or visual.  If you can see a floor trough,

20  it was.  Or the floor guy came in to set the tile, and

21  he would observe, "Hey, we got problems."

22       Q.  So was that within CT's scope of services, to

23  make sure that floor drains and floor troughs were

24  level?

25       MR. SCHWERDTFEGER:  Objection.  Vague and



PETE ALBERS                                            March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                       77

1   ambiguous as to time.  And ambiguous.

2          THE WITNESS:  In order to make -- let me use

3   the trough as an example.  There was one trough in the

4   kitchen area.  And the trough, probably in the process

5   of pouring -- if you've ever observed concrete pouring,

6   the likelihood that things can get jostled and moved and

7   jacked up, so to speak, is common.

8          So as an inspector you observe, particularly in

9   conjunction with the superintendent, or if they had

10  noted and brought it to our attention, and there was no

11  remedy.  You know, there was no person to try to remedy

12  it in the field if possible.  And if it can't be

13  remedied in the field, or the tile guy comes in and

14  says, "I can't work with that -- I can't make it work,"

15  you -- we took it out and re-leveled it.

16         So from that perspective, yes, you make

17  those -- you make those observations.

18         If you're walking in a corridor, and -- this is

19  just one example, and the floor sink is out where the --

20  where the servers are going to be walking, it's a

21  hazard; right?  Then that's an obvious observation, that

22  it's in the wrong place.

23  BY MR. McMANUS:

24      Q.  So --

25      A.  So at that point, you know, we would -- at that



PETE ALBERS                                                    March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                                    78

 1 | point, it may -- it's reported; right?

 2 |     Q.  Right.

 3 |     A.  It's understood between the people that are

 4 | sitting, standing there that, "Hey, we got a problem

 5 | here.  What could we do?"

 6 |         So in that sense, you know, it's reported, look

 7 | at it, you try to solve the problem.

 8 |         Maybe they moved a cabinet.  Maybe they rebuild

 9 | a cabinet.  Maybe they -- you know, it's observed.  It's

10 | noted.  And not every location is fatal.  You know,

11 | there's things that you can do to repair and make things

12 | work in the field within -- as long as you're working

13 | with the plumber, the superintendent, the cabinet

14 | builders.  You try to get -- accommodation for the sake

15 | of accommodation doesn't work for moving a project

16 | along, so.

17 |         Sure, it was observed.  It was in the wrong

18 | location, and we repaired it.

19 |     Q.  So it's fair to say that if a third-party

20 | inspector such as CTE was observing the installation of

21 | plumbing work, and at the time that the installation was

22 | occurring, it was obviously deficient, would CTE's scope

23 | of services include noting and reporting that

24 | deficiency?

25 |         MR. SCHWERDTFEGER:  Objection.  Argumentative.



 1   Vague and ambiguous.

 2          THE WITNESS:  No, it may not.

 3   BY MR. McMANUS:

 4      Q.  It would not?

 5      A.  No.  You're not accepting defective work.  But

 6   the defect may not become obvious until you're at a

 7   finish.  Because finished products dictate whether some

 8   locations are legit or not.

 9          And so that location has more than all of the

10   other trades related to it than what a single inspector

11   sees.  So there's clearances.  There's -- primarily, you

12   know, clearances in a bathroom or something like that.

13   Rough dimensions.

14          We came -- like I said earlier, we came across

15   some.  And we -- it was in the wrong location to set a

16   urinal.  That's not an observation that's made at

17   rough-in.  You know, it became apparent at finish.  And

18   we took care of it.

19          But those -- those finite observations, the

20   responsibility of putting pipe, putting floor troughs,

21   putting floor drains, locating walls, framing, putting

22   up steel, whatever, whatever trade it is, those

23   observations -- that function is the function of the

24   contractor, contractor's workmen.  And ours is an

25   observation, so.



1        And we -- primarily our observation is based on

2   testing, the level, seeing if it's a quarter inch per

3   foot.  The finite location of product is the function of

4   the contractor.  And the builder.  They're contracted to

5   build that thing in the right -- they're supposed to put

6   the toilet in the bathroom, you know, not in the dining

7   room.  Sorry for that example.

8        Q.  So on the finish issue then, let's say that a

9   third-party inspector such as CTE was on site, in the

10  dining facility, all of our floor sinks are installed in

11  the dining facility and our concrete sub is about to

12  pour concrete.  If a third-party inspector such a CTE

13  noticed a deficiency with the height or location of the

14  floor sinks before the pour of concrete, the concrete is

15  going to be poured that day, would it be CTE's

16  responsibility to note and observe that deficiency?

17        MR. SCHWERDTFEGER:  Objection.  Incomplete

18  hypothetical.  Asked and answered.

19        MR. CAULEY:  Join.

20        THE WITNESS:  Once again, it's responsibility

21  of the contractor for the location.  Absolute

22  responsibility of them.  I mean, you can't expect an

23  inspector to go out there with concrete boots and go out

24  there and try to direct contractors to fix work, in

25  other words, you know.



```
1    BY MR. McMANUS:

2        Q.  I know.

3        A.  You can't.  You just can't.

4            MR. SCHWERDTFEGER:  You're entitled to

5    finish --

6            THE WITNESS:  I know.

7            MR. SCHWERDTFEGER:  -- before he cuts off your

8    question.  So you're finished, let him know.  Otherwise

9    finish up.

10           THE WITNESS:  That's it.

11   BY MR. McMANUS:

12       Q.  I appreciate that.  I'm just asking that if

13   there was an observation made with regard to a

14   deficiency, would the inspector have to report that?

15           MR. SCHWERDTFEGER:  Objection.  Vague and

16   ambiguous.  This has been asked at least 10 times.

17           MR. McMANUS:  I haven't gotten an answer yet.

18           MR. SCHWERDTFEGER:  You have gotten an answer.

19           MR. McMANUS:  I haven't gotten a yes or no.

20           MR. SCHWERDTFEGER:  Well, I'm going to disagree

21   with you on this point.  When the witness gives you an

22   answer, you've asked it more than five times, to

23   continue to ask the same point in a vague and ambiguous

24   with the hopes tripping him up is not a good tactic.

25           MR. McMANUS:  That's not what I'm doing.
```



1           MR. SCHWERDTFEGER:  I think the record will

2    belie that point.

3           Ask your next question.

4           MR. McMANUS:  All right.  I'll make a record of

5    that, that I don't think the witness has answered my

6    question.  I've asked for an inspector's duty and

7    responsibility.  I'm getting an answer on a contractor's

8    duty and responsibility.  As you probably know, they are

9    two separate disciplines, so I don't think that's a

10   responsive answer to my question.

11          MR. SCHWERDTFEGER:  We disagree.

12          MR. McMANUS:  We do.

13          MR. SCHWERDTFEGER:  So if I hear it another

14   couple times, I'm going to instruct him not to answer.

15          Go ahead.

16          MR. ALFONZO:  Are you instructing him not to

17   answer?

18          MR. SCHWERDTFEGER:  I just -- I thought I said

19   it clearly.

20          So go ahead and ask your question, and we'll

21   take it question by question.

22          MR. ALFONZO:  Okay.

23   BY MR. McMANUS:

24     Q.  I just want to know that if a special inspector

25   observed a deficiency, it's something that they know is



1  deficient at the time of the finish work, would it be

2  their responsibility to report that?

3      A.  Yes.  Finish work.  Okay.  Like I'll go back to

4  that example again.  At finish, I observed a urinal

5  where the outlet for the urinal was at the wrong height.

6  And we repaired that.  So at finish, yes.

7          Give you another example we talked about

8  earlier.  The finish where the floor trough was out of

9  level to the point where the tile guy could not make it

10 work.  And that's pre-finish, but it's post pour.

11         You don't expect a third-party inspector to

12 confirm absolute locations prior to a pour.  That's --

13 I'll just state it again.  It's their purpose in life to

14 put that where it says it's supposed to go.  Mine is to

15 test it, that it meets the requirements.

16     Q.  So it would not be the third-party inspector's

17 responsibility to note a deficiency observed at the

18 time, for example, concrete's being poured?

19         MR. SCHWERDTFEGER:  Objection.  Argumentative.

20         THE WITNESS:  I wouldn't --

21         MR. SCHWERDTFEGER:  Stated in the negative.

22         THE WITNESS:  I wouldn't say that.

23 BY MR. McMANUS:

24     Q.  You wouldn't say that, it's their

25 responsibility?



 1          MR. SCHWERDTFEGER:  That's argumentative.

 2          He didn't ask you a question.  Don't answer

 3     that question.

 4          Next question.

 5          MR. McMANUS:  You're instructing him not to

 6     answer?

 7          MR. SCHWERDTFEGER:  I am.

 8          MR. McMANUS:  On what --

 9          MR. SCHWERDTFEGER:  A comment?

10          MR. McMANUS:  -- you're objecting.

11          MR. SCHWERDTFEGER:  A comment is not a

12     question.

13          MR. McMANUS:  You have an objection?

14          MR. SCHWERDTFEGER:  I --

15          MR. McMANUS:  State your objection.

16          MR. SCHWERDTFEGER:  Okay.  I'm waiting for the

17     question.

18          MR. McMANUS:  I asked him if his answer to my

19     question was that he did not believe that the scope of

20     services a third-party inspector involves reporting a

21     deficiency noted at the time concrete is being

22     performed?

23          MR. SCHWERDTFEGER:  That's not what you said.

24          MR. McMANUS:  We can read it back.

25          MR. SCHWERDTFEGER:  All right.  Go ahead.



```
 1        (Record read:

 2        "Question:  You wouldn't say that, it's their

 3   responsibility?")

 4        THE WITNESS:  Let's just clarify something.

 5   Okay?

 6   BY MR. McMANUS:

 7     Q.  Yeah.

 8     A.  As an inspector, for plumbing, the requirement

 9   is to test the existing system as put in.  In other

10   words, if I'm doing a building and I call a plumbing

11   inspector, "I want you to test this system," he doesn't

12   come in four weeks earlier and stay on site to watch all

13   of the -- you know, he tests 1^ -- testing the facility.

14        He may not even be -- in a lot of jobs the

15   third-party plumber is not even near the project when

16   they're pouring.  Because he's -- you know, he could

17   test the -- he tests the plumbing.  You know -- yeah, he

18   might not even be there during concrete, you know.  And

19   then the reference at that point to finish floor is not

20   his responsibility.

21        You know, yeah, if the floor drain was up here

22   and the floor was down there, yeah, you'd say, "Wait a

23   minute.  We've got a problem here."

24        But during the pour, that thing getting jacked

25   up, moved, pushed, you know, sometimes the plumbers not
```



1   even on site when those components get jacked up.

2          So the care, the responsibility is the

3   contractor, because they're -- not only are they

4   responsible for the product, but for the function of the

5   product, and the cost of repairing it if it's wrong.

6          So there's a certain performance in a

7   workmanlike manner that's demanded of people in the

8   field.  In a workmanlike way would be to make sure that

9   it's -- I don't care if it's a wall or a floor sink or

10  whatever, you know, level, plum, square, whatever the

11  requirements are.

12         And the anticipation is that the mechanic,

13  whoever that is, is performing his function as a

14  bona fide, legitimate journeyman workman.  And

15  observation is, you know, is it -- does the water flow?

16  You know, in reference to the finishes, once the

17  finishes are there, the rough floor there is, it's like,

18  "Whoa."  So that's how I answer the question.

19         MR. McMANUS:  Okay.  I'm going to mark as

20  Exhibit 353 --

21         THE REPORTER:  343?

22         MR. McMANUS:  Oh, thank you.  343.

23         (Exhibit 343 marked)

24  BY MR. McMANUS:

25    Q.  Take your time to take a look at this.  I'll



 1  represent to you that this is a compilation of documents

 2  prepared by myself.  They've been produced by CTE in

 3  this action.  They range from Bates stamp CTE001612 to

 4  CTE001818.  This is a compilation I made myself of

 5  inspection reports, test reports, and other documents

 6  bearing your name.

 7       So please take a look through here.  Please

 8  take a look through each document.  Let me know if

 9  there's anything on here that you believe is not your

10  signature.

11       And whenever you're ready, we can get back to

12  it.

13  A.  Okay, this is just to see that I actually did

14  these rather than review each particular document?

15  Q.  If you want to review each particular one,

16  please do.  I just want to make sure --

17  A.  How much time have we got?  I don't recall

18  these two.

19  Q.  Can you tell me the Bates stamps on those?

20  It's the lower right-hand corner.  It will be CTE

21  followed by --

22  A.  CTE001645.

23       I don't have a signature on that one either.

24  Q.  What number is that?

25  A.  1656.



 1      Q.   Okay.  Thank you.

 2           MR. SCHWERDTFEGER:  I'm looking over the

 3  witness' shoulder.  You're asking if they're all signed.

 4  Many of the reports are just printed; he hasn't signed

 5  them.

 6           MR. McMANUS:  Well, if he hasn't signed them,

 7  then --

 8           THE WITNESS:  A lot of them aren't signed.  But

 9  I have my name on the bottom.

10           MR. SCHWERDTFEGER:  You can conduct the

11  deposition as you like.  But many are just printed.  Are

12  you just asking -- so the answer to your question would

13  be answered.  If you have a specific report, can you

14  move to that?  Or do you just want to --

15           MR. McMANUS:  Yeah, I just want him -- I don't

16  want him to have to be speaking about something he

17  didn't prepare.  So I just want to make sure --

18           THE WITNESS:  Well, let's go through each one

19  of them.  And then -- however you want to do that.

20           MR. McMANUS:  Okay.

21           THE WITNESS:  And then if it appears it doesn't

22  jog my memory or is prepared by somebody else.

23           MR. McMANUS:  Okay.

24           THE WITNESS:  Let's just do that.

25  ///



1    BY MR. McMANUS:

2        Q.  Let's start with the first.

3        A.  I don't want to have to read through all of

4    these just to say -- because I have my name on them, but

5    I don't have a signature on them.  And I don't know what

6    CTE has, but anyway.

7            MR. SCHWERDTFEGER:  And there's quite a few.

8    BY MR. McMANUS:

9        Q.  So we'll start with the first page, CTE001612.

10   Are you familiar with this document?

11       A.  001612?

12       Q.  Yes.

13       A.  3/20.  Okay.

14       Q.  Are you familiar with this document?

15       A.  I wrote it.  I signed it.

16       Q.  What is it?

17       A.  3/20.  "Domestic water pressure test."

18           Anyway, it's in reference to a domestic

19   water -- apparently it's a water pressure test.  And

20   then some as-built conditions in reference to an RFI

21   log.

22       Q.  Okay.

23       A.  So that's vague.  Go ahead.

24       Q.  Was it your practice to prepare reports like

25   this while you were on site?



 1      A.  I did do inspection reports, yes.

 2      Q.  And what was generally your practice in

 3  preparing an inspection report?

 4      A.  Generally.  Let's use an example here.  I think

 5  that Dana Clark was still on this project at this time,

 6  and I'd have to check to see if he completed this

 7  particular inspection report.  So we should probably

 8  look at Dana's reports from that particular day.

 9  Because I think that he was still on site for a while,

10  but --

11      Q.  It --

12      A.  Go ahead.

13      Q.  I just want to know.  You don't even have to --

14  just from what you recall, just how would you go about

15  preparing an inspection report?

16      A.  You'd note the type of inspection.

17          Let me go to the next one if you want to.  Go

18  to --

19      Q.  How about turn to --

20      A.  -- 1621 if you want.

21      Q.  Can we go to 1622?

22      A.  1622.  "Boiler/hot water investigation."

23          That's an observation.

24      Q.  So -- sorry.

25      A.  That's an observation that states that the



1   boiler -- the system was set up where they had two

2   requirements for water temperature.  There was a

3   temperature for dish washing, and one for -- I'd have to

4   look at the plans.  But dish washing was a higher

5   temperature.  And when there's hand washing or contact

6   with people, it would be a lower temperature.  So it was

7   two separate systems in the domestic water supply of the

8   DEFAC.

9       Q.  All right.  I'd like to turn your attention to

10  near the bottom of this document, Bates stamped

11  CTE001622.  It's called the "Certification of

12  compliance."  States, "All work, unless otherwise noted,

13  complies with the approved plans and specifications and

14  uniform building code."

15          What significance does the certification of

16  compliance have to you?

17      A.  It's my -- as an inspector, your performance is

18  to ensure that.

19      Q.  And you've also -- I understand you've also

20  worked for general contractors.  Is it reasonable for a

21  general contractor to rely on a certification of

22  compliance such as this?

23          MR. SCHWERDTFEGER:  Objection.  Vague and

24  ambiguous.

25          THE WITNESS:  This is an observation of



1   noncompliance.

2   BY MR. McMANUS:

3       Q.  Right.

4       A.  Okay.

5       Q.  But it's reasonable that if you -- if a

6   general -- I'm just asking, if you're a general

7   contractor, and you work for the general contractor and

8   you receive an inspection report with a certification of

9   compliance, it's -- would you think it's reasonable for

10  the general contractor to rely on the information

11  contained in that report?

12          MR. SCHWERDTFEGER:  Objection.  Vague and

13  ambiguous.

14          MR. CAULEY:  Join.

15          THE WITNESS:  There's information data, and

16  then there's compliance data.  Right?  So that if you

17  test something and it passes, it complies.

18          In the event that it doesn't, or in the event

19  there's other observations, this doesn't certify that

20  everything written above is compliant.  In fact, some of

21  these reports are reports of noncompliance.  Am I

22  missing something here?

23      Q.  So because -- it says, "All work, unless

24  otherwise noted, complies with approved plans and specs

25  and the uniform building code."  I'm just asking that if



1  a general contractor received a report like this, noting

2  these deficiencies, would it be reasonable for the

3  general contractor to assume that the remainder of the

4  work inspected was not -- did not contain any

5  deficiencies?

6          MR. CAULEY:  Objection.  It's been asked and

7  answered.

8          THE WITNESS:  I don't know what "the remainder

9  of the work" is.

10         I mean, what it says is that the dining

11 facility requires two hot water temperature circuits.

12 And this says that it doesn't.  Which means that they

13 need to see that each system is -- and we'll probably

14 see in subsequent inspections, but what that resolution

15 was, balancing valve or whatever.

16         So this is a notation of a defect for design --

17 defect.  And we didn't have compliance.  And we worked

18 with them until we found a resolution, finding balancing

19 valves, finding temperature valves, and work to resolve

20 that, so that there wouldn't be scalding or that there

21 wouldn't be excessive -- or not adequate temperature for

22 sanitary dish washing.  You know, the dishwasher

23 requires a higher temperature than you would want to

24 have in a hand sink.  But the water only had one

25 temperature.  So the regulation of that water has to be



1  downstream.  So that's what that says.

2      Q.  Okay.  Thank you.  That's not really my

3  question.

4          I want to know that from a general contractor's

5  perspective, if they're receiving a report like this

6  with a certification, I want to know whether it's

7  reasonable for them to rely on this certification

8  stating that all other work, unless otherwise noted,

9  complies with the plans and specs and the building code?

10         MR. SCHWERDTFEGER:  Objection.  Vague and

11  ambiguous?

12         THE WITNESS:  All other work?  This doesn't say

13  anything about all other work.  This says that the

14  boiler has -- the boiler system has a deficiency.  That

15  doesn't say anything about -- that doesn't say anything

16  about the walls out of plumb or the ceiling, or -- I

17  mean, I'm missing something, I guess.

18  BY MR. McMANUS:

19     Q.  It's on the very bottom.

20     A.  I see what it says, yeah.  I read it.

21         MR. SCHWERDTFEGER:  That's his answer.

22         THE WITNESS:  This pertains to -- that

23  paragraph pertains to the fact there's a deficiency in

24  the plumbing, the water temperature.  Okay?

25         Where do you get "all other work"?



1  BY MR. McMANUS:

2      Q.  It says, "Certification of Compliance:  All

3  work unless otherwise noted."

4      A.  I don't know about the walls.  I don't know

5  with the floor drains.  I don't know anything else.

6  This is an observation for this particular part of the

7  work.  It doesn't -- in other words, if you -- we'll go

8  through this again.

9          But if there's a plumbing test, and the

10  plumbing test passes or doesn't pass, it means that

11  specific work.  That work.

12          MR. McMANUS:  Can you read back his answer to

13  my question on what does he believe is the significance

14  of the certification of compliance, please?

15          (Discussion off the record)

16          (Record read:

17          "Question:  What significance does the

18  certification of compliance have to you?

19          "Answer:  It's my -- as an inspector, your

20  performance is to ensure that.")

21  BY MR. McMANUS:

22      Q.  When you sign an inspection report such as this

23  one, are you agreeing to the words that are stated in

24  the certificate of compliance?  Was that your practice

25  on the job?



1          MR. SCHWERDTFEGER:  Objection.  Compound.

2          THE WITNESS:  I agree to the fact that the

3    boiler does not function per plans and specifications.

4    That's what that states.

5    BY MR. McMANUS:

6       Q.  Did you have a thought process with regard to

7    all other work?  Because I'm just asking, because the

8    certification of compliance says "all work."  So besides

9    the items noted, did you have a thought process

10   regarding "all work"?

11      A.  If I inspect --

12         MR. SCHWERDTFEGER:  Objection.  Compound.

13         THE WITNESS:  If I inspect a plumbing pipe,

14   that's the plumbing pipe.  All plumbing pipe, that work,

15   then that -- it's test specific.  Observation specific.

16         So this says that the boiler didn't have the

17   right temperature settings per plan.  A concept that

18   they needed to ensure compliance to a safe system.  And

19   that's what that means.

20   BY MR. McMANUS:

21      Q.  So let me --

22      A.  As a result, all right, work with the plumber.

23   You know, we actually worked and found some valves, and

24   worked with the QC.  We worked with it until we had a

25   system that complied.  So all other work, yeah, I did

1  other work too.  I did work as if I was -- you know, to

2  see that that system was done.  Didn't simply observe

3  it.  But I worked with them to see that we could have

4  those valves.  Not because of requirement.  But because

5  it's a safety issue too.

6          So in that sense, yeah, I did other work.

7      Q.  Let me ask you a different way.  Say that there

8  was an inspection report observing plumbing work being

9  performed, but not noting any deficiencies.  And then

10  that report's turned into the general contractor.

11  General contractor sees "no deficiencies noted," sees

12  the certification of compliance.  Do you think it would

13  be reasonable for the general contractor to rely on the

14  fact that there were not any deficiencies in the

15  plumbing work noted in that particular report?

16          MR. SCHWERDTFEGER:  Objection.  Vague and

17  ambiguous.  Incomplete hypothetical.

18          MR. CAULEY:  Join.

19          THE WITNESS:  When the plumbing work was

20  tested, that's -- that's when the work is deemed, where

21  inspections are required, that it's acceptable.  I mean,

22  that I do testing.

23  BY MR. McMANUS:

24      Q.  I'm asking about an observation, though?

25      A.  Like this one?



1    Q.  Yes, like this one but not noting any

2    deficiencies.

3         MR. SCHWERDTFEGER:  Ask a full question,

4    please.

5    BY MR. McMANUS:

6    Q.  I'm just asking, a similar report like this,

7    except observing work performed but not noting any

8    deficiencies.  If in a general contractor received that,

9    I just want to know if it would be reasonable for them

10   to rely on the report and to believe that there were no

11   deficiencies with the work specifically observed in that

12   report?

13        MR. SCHWERDTFEGER:  Objection.  Vague and

14   ambiguous.

15        THE WITNESS:  The testing would tell whether

16   the work was deficient or not.

17   BY MR. McMANUS:

18   Q.  Okay.  So let's say that there is an inspection

19   report prepared by CTE.  CTE's inspector says,

20   "McCullough Plumbing, Inc., was working on installing

21   the rough-in in the dining facility today."  And then

22   the inspector signs it at the bottom and hands over to

23   Halbert's quality control manager.

24        If Halbert's quality control manager looked at

25   that and just saw McCullough installing work, rough-in



1   in the dining facility, they see the certification of

2   compliance.  Do you think it would be reasonable for

3   Halbert's quality control manager to believe that the

4   inspector did not observe any deficiencies in

5   McCullough's work on that day?

6          MR. SCHWERDTFEGER:  Objection.  Assumes facts.

7   Incomplete hypothetical.

8          MR. CAULEY:  Join.

9          THE WITNESS:  It's an observation.

10         MR. SCHWERDTFEGER:  You can answer.

11         THE WITNESS:  It's an observation.

12   BY MR. McMANUS:

13     Q.  Right.  I just want to know if it would be

14   reasonable for them to rely on the certification?

15     A.  If there's a test, the testing is -- but back

16   to this example.  You know, this was an observation that

17   it was deficient.  And it would be reasonable for the

18   guy who read this just to believe that this is

19   deficient.  Right?

20     Q.  What about an observation that does not note

21   deficiencies?  Is it reasonable --

22     A.  No.

23     Q.  Would --

24     A.  Here's an example.  This is what -- this is

25   what I did.  Now, this is an observation of something

1   that was deficient, and this is -- and that's what that

2   means.

3        Q.  Right.  But --

4        A.  So --

5        Q.  My other question, sorry, I'm asking --

6            MR. SCHWERDTFEGER:  Hold on.

7            THE WITNESS:  I'm sorry.

8            MR. SCHWERDTFEGER:  You're entitled to finish.

9            THE WITNESS:  I would -- this is a dead horse.

10  This is an observation that was made where there was a

11  deficiency.  And as an inspector I noted it, saw a

12  problem, and we resolved and we worked diligently.  And

13  beyond the capacity of the inspector to see that

14  these -- this work was performed, and ultimately it was

15  piped or whatever we had to do to resolve it.  So all

16  I'm saying is there's -- this states a specific problem

17  as an observation.

18       Q.  I want to turn away from this document for a

19  minute.

20       A.  Okay.

21       Q.  I just want to ask you, say that you're working

22  for Halbert, you're Halbert's superintendent on the job.

23  McCullough is installing shields in the dining facility.

24  You're working.  McCullough's foreman comes up to you,

25  gives a report -- I'm sorry, not McCullough's foreman.



1   CTE's special inspector comes up to you and gives you an

2   inspection report.  The inspection with regards to

3   McCullough says that, "Observed McCullough in the dining

4   facility installing shields."  Inspector signs it.

5          As a superintendent, would you think that there

6   were any deficiencies in McCullough's work performed

7   that day?

8      A.  No.  It would be an observation.  Now, if he

9   said, "Hey, he's installing backwards," then, you know,

10  I would note.

11         It's just -- some of these might be just a

12  reporting of work, what they were functioning that --

13  what they were doing that day.

14     Q.  Right.  And if there wasn't a deficiency noted,

15  the general contractor is going to rely on that fact and

16  assume that the work was performed correctly; right?

17     A.  No.

18     Q.  If there's a --

19     A.  The --

20         MR. SCHWERDTFEGER:  Hang on.  Let him finish.

21         THE WITNESS:  The testing -- I make an

22  observation they're putting in the underground.  Right?

23  BY MR. McMANUS:

24     Q.  Right.

25     A.  And at the end of that process, when they're



1   finished with that section of work, then we test it.

2   And you put a level on it, or whatever the testing is,

3   or you do the water test, which is what typically is

4   required because it's ABS pipe.

5          And when that report for the 10-foot head test

6   for that section comes out, and is approved or denied,

7   then as a superintendent, I would say then that area

8   is -- for the pipe, for the pressure test performed,

9   it's good.  Because that tests whether or not there's

10  leaks, whether or not it's been, whatever.  So that

11  report would say that that section is good per a 10-foot

12  head test.

13       Q.  But with regards to a report just noting

14  observations, not related to testing just, noting

15  observations of work performed on the site that day?

16       A.  Yes.

17       Q.  If no deficiencies are noted in the report, is

18  it your opinion that the general contractor would not be

19  able to rely on the fact that no deficiencies were

20  noted?

21       A.  It's an observation.

22       Q.  What is an obser- --

23       A.  If that's what the report says, they're

24  plumbing or piping today, it means they're plumbing or

25  piping.  It doesn't mean it was tested.  The test would



```
 1  say it was tested.
 2       Q.  Do you know why the inspector reports contain
 3  the certification of compliance, though?
 4       A.  Uh-huh.
 5       Q.  Why is that?
 6            MR. ALFONZO:  That was a yes; right?
 7            THE WITNESS:  Pardon?
 8            MR. ALFONZO:  That was a yes?  You said
 9  "uh-huh."
10            THE WITNESS:  Sorry.  One more time, the
11  question?
12  BY MR. McMANUS:
13       Q.  I'm asking, why do your inspection reports
14  contain the certification of compliance?
15       A.  That the testing that we did, the testing that
16  was performed, tested that specific portion of work.
17  And that it complies.  Or as an observation, you observe
18  that the system does not have a separate loop for 140
19  degree or 120 degree.  That's not a test.  That's an
20  observation.  But it determined that the system
21  specifically was not compliant.
22       Q.  What about an inspection report that was just
23  an observation and not an inspection --
24       A.  Just an inspection?
25       Q.  Sorry.  Just an observation.
```



1    A.  Just an observation.

2    Q.  No deficiency is noted.  What would be the

3  point of the certification of compliance on that

4  particular document?

5         MR. SCHWERDTFEGER:  Objection.  Asked and

6  answered.  And kind of argumentative.

7         THE WITNESS:  It's an observation.  It's a

8  report of what -- of what the workmen were doing.

9  BY MR. McMANUS:

10   Q.  I understand.

11   A.  That's all that is.

12        Now, if there's a test, it's a test.  And the

13 test is -- says that it's compliant otherwise.

14        MR. ALFONZO:  Can we go off the record a

15 second?  I have a question about breaks.

16        (Recess)

17        MR. McMANUS:  All right.  We're still in

18 Exhibit 243 --

19        MR. CAULEY:  343.

20        MR. McMANUS:  343.  Thank you.

21 BY MR. McMANUS:

22   Q.  I'd like you to please turn to the last page,

23 CTE 001818.

24        I note here that it says here, "Name: Pete

25 Albers; Signature: 092017."  What does that mean to you?



1    A.  I don't know.  I don't know what 092017 is.

2    Q.  Do you remember preparing this report?

3    A.  Let's see.

4        Oh, it's the report number, apparently.  See up

5    there under report number, 092017.  And then under

6    signature it has the same number.

7        MR. CAULEY:  Also has that under "inspection

8    date" as well.

9        THE WITNESS:  Oh, okay.  That's the date.

10   Report number is the date, okay.

11       And under "signature" is the date, September

12   20.  Okay.

13   BY MR. McMANUS:

14   Q.  Can you tell me what this document is?

15   A.  An observation of gas line installation, Ansul

16   systems.  So there was -- that's an observation of two

17   different functions.  Ansul systems is the piping on

18   hoods, where there's hoods.  And then subsequently they

19   have -- Ansul is a temperature actuator valve.  In other

20   words, if they had a fire on a stove, it would activate

21   that.  And then it would put the fire out.

22       So that's -- that's one part of the work.

23   That's a separate sub.  I forget the name of the sub

24   right now.  A company out of Salinas.  I'll come to it

25   in a minute.



1          But anyway, the other one is some gas boiler

2    piping that would have been performed by -- at that

3    point it might have been Cobabe Plumbing.

4          And then they observed some concrete curb

5    placement, Phase 2, 15 yards.  Observation of work

6    performed.

7       Q.  So this document is not related to a test.

8    It's related to an observation; correct?

9       A.  That's correct.

10      Q.  And so in this document, it's your

11   documentation of the matters that you observed with

12   regard to these particular trade installations on

13   September 20th, 2017; is that correct?

14      A.  Yes.

15      Q.  And if we go down to the bottom we have that

16   certification of compliance.

17      A.  Uh-huh.

18      Q.  Were you aware of that certification when you

19   put your name and signature on this document?

20      A.  It's there, yes.  I see it.  Yes.

21      Q.  So were you certifying that with respect, for

22   example, to installation of the gas lines and Ansul

23   valves and gas boiler piping, that there were no

24   deficiencies related to that work?

25      A.  There's no test there.



PETE ALBERS                                           March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                         107

 1       Q.  Right.  But I'm asking --

 2       A.  The test would -- concrete.  Concrete is

 3  placed.  Rebar would be observed.  And typically, right?

 4       Concrete is poured within the forms in the

 5  location per plan.  Concrete tests are done over time.

 6  You know?  So the test -- the actual testing for this

 7  concrete is -- I don't know, I'm just going to guess

 8  it's 2500 psi at 28 days with -- I don't remember the

 9  specs.  We'd have to look at it, but there may be three

10  breaks.

11       So certification of concrete isn't based on

12  what's done that day.  You make an observation that it's

13  poured within forms and has or doesn't have rebar,

14  whatever, so.  This is like a daily report and an

15  observation.  But this doesn't -- there's no test on a

16  day that you pour, you pour concrete.  There's no test

17  to certify.

18       Q.  But --

19       A.  There's no certificate based on a test or a

20  breaking of concrete cylinders, you know.  Because

21  they'll take three or four cylinders; they'll -- this is

22  a function of CTE.  I'm not a concrete inspector.  So

23  concrete inspections are done separately from me.

24       So the cylinders that are taken, and usually

25  three of them, and they're breaking them.  And then a



1    report comes back from the testing company that it

2    reached a certain psi at those certain days.  And when

3    -- you know, when a concrete specification says that

4    it's 2500 at 28 days, or whatever, you know, you can go

5    to a higher compression concrete, and if you get that

6    2500 at 14 days, then you know you comply.  Sidewalk not

7    so much.  But a slab where you want to work over it, you

8    may increase that.

9            But the test and the ultimate compliance comes

10   from a report, whoever the testing agency for the

11   concrete is.

12           Gas testing comes from a pressure test.  Two

13   hours at -- I put a lot of gas pressure in those

14   systems.  But this isn't -- once again, it's an

15   observation.

16       Q.  So if we go to the certification of compliance

17   down at the bottom, it doesn't mention tests; right?

18       A.  No.

19       Q.  So then why was the certification of compliance

20   included on an inspection report titled "Field

21   observations," and there's no reference to test on here?

22       A.  Because --

23           MR. SCHWERDTFEGER:  Objection.  Calls for

24   speculation.

25           Go ahead.

```
 1              MR. CAULEY:  Join.
 2              THE WITNESS:  Because it's obvious that it
 3      would certify a test.
 4      BY MR. McMANUS:
 5          Q.  But a test and an observation are two separate
 6      functions; right?
 7          A.  Uh-huh.
 8          Q.  So if the certification, if you're saying that
 9      it's related to tests, I'm just asking, why would you
10      sign this document with certification if there's no test
11      noted in this document?
12          A.  It's an observation for the benefit of QC, and
13      superintendent, whoever else is looking at the report.
14          Q.  And what's the benefit for them?
15          A.  They know what's happening in the project.
16      They know what specific portion where it's -- it keeps
17      them aware of what's progressing on the project.
18          Q.  And they rely on the fact that items noted in
19      an observation are accurate; right?
20          A.  Yes.  They were -- as an example, they were
21      installing an Ansul system, and they were installing the
22      gas piping system, and they were pouring concrete that
23      day.
24              And it may give them an idea -- sometimes they
25      never got out of the trailer, you know.  So maybe it's
```



1  the superintendent's hat I got on.  But give them an

2  idea of what's happening.

3      Q.  So if you had observed a deficiency related to

4  the installation of gas line, Ansul valves, and gas

5  boiler piping, and it was not included on here, do you

6  think that as a general contractor they would rely on

7  that specific scope of work not containing deficiencies?

8      A.  The deficiency would come from -- well, okay.

9          Go back to -- if I saw that the gas line was

10 being piped -- he's supposed to be piping to a boiler,

11 and he's piping to a water heater or something, I mean,

12 that would be an obvious thing.

13         But the point of this is in observation.  All

14 right?  Now, I've illustrated in the past that if I see

15 the piping system does not include 140 degree

16 temperature and 120 degree temperature, I observed it

17 and noted it, so.  And subsequently worked on it.

18         This is an observation of an Ansul system, and

19 gas lines to the boiler, and concrete placement.  It is

20 what it says.

21     Q.  If you had observed a deficiency with respect

22 to that scope of work, you wouldn't have signed -- would

23 you have signed this without noting that deficiency in

24 the report?

25     A.  If I saw a discrepancy -- well, let's go back



1  to this.

2          Use an example, whatever that first one was --

3  I mean, I've illustrated if I saw that the system had --

4  didn't have the means to produce 140 and 120 degree

5  temperatures, I note -- I observed that and brought that

6  to the attention, and worked to resolve that.

7      Q.  And if you didn't note something other than

8  that, all other work noted in that report is correct;

9  right?

10     A.  No.

11         MR. SCHWERDTFEGER:  Objection.  Misstates

12  deponent's testimony.

13         THE WITNESS:  No.

14  BY MR. McMANUS:

15     Q.  So would you -- when you signed these

16  inspection reports, did you sign them without regard to

17  the certification of compliance?

18     A.  The certification of compliance refers to

19  testing.  So in other words, if I did a 10-foot head

20  test, right?  I mean on like the -- yeah, if I did a gas

21  test and I did it for two hours, and I had it observed

22  by the QC, and we held it at, I don't believe

23  extraordinary -- super high pressure, but I noted that,

24  which I have, that would mean that that section of that

25  pipe is certified to comply with plans and



 1  specifications.

 2         The test is what -- and plus it's usually

 3  observed.  I usually use the QC to observe.  We noted

 4  sometimes before, sometimes after what the pressures

 5  were or -- a lot of times for gas pressure -- this is

 6  not a gas pressure test.  This is an observation.  That

 7  that's the work they were doing.

 8     Q.  So is the certification for compliance

 9  meaningless for an observation?

10     A.  Well, go to the first example.  First example

11  is an observation that the system appears not to be per

12  plans and specifications.  So what does a cert -- what

13  does that certification mean from there, then?  If you

14  observe that there's something -- you know, it may not

15  be per plans and specifications, make a note of it.

16  What does that mean for all other work?  I have no idea.

17     Q.  Well --

18     A.  What's that have to do with the piping in -- if

19  I say that this piping here is 140 versus 120 degrees,

20  and make an observation, that's what that is.

21         Now, if it says "passes test at 120 psi in two

22  hours," it means that that is compliant.

23     Q.  But when you fill out one of these field

24  observation inspection reports, you're not noting all

25  work performed on the project that day; you're noting



1   very specific and discrete areas of work.  So --

2       A.  Typically related around, you know, work at

3   which I will at some time be testing or CTE is doing

4   this concrete testing.

5           I'd have to go through them to see how specific

6   I was to my trade, or if I was using and doing it for

7   them, the QC of other work.  I don't know.  I'd have to

8   look.

9       Q.  So when you're on site and you're filling out

10  one of these inspection reports of your observations,

11  not in a test, just your observations, and you're

12  putting in there specific trade work that you're

13  inspecting, when you signed off on that report, were you

14  certifying that all work noted in that report, unless

15  otherwise noted, complied with the plans and specs and

16  the Uniform Building Code?

17      A.  No.

18      Q.  You weren't?

19      A.  No.  It was not tested.

20      Q.  So for --

21      A.  I can -- see, well, I look at this gas piping

22  being installed, I look at the Ansul system being

23  installed, and that that's the performance that the

24  workmen are performing that day.

25          The certification that it is compliant or per



PETE ALBERS                                                    March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                                     114

1   plans and specs ultimately comes from a gas pressure

2   test.  A gas pressure test is noted and observed and

3   witnessed.  Now, that is -- that is where compliance of

4   that particular sector, portion of work is.

5        Q.  For an observation such as this one, the one

6   we've been looking at, CTE001818, would you have signed

7   it certifying that work is complete -- I'm sorry, work

8   is compliant with approved plans and specifications if

9   that wasn't true?

10       A.  Which one you are you at?

11       Q.  It's the very last page, CTE001818.  It should

12  be the last document.

13       A.  I thought this was the last one.

14       Q.  Look at the very bottom.  It's the 9/20/17.

15       A.  Yeah, 1818.  Yeah.

16       Q.  So --

17       A.  This is still an observation.

18       Q.  Right.

19       A.  It really is an observation.  It's an

20  observation of three trades that are -- all of which are

21  working in plumbing, piping-related products, and

22  concrete.  And I've noted in a report that I've observed

23  that work being completed.

24       Q.  Right.

25       A.  And I couldn't even tell you if ultimately



1    those concrete cylinders came -- they must have come

2    in -- must have come in good.  Because there's no

3    subsequent removal of concrete.  I don't have any

4    remedial -- I don't recall any remedial gas piping work.

5    The Ansul system was performed.  We did balloon tests.

6        Q.  Was all work performed in accordance with the

7    plans and specs?

8        A.  The balloon test passed.  At -- not at this

9    stage.  So Ansul systems were tested.  The boiler piping

10   would have been tested.  The concrete cylinders and

11   slump.  A slump test -- I think we did slump tests.

12   Although, for sidewalk work, you may or may not do that.

13        And then those are reports come in at a later

14   date.

15       Q.  So --

16       A.  And at the bottom of those reports we would

17   probably have a certificate of compliance.  And at that

18   point it's the testing that confirms and verifies that

19   observation.

20       Q.  But this document Bates stamped as CTE001818,

21   this is a field observation; correct?

22       A.  Yes.

23       Q.  It does not mention tests anywhere on this

24   document; correct?

25       A.  That's correct.



1    Q.   And there is a Certification of Compliance,

2    stating, "All work, unless otherwise noted, complies

3    with the approved plans and specifications and the

4    uniform building code" on the bottom this document;

5    correct?

6    A.   Uh-huh.

7         MR. ALFONZO:   Is that a yes?

8         THE WITNESS:   Yes.   Sorry.

9  BY MR. McMANUS:

10   Q.   And your name and signature are on this

11   document?

12   A.   Yes.

13   Q.   Okay.   Thank you.

14        MR. SCHWERDTFEGER:   Are we done this with?

15        MR. McMANUS:   For now, yes.   Probably, yeah.

16        We'll mark as Exhibit 344.

17        (Exhibit 344 marked)

18        MR. McMANUS:   This a plan sheet, Bates stamped

19   HAL005474.   It's "Sheet Identification P-101, FY11

20   Barracks Complex, Phase 1 (1300 PN Dining Facility)."

21   Signed by Pete Albers on November 14th, 2017.

22        I'll give you this nice, large copy.   And I'll

23   pass out some smaller, less nice copies for everybody

24   else.

25        MR. CAULEY:   So we're supposed to have five



 1  pages, Patrick?

 2          MR. SCHWERDTFEGER:  There's only one page in

 3  ours.

 4          MR. McMANUS:  That's a couple different ones.

 5          MR. CAULEY:  Okay.

 6          MR. McMANUS:  Just blown up.  This one we're

 7  just focusing on 5474.

 8          MR. CAULEY:  All right.

 9          MR. McMANUS:  But I have a couple.

10          Let me know when you're done reviewing the

11  document?

12          Are you having trouble reading?  I actually

13  have it blown up.

14          MR. SCHWERDTFEGER:  Do we have a magnifying

15  glass or something?

16          THE WITNESS:  A magnifying glass.

17          MR. SCHWERDTFEGER:  This diagram's different.

18          MR. McMANUS:  It is.  It's blown up certain

19  text on that very same document so it's easier to read.

20          THE WITNESS:  I can't read the -- I can't read

21  the room numbers or even where this is located that's

22  in -- oh, that's a men's restroom.  Men's restroom,

23  women's restroom.

24          MR. SCHWERDTFEGER:  Let's find an orientation.

25  Looks like he's blowing up this portion.



 1          MR. McMANUS:  That portion right there.

 2          MR. SCHWERDTFEGER:  Okay.

 3          This is the only area you want him to focus on

 4  this; correct?

 5          MR. McMANUS:  We'll focus on other areas.  That

 6  was the hardest to read, so I blew that up.  But we're

 7  going to go to other areas.  If you can't read it --

 8          THE WITNESS:  I think I can.

 9          MR. McMANUS:  -- we'll figure something out.

10  You can hold on to that.

11          THE WITNESS:  I think I got it.  I wanted to

12  find out what the location.  It's hard to tell that.

13  Now that -- those are the men's and women's bathroom.

14  BY MR. McMANUS:

15      Q.  It looks like we're in Area A --

16      A.  Yes.

17      Q.  -- I think, based on that stamp in the bottom

18  right-hand corner.

19      A.  Yeah.  It is Area A.  But I could not tell

20  which room.  Okay.

21      Q.  Did you repair this document?

22      A.  Yes.

23      Q.  Is that your signature on the right?

24      A.  Yes.

25      Q.  Do you -- I want to ask you, can you see in the



1  top portion it looks like it says, "In general - missing

2  30 water supplies to kitchen equip"?

3      A.  Yes.

4      Q.  Can you tell me what is the significance of

5  that?

6      A.  The kitchen equipment, particularly in those

7  radius walls and in that prep area, is -- there's a

8  kitchen equipment schedule.  There was -- so the plan

9  determining where the piping should go is in a sense

10  generic, because all of the shop drawings and all the

11  water connections that go to all the individual sinks,

12  like 30 of them, I'm going to assume that those are all

13  missed because the shop drawings were probably not

14  available at the time is my assumption, weren't there at

15  the time.  But that's pretty much the consensus, I will

16  say for electric and plumbing, that none of those

17  connections for restaurant equipment were delineated or

18  defined at the time.  And they did their stub-ups per

19  plan.  I don't know if we can see that.

20          But I would imagine that there's 30 -- probably

21  15, if they're both hot and cold water.  But those were

22  not -- if they were plumbed before the restaurant

23  equipment company had supplied a shop drawing or

24  detailed drawings, or they referred to the KE, kitchen

25  equipment plans, then that was missed.



1    Q.  So with regard to that piece of equipment being

2   missed, would you agree that that work did not comply

3   with the project specifications?

4         MR. CAULEY:  Vague and ambiguous as to "work."

5   BY MR. McMANUS:

6    Q.  So --

7    A.  Well, those -- the components that were there

8   needed water.  I can say that.

9    Q.  So --

10    A.  And the miss is the difference between probably

11   a -- shop drawings come, and design comes later, or

12   perhaps they didn't bid it at the time.  They didn't --

13   so anyway.

14    Q.  So kitchen components need the water.  Here

15   it's noted that there's 30 water supplies missing from

16   that equipment.  Would you agree that that constitutes

17   noncompliant plumbing work?

18         MR. SCHWERDTFEGER:  Objection.  Vague and

19   ambiguous.

20         MR. CAULEY:  Objection.  Vague and ambiguous.

21   Misstates testimony.

22         MR. SCHWERDTFEGER:  I would agree.  Misstates

23   the testimony.

24         THE WITNESS:  I would agree that there's 30

25   water supplies missing from sinks that needed water.

```
 1   BY MR. McMANUS:
 2       Q.  Would you say that that constitutes a
 3   deficiency?
 4           MR. CAULEY:  Argumentative.  Misstates his
 5   testimony.
 6           MR. SCHWERDTFEGER:  Vague and ambiguous.
 7           MR. ALFONZO:  It's a question to you.
 8           THE WITNESS:  I don't know.
 9           MR. ALFONZO:  There's no testimony that he's
10   repeating.  It's a question.
11           MR. SCHWERDTFEGER:  We don't need commentary.
12           Go ahead.  The question's fine.  It's vague and
13   ambiguous as to "deficiency," but go ahead.
14           THE WITNESS:  The water supplies needed to be
15   provided to the kitchen equipment company.  And it's
16   required that water goes to those sinks, so -- and I'm
17   sure that at some point the submittals require water to
18   sinks, yes.
19   BY MR. McMANUS:
20       Q.  Based on your training with the Army Corps CQC
21   program, do you think the Army Corps would have accepted
22   the building and taken occupancy if there were missing
23   water supplies.
24       A.  It depends.  If -- and I don't mean to be
25   smart, but we had a couple of examples where they didn't
```



1  show electrical to double-stacked pizza ovens or

2  something, and they accepted it, so.  But the water

3  supplies were piped to all those, that I know of.

4      Q.  But not when you noted it here; right?

5      A.  Right.

6      Q.  Right.  If you had been performing plumbing

7  inspections while McCullough was engaging in this work,

8  would you have observed this area, this missing line?

9          MR. SCHWERDTFEGER:  Objection.  Lacks

10  foundation.  Beyond the scope of this witness.  He's a

11  percipient.

12          MR. CAULEY:  Join.  Calls for speculation.

13          THE WITNESS:  I would observe stub-ups, and

14  have tested those stub-ups.  In other words, the piping

15  that came up through the floor into these cabinets.

16  These are a series of cabinets.  And the rough work

17  would be stubbed up and tested and complied.

18  BY MR. McMANUS:

19      Q.  Okay.  Would you have noted any deficiencies

20  related to that in a report?

21      A.  If the cabinetry came in, the sinks were set,

22  and the plumber said it wasn't in his scope, or

23  whatever, then I'd say, "We're missing water," yes.

24      Q.  Okay.

25      A.  I mean, it's reasonable.  But at rough-in, no.



1    Q.  So what about on the top now, a little bit

2    above that, it says "Water lines as built by McCullough

3    in error"?  It's at the very top, above the line

4    denoting the plan.

5    A.  Uh-huh.

6    Q.  What's the significance of "as built by

7    McCullough in error"?

8    A.  That they missed the 30 water connections.  But

9    they were stubbed up within the cabinet.

10   Q.  So when you say "in error," does that mean that

11   the work did not comply with the project specifications?

12   A.  Yes.

13   Q.  Does --

14   A.  In other words, they didn't have the 30 water

15   connections.

16   Q.  Does "in error" mean that the installation did

17   not comply with the project plans?

18        MR. SCHWERDTFEGER:  Objection.  Lacks

19   foundation.

20        MR. CAULEY:  Objection.  Vague as to time.

21        THE WITNESS:  Yeah, it was -- there's -- they

22   were stubbed up -- they were stubbed up into the

23   cabinets, so.  I've already said that.

24   BY MR. McMANUS:

25   Q.  Okay.  Let's go to -- a little bit below that,



1   it's a little diagonal writing.  I read it as, "Pumps

2   not piped to manufacturer recommendation."  Do you see

3   that?

4        A.   Yes.

5        Q.   And what is the significance of that statement?

6        A.   Mechanical -- I think there was a recirc pump

7   that was reversed.

8        Q.   I'm sorry, a what pump?

9        A.   Recirc.  A small recirculation pump.  I don't

10  recall exactly what that was, but it would most likely

11  be a small recirculation pump where the supply could

12  have been reversed or something, you know.  It's not

13  unusual to have -- sometimes to have something like that

14  done.

15       Q.   What does it mean that the recirculation pump,

16  the supply was reversed, what does that mean "reversed"?

17       A.   I don't recall exactly.  But it may be that the

18  hot was in cold.  Or supply in -- the in was in the out

19  or the out was in the in.  So no, I don't

20  specifically -- I can't tell you exactly what the piping

21  was.  Just I don't recall.

22       Q.   Would a recirculation pump where the supply was

23  reversed be in compliance with the project

24  specifications?

25       A.   No.



1       Q.  Would a recirculation pump where the supply was

2    reversed be in compliance with the project plans?

3       A.  No.

4       Q.  So is this statement saying that this

5    particular recirculation pump in Area A of the dining

6    facility was not in compliance with the project plans

7    and specifications?

8       A.  Yes.  Like I said, I'm not -- I don't know

9    exactly what it is.  But if it's noted that it's not

10   piped according to manufacturer's recommendations,

11   then -- well, you know, we could get into the weeds on

12   this one.  Without knowing specifically, it could have

13   shown per plan to be piped a certain way, and the

14   manufacturer's recommendation to do it in a different

15   manner.  So I don't want to get into the weeds on that

16   one, but manufacturer's recommendations usually overrule

17   all, so unless I really know what that is.

18          But you know here's a case where you note

19   something and then it gets re-piped or whatever.  It

20   gets fixed.

21      Q.  If you had been plumbing special inspector on

22   the job while McCullough was installing this

23   recirculation valve that was reversed, would you have

24   noted that in an inspection report?

25          MR. SCHWERDTFEGER:  Objection.  Improper



 1 | hypothetical.  Lacks foundation.

 2 |         MR. CAULEY:  Join.

 3 |         THE WITNESS:  We did.

 4 | BY MR. McMANUS:

 5 |    Q.  But this is after the fact; right?

 6 |    A.  No.  This is in the course of -- okay.  Go

 7 | ahead.

 8 |         MR. SCHWERDTFEGER:  Let me -- this is an

 9 | important aspect.  So because he's an unretained

10 | percipient, he's only entitled to render opinions he

11 | forms while he's there.  It's not an open invitation for

12 | hypotheticals.  So if we could just stay within that

13 | role, that will make life easier.

14 |         MR. McMANUS:  It's within the scope of

15 | discovery.

16 |         MR. SCHWERDTFEGER:  It's not.

17 |         MR. McMANUS:  It is.  It's relevant to our

18 | claim of defense.

19 |         MR. SCHWERDTFEGER:  I'm not going to argue with

20 | you about what the difference is between an expert and a

21 | percipient --

22 |         MR. McMANUS:  It has nothing to do with

23 | experts.

24 |         MR. SCHWERDTFEGER:  It does.

25 |         MR. McMANUS:  It has to do with the scope of



 1   discovery.

 2           MR. SCHWERDTFEGER:  In any event, go ahead.

 3           THE WITNESS:  There's commission, there's

 4   start-up.  All of those are the function of the

 5   building.  And as they're observed, there's changes that

 6   are made in every single job.  And this is probably

 7   something very minor.  Because it's location where the

 8   pumps are.  They're not -- they weren't major pumps.  It

 9   wasn't like a foreign-made pump or something like that,

10   which is a major big deal.  I believe they were recirc

11   pumps.  It looks like they were observed by CTE and

12   subsequently change.

13   BY MR. McMANUS:

14      Q.  Did you observe McCullough installing a

15   recirculation pump where the supply was reversed?

16           MR. SCHWERDTFEGER:  Objection.  Lacks

17   foundation.  Calls for speculation.

18           MR. CAULEY:  Wasn't on site when McCullough

19   was.

20           THE WITNESS:  McCullough was gone.

21   BY MR. McMANUS:

22      Q.  So this report was prepared after McCullough

23   had already installed the work?

24           MR. SCHWERDTFEGER:  Lacks foundation.

25           MR. CAULEY:  Lacks foundation.  Could not be.



1  Could be someone besides McCullough, November 9th, 2017.

2          THE WITNESS:  I was not there to observe.

3  BY MR. McMANUS:

4      Q.  But if you had been there while -- so did you

5  observe this pump being installed, or when you came here

6  was it already installed?

7      A.  It was already installed.

8      Q.  So if you had been inspecting during the

9  initial installation and saw that it was being installed

10  such as the supply was reversed, would you have noted

11  that in an inspection report?

12     A.  Not --

13          MR. SCHWERDTFEGER:  Objection.  Improper

14  hypothetical.

15          THE WITNESS:  Not necessarily.

16  BY MR. McMANUS:

17     Q.  Why not?

18     A.  The -- in start-up, and in, you know, large

19  complicated systems, so something minor like a recirc

20  pump could be overlooked.  But it always comes out in

21  the wash.  In other words, it's observed and rectified.

22  And I don't know, so -- I don't know, system works, as

23  far as I'm concerned.

24     Q.  Let's go under that a little bit, just the text

25  under there.  It says -- it looks like it says, "Pipe



 1  Schedule 40 threaded, needed Schedule 80 threaded."  Do

 2  you see that?

 3      A.  Uh-huh.

 4      Q.  What's the significance of that statement?

 5      A.  They had Schedule 40 pipe, not Schedule 80.

 6  One's white; one's gray.

 7      Q.  Why did you note that?

 8      A.  Because it wasn't Schedule 40.

 9      Q.  Did the project specifications require

10  Schedule 80?

11      A.  Uh-huh.

12      Q.  So if Schedule 40 pipe was installed, would you

13  say that that pipe does not comply with the project

14  specifications?

15      A.  Yes.

16      Q.  Do you know what entity installed Schedule 40

17  threaded where Schedule 80 was required?

18      A.  At that -- I'd have to look.  It could have

19  been -- could have been one of two contractors.  It

20  could have been D-Kal, who did the cistern system,

21  because of its location.  Most likely I'd say that that

22  was D-Kal.  I don't have a picture of it.  I can't tell

23  for sure.  But I think that was -- that Schedule 80 pipe

24  in that location seems to me is where the cistern system

25  came up, and that would have been D-Kal.  D-Kal did the



1  underground and the -- the underground for the cistern

2  system, and the entire pumping system for that.

3       Q.  But it wasn't McCullough?

4       A.  I don't think so.

5       Q.  So I want to -- I'm sorry.

6       A.  I don't think so.

7       Q.  I just want to ask, because I'm seeing at the

8  top says, "Water lines as built by McCullough in error."

9       A.  Yeah.

10      Q.  Can you tell me which areas noted on this plan

11 sheet were built by McCullough?

12      A.  I would say domestic water.

13      Q.  Where do you -- I'm sorry, if you can direct me

14 to that on the plan sheet, domestic water.

15      A.  Domestic water, any piping that goes to a water

16 fixture or fitting.

17          The pumps -- this is -- hang on here.  Plumbing

18 floor plan.  I would say that the entire sheet with the

19 exception of the Schedule 80, because that's drawn in

20 where it's not -- that's not even part of this plan.  It

21 just has a location right there.  It's not connected to

22 this water system, domestic supply system.  Those pumps

23 would be recirc drums for hot/cold water or return.  So

24 I believe that this entire system, the water system

25 would be McCullough's.

1      Q.  Except for the?

2      A.  Except that one note about Schedule 80,

3   Schedule 40.

4      Q.  Thank you.  I appreciate that clarification.

5      A.  Sure.

6      Q.  So then let's go under the Schedule 40,

7   Schedule 80, where I believe it says "No iso valve.

8   Gauged"?

9      A.  Gauges.

10     Q.  "No iso valve.  Gauges."  Can you tell me what

11  the significance of that clarification is?

12     A.  Isolation valves are shutoff valves.  Gauges

13  typically are water pressure.  Visuals would be like a

14  sight tube.

15         And an expansion tank -- I said "no expansion

16  tank."  That's wrong.  It needed a larger expansion tank

17  per plan, so.  Initially I couldn't even see the

18  expansion tank and noted it.  But once I got up on a

19  ladder and observed, it was smaller than what the

20  specified one was.

21     Q.  So would you say that the lack of isolation

22  valves would be in compliance with the project

23  specifications?

24         MR. SCHWERDTFEGER:  Objection.  Assumes facts.

25  Lacks foundation.



1          THE WITNESS:  If I noted it, it would be not

2   per plan, typically.

3   BY MR. McMANUS:

4       Q.  Not per specs also?

5       A.  Pardon me?

6       Q.  You said not per plans.  But also not per

7   specs?

8          MR. SCHWERDTFEGER:  Same objection.

9          MR. CAULEY:  Join.

10          THE WITNESS:  Yeah.

11   BY MR. McMANUS:

12       Q.  I have a copy -- I actually brought a copy of

13   the plumbing specs, if you'd like to take a look.

14       A.  Probably be better on a plan, but.

15       Q.  What about the lack of gauges, is that in

16   compliance with the project specs?

17       A.  No.

18       Q.  Is it in compliance with the project plans?

19       A.  No.  I'd have to see where those gauges or the

20   visuals or the expansion pipe -- expansion tank was.

21   But no.

22       Q.  For the smaller expansion tank -- you said it

23   needed a larger one; right?

24       A.  Right.

25       Q.  Would you say that expansion tank that was too



1  small, does that comply with the project specs?

2      A.  Did not.

3      Q.  What about the project plans?

4      A.  Don't know where it was located.  But it didn't

5  meet the specified tank.  Whether that was on a schedule

6  or whether that was in a spec, I don't remember.  Don't

7  recall.

8      Q.  And then "visuals, no visions"; is that

9  correct?

10      A.  Visuals, those are like sight gauges.  Sight

11  gauges are usually adjacent to the tank to show water

12  level or that there's water in it.

13      Q.  So would you say that the lack of the visuals

14  and the visions would be in compliance with the project

15  specs?

16      A.  Yeah.  They needed visuals, yes.

17      Q.  So it would not be in compliance?

18      A.  Not, yes.

19      Q.  Would it be in compliance with the project

20  plans?

21      A.  Don't know which is which.  But it's -- the

22  answer is does not, either for plan or spec.

23      Q.  Okay.

24      A.  I can't tell you which one it was on.  But in

25  this case I'd have to look.  I'd have to look through a



1   set of plans to show you where it was.

2       Q.  How about a little bit below that I see "Water

3   tied to cistern not domestic."

4       A.  Uh-huh.

5       Q.  Can you tell me the significance of that

6   statement?

7       A.  Well, they had a pretty complicated cistern,

8   where we had two water supply systems.  A cistern system

9   that ran through the -- through the facility, and

10  domestic.

11          The cistern water, of course, it's just water's

12  gathered from the roofs or tanks or whatever and

13  ultimately used to run toilets.  I think toilets -- I'd

14  have to look at it.  In non-potable areas, so it's --

15  it's not specifically domestic.  And they might have had

16  some pipes reversed right there.

17      Q.  So is that -- the water was supposed to -- the

18  water line was supposed to be tied to the domestic and

19  not to the cistern?

20      A.  Right.

21      Q.  So would the water line being tied to the

22  cistern rather than domestic be in compliance with the

23  project specs?

24      A.  No.

25      Q.  Would it be in compliance with the project



1  plans?

2      A.  Like I say, I'm going to have the same thing.

3      Q.  Is it going to be --

4      A.  I don't know whether it's plan or spec.  But it

5  should have been tied to the domestic instead of the

6  cistern, so.

7      Q.  If you were performing special plumbing

8  inspections while this work was being initially

9  installed and you saw the water line being tied to the

10  cistern rather than to the domestic, would you have

11  noted that in one of your inspection reports?

12          MR. SCHWERDTFEGER:  Improper hypothetical.

13          THE WITNESS:  I did note it.

14  BY MR. McMANUS:

15      Q.  But I mean while -- because at this point is it

16  true that the water line had already been installed?

17      A.  Water lines, yes.  The system was in place.

18  But we had not done start-up.  We had not done -- yeah,

19  it hadn't been started up.  We hadn't had to run the

20  boilers.  We hadn't done all of those components.

21  They're an integral part of the entire system, so.

22      Q.  And --

23      A.  And this is -- it's not unusual when you go to

24  start up a system or do commissioning, or -- to see

25  where, you know, piping is crossed or whatever.  It's



 1 | not unusual, so.
 2 |     Q.  And --
 3 |     A.  But it was noted and changed subsequently.
 4 |     Q.  And it's your testimony that McCullough had
 5 | installed the water line to the cistern rather than the
 6 | domestic as noted here?
 7 |          MR. CAULEY:  Objection.  Lacks foundation.
 8 | Calls for speculation.
 9 |          THE WITNESS:  Cistern was DEFAC.  Domestic was
10 | McCullough.  Can't answer that one way or the other.  I
11 | don't know who.
12 |          MR. SCHWERDTFEGER:  And then correction on the
13 | record.  I think you meant D-Kal.
14 |          THE WITNESS:  D-Kal.  What did I say?
15 |          MR. SCHWERDTFEGER:  DEFAC.
16 |          THE WITNESS:  Oh.  Yeah, D-Kal.  Yeah, D-Kal
17 | was cistern.  So when you have two trades like doing two
18 | similar systems on the same project, it could be easy to
19 | mix up, but.  And it would be caught at start-up too, if
20 | you had -- don't have water where it's supposed to be.
21 | BY MR. McMANUS:
22 |     Q.  What do you mean by "at start-up"?
23 |     A.  Almost all these systems, when they're
24 | commissioned and tested before occupancy, whether it's
25 | pressures taken, the guy might have noted -- even if I



1    had missed it, the commissioning agent might have noted,

2    "Well, there's no return water coming back from here."

3    Almost all of these systems are triple checked.  That's

4    what I mean.

5        Q.  So then if you were performing the special

6    inspection while this water line here was being

7    initially installed and you saw the water line being

8    tied into the cistern and not the domestic, would you

9    have noted that in an inspection report?

10            MR. SCHWERDTFEGER:  Objection.  Improper

11   hypothetical.

12            THE WITNESS:  Like as if it was 140 degree

13   water versus 120 degree water, something like that,

14   yeah.

15   BY MR. McMANUS:

16       Q.  Okay.  So yes?

17       A.  Yeah.

18       Q.  Okay.

19       A.  And we did.

20       Q.  But this was not during the initial

21   installation; correct?

22            My question was, if you had seen this being

23   installed initially, not already installed.  It was

24   being installed and you saw it being tied into the wrong

25   area, I want to know if you would have noted that on an

 1  inspection report?

 2      A.  Might not have --

 3          MR. SCHWERDTFEGER:  Same objection.

 4          THE WITNESS:  Okay.

 5          MR. SCHWERDTFEGER:  Go ahead.

 6          THE WITNESS:  Might not have seen.

 7  BY MR. McMANUS:

 8      Q.  If you had seen it?

 9      A.  Probably.

10          MR. SCHWERDTFEGER:  Same objection.

11  BY MR. McMANUS:

12      Q.  That's yes?

13      A.  Yes.

14      Q.  I want to go below that.  Again we see, "No iso

15  valves."  I believe that's referring to similar to

16  above, no isolation valves that we spoke about earlier?

17      A.  Right.

18      Q.  And we don't have to go through the whole thing

19  again.  But would you say that the lack of isolation

20  valves complies with the project specifications?

21      A.  It does not comply with specs or plans.

22      Q.  Okay.  And what about "Crossed water," what

23  does that mean?

24      A.  Hot was -- hot was hot, cold was cold.  You

25  know, like when you go into a bathroom and you turn the



1   hot water on, and cold water comes on.  And verse visa.
2   Once again, common.  And a lot of times this is
3   corrected in start-up.
4       Q.  And --
5       A.  You know, you may do a pressure test on a water
6   line, and if the plumber crosses them, it may not be
7   observed at that particular time.  But it passes
8   inspection based on water pressure.  Plumber may have
9   crossed -- it's not unusual.  It's -- everybody's
10  experienced it.  And like I said, there's a system that
11  would correct it, and did.  In fact, you're looking at
12  it, so.
13      Q.  Would crossed water lines have complied with
14  the project specifications?
15      A.  No.
16      Q.  Would they have complied with the project
17  plans?
18      A.  No.  Whether that be plan or spec, whatever it
19  calls for.  Whichever calls for hot to go to hot and
20  cold to go to cold.
21      Q.  If you had been a special inspector at the time
22  the water lines were initially installed such that they
23  were crossed and you had seen that, would you have noted
24  it in an inspection report?
25      A.  If I'd seen it, but --



```
 1          MR. SCHWERDTFEGER:  Objection.  Improper

 2    hypothetical.

 3          THE WITNESS:  -- you know, you're testing --

 4    the certification goes to water pressure, that it's

 5    holding water.  And it may have been missed, and

 6    wouldn't be -- it wouldn't be extraordinary if it was.

 7    As these water lines are hard to get to or whatever, so.

 8    And it ended up it was observed.

 9    BY MR. McMANUS:

10       Q.  If you knew they were crossed, though -- while

11    you saw them being installed, you knew they were

12    crossed, you would not have noted it?

13          MR. SCHWERDTFEGER:  Same objection.  Improper

14    hypothetical.

15          THE WITNESS:  I don't know that I'd have noted

16    it, but I would have told the plumber, "Hey, you got

17    those crossed."

18    BY MR. McMANUS:

19       Q.  Okay.

20       A.  That happened in some other places too.  We had

21    some water, and I said, "Hey, you got -- these are

22    crossed up."  And they fixed it, you know.  So resolved.

23    More importantly than noted, is the way I look at it.

24       Q.  Understood.  What about "no water hammer," what

25    does that mean?
```



1      A.  WHA, water hammer arrestors, they were omitted.

2  Water hammer is a -- it's like an air gap, where the

3  water pressure hammers against air rather than banging

4  pipes.  You know, sometimes when you close a valve, and

5  you here a bang, that can be piping.  And some of those

6  were missed.

7      Q.  Would the omission of water hammers be in

8  compliance with the project specifications?

9      A.  They were not in compliance.

10      Q.  Would the omission of water hammers be in

11  compliance with the project plans?

12      A.  The water hammer -- water arrestors were found

13  and repaired, so.  Once again, the inspection process

14  per notes, where observations showed they didn't have

15  water hammers, and it was corrected.  This applies to

16  everything we've talked about so far on this sheet.

17      Q.  I understand.

18      A.  I mean, we did -- and the ultimate process

19  works whether it's -- I think some of this -- most of

20  this was probably pre even start-up, you know, work.

21      Q.  I'm asking, though, before that process, where

22  you have the omission of water hammers, when they're not

23  there, does that comply with the project plans?

24      A.  No.  The plan called for water hammers.

25      Q.  So the omission of the water hammers would not



1  be in compliance with the plan?

2       A.  Would not be at that time.  But it is now.  So

3  it is -- I mean, I don't get the splitting of hairs

4  here.  I mean, it called for water hammers.  We

5  discovered that there was -- they didn't have them, or

6  we discovered that a pump was water crossed or whatever.

7  And then in the process of the inspections, facilitating

8  running the pipe, whatever, we found them.  So it is in

9  compliance.

10      Q.  Because --

11      A.  Now --

12      Q.  -- someone else had to come in and correct it?

13           MR. SCHWERDTFEGER:  Objection.  Lacks

14  foundation.  Argumentative.

15           THE WITNESS:  Okay.

16  BY MR. McMANUS:

17      Q.  You can answer.

18      A.  Same answer.

19      Q.  I was asking --

20      A.  I mean, you know, they -- I know what the plan

21  called for and ultimately that's what we got, so.  I

22  mean, is it easy -- you know, none of it is necessarily

23  hard.  Some of this is minor, easy to overlook, and

24  ultimately found, so.  It's per plans, specs.

25      Q.  Well --



```
 1        A.  As best I can get per plans and specs.  Oh.

 2             MR. SCHWERDTFEGER:  You're doing good.

 3             THE WITNESS:  Okay.

 4   BY MR. McMANUS:

 5        Q.  I'm just asking because the fact that someone

 6   had to come in here and perform this remedial work was

 7   because the work wasn't installed that way in the first

 8   place.  So I want to know --

 9             MR. SCHWERDTFEGER:  That's not going to work.

10   That's argumentative.  That's not a question.  Why don't

11   you just ask a question?

12             THE WITNESS:  There --

13             MR. SCHWERDTFEGER:  There's no question.

14             THE WITNESS:  Okay.

15   BY MR. McMANUS:

16        Q.  What about "wet vent to floor sink"; what does

17   that mean?

18        A.  There was not -- where are we here?  It

19   probably meant there was not a -- not a vent.  So a vent

20   was omitted.

21        Q.  Would the omission of a vent comply with

22   project specifications?

23        A.  Yes.

24        Q.  If the specification --

25        A.  Or code.  Either way.
```



PETE ALBERS                                    March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                    144

1    Q.  So if the specifications required a vent and

2    the vent wasn't there, would that installation be in

3    compliance?

4    A.  Not in compliance if it didn't have a vent.

5    Q.  Would the omission of the vent be in compliance

6    with the project plans?

7    A.  The vent needed -- or the floor sink needed a

8    vent, yeah.  I don't know if it actually showed a vent,

9    but it needs a vent to operate properly.

10   Q.  If -- now, I'm not talking about this

11   particular inspection.  I'm talking about -- my question

12   is, if you were there when the plumber had been

13   installing floor sinks and the related installations,

14   and you had seen vents being omitted, would you have

15   noted that omission of vents in your inspection report?

16       MR. SCHWERDTFEGER:  Objection.  Improper

17   hypothetical.

18       THE WITNESS:  Probably would have.  Probably

19   would have, yeah.

20   BY MR. McMANUS:

21   Q.  Okay.  We see here again, "No iso valves."  We

22   covered that before.  I won't go through that again.

23       MR. CAULEY:  Thank God.

24   BY MR. McMANUS:

25   Q.  What about --



1      A.   You know, there's -- I'll just say one thing.

2   There's catastrophic failures; right?  Like remodeling

3   this building and digging up piping that had been

4   destroyed and cut.  That's catastrophic.  That required

5   something above and beyond normal systems because of a

6   mismanagement or whatever.  Okay?  Was out of sequence.

7   Broke the pipes.  They destroyed the plumbing, not once

8   but twice.  That is a catastrophic failure and caused

9   great grief for all concerned.

10         I mean, they had to dig up piping, and delayed

11  the project.  And it cost everybody enormous amounts of

12  money.  That's a different category than crossing a pipe

13  for hot or cold water.  In the grand scheme, that's

14  insignificant.  That's a common occurrence.  You can't

15  equate the two.  You know, you can't say that destroying

16  all the pipe, and having it broken, and ultimately

17  having had that been left, not discovered, we would have

18  a catastrophe in that building.  I don't know if that's

19  your point.  But these are -- they may not be specs that

20  we missed if we wouldn't have a water hammer, but we

21  found we had a water hammer, and we put them in.

22         Iso valves, crossed water lines.  Does not meet

23  specifications and plans?  Yes.  Significant?  We found

24  them, we repaired them, which is not uncommon in

25  mechanical jobs or plumbing jobs.



1          But all of the underground that had to be

2     removed is a completely different category than this.

3     In my estimation.

4          MR. McMANUS:  I'd like to strike that as

5     nonresponsive.  There wasn't a question pending.

6     BY MR. McMANUS:

7          Q.  Under where it says "No iso valves," we see

8     "outside wall."  Can you tell me what "outside wall"

9     means?

10         A.  Okay.  Where are we?  Sorry.

11         Q.  On the right-hand side, in between the drawing

12    here and where it says "A," there's a little text here

13    that says "Outside wall."

14         A.  Outside wall.  Yeah, the water line apparently

15    was not within the confines of the wall once the wall

16    was framed is my -- I don't recall exactly what that

17    was.  "Water line out of wall."  That would most likely

18    mean that the water line was not within the confines of

19    the wall.

20         Q.  Would you say that a water line not being

21    within the confines of the wall is compliant with the

22    project specifications?

23         A.  Depends on whether the wall was put in the

24    right spot or whether the plumbing was put in the right

25    or wrong spot.  Water lines, typically, no, they do



 1  | not -- water lines are not exposed.
 2  |     Q.  So outside the wall is --
 3  |     A.  Would not comply.
 4  |     Q.  What about the project plans?
 5  |     A.  Right.
 6  |     Q.  The same?
 7  |     A.  Yes.
 8  |     Q.  That would be a noncompliant?
 9  |     A.  Yes.
10  |     Q.  If you would --
11  |     A.  Well, I don't recall.  Everything happened.  If
12  | they put the wall in the wrong spot and the plumbers got
13  | it where it's supposed to be, then, yeah, maybe the
14  | piping is compliant but the wall is not.  You know, so I
15  | don't -- so it can and it can't be.  I don't mean to be
16  | argumentative about that, but.  I just don't have that
17  | info right here.
18  |     Q.  Understood.  I see "crossed."  We don't have to
19  | talk about that again.  I assume it's the same above.
20  | Same with isolation valves.
21  |         What about below that, do you see where it
22  | says, "Waste wrong size and vents no cleanout"?
23  |     A.  That would be a piping problem.  Piping wrong
24  | size; no vent or cleanout.  Does it show where the plans
25  | would be?  Anyway, that would be noncompliant.



1    Q.  With the project plans and specifications?

2    A.  Yes.

3    Q.  Okay.  If you had on site performing a plumbing

4  inspection upon the initial installation of that waste

5  pipe and you saw that it was the wrong size, would you

6  have noted that in your inspection report?

7        MR. SCHWERDTFEGER:  Objection.  Improper

8  hypothetical.

9        THE WITNESS:  I probably would, yeah.

10 BY MR. McMANUS:

11   Q.  What about below that, I see it says, "Charge

12 wall to accommodate vents"; am I right in reading that?

13   A.  Change wall to accommodate vents.

14   Q.  What's the significance of that statement?

15   A.  The wall was probably not adequate size to fit

16 the vents, so probably change the wall.

17   Q.  So is that an issue with the plumbing or an

18 issue with the wall?

19   A.  Probably the wall.

20   Q.  Okay.  Let's go to the left of that.  I see it

21 says, "Water lines out of wall."  Is that a similar

22 issue to the one we were speaking about, where it was

23 water lines not within confines of a wall?

24   A.  Same one.

25   Q.  I think it's pointing to a different one.



1           Because we see on the top right it looks like

2    it's pointing to the right-hand side here.  And then

3    this little one down here in the left looks like it's

4    pointing to the leftern -- leftern, it's not a word --

5    the left portion of this drawing?

6         A.  Water line, that's here.  Where are you at?

7         Q.  I am right here.

8         A.  Okay.  That points to here.  Where was the

9    other one?

10        Q.  And this one is outside wall pointing to right

11   here.

12        A.  "No iso valves."  I was looking -- when we were

13   talking about that, I was looking at this one.

14        Q.  Okay.  We can talk about this one.

15        A.  Blah, blah, blah.  "No iso valves.  Outside

16   wall."

17        Q.  Are these similar issues?

18        A.  Yeah.  Well, one is -- yes, they are.

19        Q.  So --

20        A.  I mean, both of them have to do with the same

21   system.  And if you got two piping systems and you end

22   up with identical problems on them, it may be the

23   framing, or you know -- I guess I don't have enough

24   information here.  Outside wall.

25           It's hard to build a manifold like that and get



1   it outside the wall.  Maybe it was specified 2-by-6 --

2   maybe it was specified a 2-by-4 and should have been a

3   2-by-6.  I can't answer that unless it dealt with the

4   framing.

5        Q.  Okay.

6        A.  I don't know.  But the fact that there's two of

7   them, and exactly the same thing leads me to believe it

8   wasn't necessarily a plumbing problem.  But it could

9   have been potentially a framing problem if we had to

10   move walls, but.

11        Q.  Understood.  Let's go below that where it says,

12   "Floor drain trap primer tied to domestic, not cistern

13   water."  Do you see where I'm at?

14        A.  Yes.

15        Q.  Is that the same issue as we were speaking

16   about, the one above where it says, "Water tied to

17   cistern water, not domestic"?

18        A.  Yes.

19        Q.  So it's the same type of issue where --

20        A.  Same type of issue.

21        Q.  -- water lines were being installed in the

22   wrong place?

23        A.  "Floor drain trap primer tied to domestic, not

24   cistern water."  Yes, they should have been tied to

25   cistern water.



1    Q.  So would the failure to tie the lines to the

2    cistern water be noncompliant with the project

3    specifications?

4    A.  Yes.

5    Q.  Noncompliant with the project plans?

6    A.  Yes.

7    Q.  If you had been on site performing a special

8    plumbing inspection at the time that this line was first

9    being installed, and you saw that it was being tied into

10   the domestic rather than the cistern, would you have

11   noted that in your inspection report?

12        MR. SCHWERDTFEGER:  Objection.  Improper

13   hypothetical.

14        THE WITNESS:  I don't know.  I don't know if

15   that one would be caught.  I don't know.

16   BY MR. McMANUS:

17   Q.  But I'm just --

18   A.  You know, it's back to the contractor's

19   responsibility for putting the right piece to the right

20   place.  Or if there are water pipes that are crossed way

21   back in the hinterlands up underneath installation.  Can

22   all that be caught by the inspector?  No.  Whose

23   responsibility is it?  It's the contractor's.  So no, I

24   may not have observed that.

25   Q.  If you had observed it, would you have noted it



 1  in your report?

 2          MR. SCHWERDTFEGER:  Same objection.

 3          THE WITNESS:  Yeah.

 4  BY MR. McMANUS:

 5     Q.  And then if we go to the left, I see -- I think

 6  this is the same issue just in a different location.

 7  Correct me if I'm wrong.  It says, "Floor drain trap

 8  primer tied to domestic, not cistern water."  You see

 9  on -- it's very, very left side of the --

10     A.  Yes.

11     Q.  Yep.  Is that the same --

12     A.  Same issue.

13     Q.  So also that installation would be noncompliant

14  with the project specs?

15     A.  That's right.

16     Q.  Noncompliant with the project plans?

17     A.  Uh-huh.

18          MR. SCHWERDTFEGER:  Yes?

19          THE WITNESS:  Yes.

20  BY MR. McMANUS:

21     Q.  If you had been on site performing plumbing

22  inspection at the time of the initial installation and

23  you had actually seen that this line was being tied into

24  the wrong place, would you have noted it in an

25  inspection report?



1          MR. SCHWERDTFEGER:  Objection.  Improper

2   hypothetical.

3          THE WITNESS:  Same answer.  Every single nuance

4   of water supply -- an inspector tests the water, the

5   capacity of the water, that it's going to hold water,

6   it's going to be tested, it's going to be pumped up and

7   all that.  Still the responsibility for all locations,

8   proper locations, ultimately comes down to the

9   contractor.

10  BY MR. McMANUS:

11      Q.  But just assuming that you noted this -- and

12  you saw it being installed incorrectly, you would have

13  noted it?

14          MR. SCHWERDTFEGER:  Objection.  Improper

15  hypothetical.

16          THE WITNESS:  I would.

17          MR. SCHWERDTFEGER:  Asked and answered.

18  BY MR. McMANUS:

19      Q.  Okay.  Thank you.  I think this is the last one

20  on here, if we just go up above where we're at right

21  now.  It says, "Missing hose --"

22      A.  "Hose bibb."

23      Q.  "Missing hose bibb," thank you, "to --"

24      A.  "Trash."

25      Q.  "To trash compactor"?



1    A.  Yes.

2    Q.  So "missing hose bibb to trash compactor."

3  What does that mean?

4    A.  Oh, a hose bibb was supposed to be outside in

5  the yard.

6    Q.  Is that related to the plumbing work?

7    A.  The hose bibb is, yes.  A hose faucet, if you

8  will.

9    Q.  So would you say that the missing hose bibb

10  complies with the project specs?

11    A.  I'd say that we found the missing hose bibb and

12  corrected it.

13    Q.  But at the time before you corrected it, did

14  that lack of a hose bibb comply with project specs?

15    A.  No.

16    Q.  At that time did the lack of the hose bibb

17  comply the project plans?

18    A.  No.

19        MR. McMANUS:  I think I'm done with this one.

20  Thank you.

21        Next I'll mark as 345.

22        MR. SCHWERDTFEGER:  Can we use the rest room

23  before we start on the next one?

24        MR. McMANUS:  Yes, of course.  Take a break.

25        (Recess)



 1          MR. McMANUS:  Next I'll mark as Exhibit 345.

 2  This is Bates marked HAL005472.

 3          (Exhibit 345 marked)

 4          (Discussion off the record)

 5  BY MR. McMANUS:

 6     Q.  Mr. Albers, did you prepare this -- these notes

 7  on this plan sheet?

 8     A.  Yes, sir.

 9     Q.  Is that your signature on the right?

10     A.  Yes, sir.

11     Q.  And is this a -- what is this document?

12     A.  It's a repeat of this in a -- this is like a

13  rough draft of this.

14     Q.  Oh.

15     A.  These are one and the same.

16     Q.  So anything noted in here would have been noted

17  in 344?

18     A.  I don't know which is which, but --

19          MR. SCHWERDTFEGER:  This is 344.

20          THE WITNESS:  These are rough notes, and then

21  these are put in like a schedule form.  So that

22  it's -- this would be easier to note.  And then in a

23  note form.

24  BY MR. McMANUS:

25     Q.  So Exhibit --



1    A.  You can see where they're -- where each item is

2    noted.  So this is a repeat.

3    Q.  Is 344 the final draft?

4    A.  No.  This would be.

5    Q.  345 would be the final draft?

6    A.  Yes.

7    Q.  Okay.  So would all the -- I want to know for

8    the notes that we have here --

9         MR. SCHWERDTFEGER:  So you want to focus on

10   345; correct?

11        MR. McMANUS:  Yes, 345.

12   BY MR. McMANUS:

13   Q.  For our notes on here under "Mechanical room

14   remediation" and "Remedial water lines," are there any

15   items noted here that do not relate to work performed by

16   McCullough?

17   A.  Yes.

18   Q.  Can you tell me which items those are?

19   A.  Like the last -- on the last one we talked

20   about, the Schedule 80 versus 40.

21   Q.  Okay.

22   A.  That's line -- that's Number 1.

23        There's one assumption I made in the last issue

24   was on the re-piping of the pumps.  No, that shows

25   domestic line.  Never mind.

1          Okay.  Remedial water lines.  Water lines
2     should not have anything to do with D-Kal, but let's
3     see.  Domestic water.  Trap.  There's a hose bibb.
4          Yeah, I believe that all -- all except the
5     Schedule 80.
6          Cistern -- any piping to cistern could be --
7     that should all be McCullough's work, I believe.
8          Q.  Okay.  Let's start on the left with "Mechanical
9     room remediation."  Number 2, "Missing visuals," is that
10    similar to the issue we've discussed before from the
11    prior exhibit regarding --
12         A.  It's the same.
13         Q.  It's the same one?
14         A.  It's the same.
15         Q.  If I asked you the same questions I asked you
16    before, would your answers be the same?
17         A.  Yes.
18         Q.  How about "Missing isolation valves"; is that
19    the same?
20         A.  Yes.  You'll find that right over here.
21         Q.  If I ask you the same questions, your answers
22    would be the same?
23         A.  Yes.
24         Q.  And "missing expansion tank," is that related
25    to the wrong size tank that we discussed before?




1     A.   Yes.

2     Q.   And it's the same issue?

3     A.   Same issue.

4     Q.   If I asked you the same questions, would your

5  answers be the same?

6     A.   Yes.

7     Q.   So "Pumps wet piped to manufacturer

8  recommendations," is that the same --

9     A.   Same.

10    Q.   -- issues we noted before?

11    A.   It's the same.  It's "not piped."

12    Q.   Right.  Oh, "not piped"?

13    A.   It said "to," but it should say "per."

14    Q.   And if I asked you the same questions related

15  to that issue, would your answers be the same?

16    A.   Yes.

17    Q.   Okay.  Let's move over to "Remedial water

18  lines."  Number 1, is that "Repipe"?

19    A.   "Repipe," Area 1, yes.

20    Q.   And did we discuss that one before?

21    A.   No, we did not.

22    Q.   So what does "repipe" mean?

23    A.   Revise some piping.

24    Q.   Why would you revise the piping?

25    A.   Could be blocking.  Could be framing.  Could be



 1  a whole host of problems.

 2      Q.  So would you note to repipe a particular

 3  installation because it does not comply with the project

 4  specifications?

 5      A.  Or that the framing was wrong, or any other

 6  problems.  So no, I would not.

 7          MR. CAULEY:  It looks to me like the 1s point

 8  to that out-of-wall thing he was talking about

 9  previously.

10          MR. McMANUS:  Uh-huh.

11          THE WITNESS:  Yeah, this probably doesn't --

12  gives me a little grief here.  Where is that?  Oh,

13  that's where that hose bibb is?

14          MR. McMANUS:  Yes.

15          THE WITNESS:  Typical.  Okay.

16  BY MR. McMANUS:

17      Q.  What about Number 2, "Missing WHA"?

18      A.  Water hammer arrestors.

19      Q.  Is that the same issue we discussed before?

20      A.  Yes.

21      Q.  And if I asked you the same questions, would

22  you have the same answers?

23      A.  Yes.

24      Q.  What about "Missing circulation line"?

25      A.  Yes.



1    Q.  What does that mean?

2    A.  There's a circulation line.  Where's Number 3?

3  Circ line.  Yeah, there's like a water return line that

4  comes off of those valves that was put in.

5    Q.  Does the lack of a circulation line comply with

6  the project specifications?

7    A.  Well, you know, one point I never made, some of

8  this work might not have been completed.  I mean,

9  McCullough pulled off the job, so there's always a

10  potential some this was not completed.  So this could be

11  the initial inspection.

12    Q.  Is there any work item remaining on this list

13  that we're looking at that you believe was incomplete

14  work as opposed to noncompliant work item?

15    A.  I have no idea.  I mean, I wasn't there.  I

16  don't know at what point the work -- you know, the work

17  stopped.  So it's hard to tell.

18    Q.  But --

19    A.  I mean, so is this the first run through on all

20  this?  I don't know.  Could be.

21    Q.  But if the specifications called for a

22  circulation line and circulation line was missing, that

23  would not comply with specifications?

24    MR. SCHWERDTFEGER:  Objection.  Lacks

25  foundation.



1        MR. CAULEY:  Join.

2        THE WITNESS:  May not have been completed, but

3  a circ line is needed to comply.

4  BY MR. McMANUS:

5    Q.  So then Number 4 we see "Missing isolation

6  valves."  Is that the same issue you we discussed

7  before?

8    A.  Yes.

9    Q.  If I asked you the same questions, would your

10 answers be the same?

11   A.  Yes.

12   Q.  What's "Missing micing valves"?

13   A.  Mixing.

14   Q.  What's a mixing valve?

15   A.  Mixing valve determines -- it's a thermostatic

16 valve that mixes cold and hot water.  And it reduces the

17 water from 140 to 120.  Back to the issue at hand way

18 back when.

19        And where was that?  Number 8?

20        Might have to pick that up off an as-built.  I

21 don't think we talked that one over here, did we?

22   Q.  I don't think so.

23   A.  A new one.

24   Q.  So what's the problem?

25   A.  Not noted.



1     Q.  Would the lack of a mixing valve, would that be

2  compliant with the project specifications?

3     A.  I might have a problem with this because this

4  is domestic water, which should all be rated 120.  So

5  unless I study this, I would not have 140-degree water

6  in this drawing, from what I can tell so far.  So I'd

7  have to study it to see.

8     Q.  Do you need anything else besides that document

9  to study?

10     A.  Yeah.  Probably have to have a set of plans.

11     Q.  What are we on, P-101?  I do have a set of

12  plans.

13          This has previously been marked as Exhibit 14.

14          We can go off the record while you familiarize

15  yourself.

16          MR. SCHWERDTFEGER:  Let's keep the record

17  going.

18          MR. McMANUS:  Okay.

19          THE REPORTER:  I'm sorry, I can't hear.

20          THE WITNESS:  I'm sorry, I'm talking to myself.

21          I think it's right there.

22          That is Sheet Note 9, "Provide 140-degree hot

23  water to this fixture."

24          It's not noted here.  It's not marked on the

25  plan here.  Although it's in the legend.



 1   BY MR. McMANUS:

 2       Q.  So I want to be clear that --

 3       A.  It could be -- it could be accurate.  It's not

 4   on here.  I didn't list.  I don't know.

 5           MR. McMANUS:  The witness is referring to the

 6   fact that it's not noted on Exhibit 344.

 7           THE WITNESS:  Correct.

 8           MR. McMANUS:  But was noted --

 9           THE WITNESS:  345.

10           MR. McMANUS:  Well, is not noted on?

11           THE WITNESS:  It's not designated on either one

12   specifically.  I have a sheet note, but it's not

13   highlighted on the plan.  On either one.

14           There is 140-degree water piped to a floor --

15   which is unusual.  It's a mop sink.  I would probably

16   question that.  You know, 140-degree water where a

17   janitor is washing -- washing mops, and -- so might have

18   been a question, but.  It's not designated here, so I

19   can't tell you.

20   BY MR. McMANUS:

21       Q.  So you don't know if it's compliant with the

22   plans?

23           MR. SCHWERDTFEGER:  Objection.  Misstates

24   witness' testimony.

25           THE WITNESS:  It shows 140-degree water to



1   there.  So I don't know if -- it may comply.

2   BY MR. McMANUS:

3       Q.  How would you know one way or another?

4       A.  I'd rely on the fact that the sheet note is not

5   noted on either one of them.

6       Q.  So you don't know?

7           MR. SCHWERDTFEGER:  Objection.  Misstates the

8   witness --

9           THE WITNESS:  I say no.  I'd say that it was --

10  it's not noted specifically.  I didn't carry that little

11  sheet note.  So I'd say that the actual water line is

12  there and it's compliant.

13          MR. McMANUS:  Okay.  Thank you.  Next I'll mark

14  as Exhibit -- we're done with that one.  Thanks.

15          Let's keep that there for a minute.  Who knows?

16          MR. SCHWERDTFEGER:  All right.

17          MR. McMANUS:  This is Exhibit 346.  It's Bates

18  stamped HAL005475.

19          (Exhibit 346 marked)

20  BY MR. McMANUS:

21      Q.  Are you familiar with this document, sir?

22      A.  Yes.

23      Q.  Did you prepare it?

24      A.  Yes.

25      Q.  Is that your signature down at the bottom?



1     A.  Yes.

2     Q.  And is this a final draft of what was

3   Exhibit 344?

4     A.  No.

5         MR. SCHWERDTFEGER:  No.

6         THE WITNESS:  They're different.

7   BY MR. McMANUS:

8     Q.  What is that?

9     A.  Water lines.

10    Q.  Okay.

11    A.  This is domestic water lines primarily.

12    Q.  So --

13    A.  In Area -- I guess that's Area A.  So this is

14  waste lines.  This is sanitary floor drains, sanitary

15  floor plan.

16    Q.  I see at the top it says, "Deficiencies."  Does

17  that mean -- is that to denote that the list below that

18  constitute plumbing deficiencies?

19    A.  Yes.

20    Q.  So Number 1, "No slope," something "in line"?

21    A.  I think that says "main line."

22    Q.  I can trade with you, if you want.  This one is

23  a little blown up.

24        MR. SCHWERDTFEGER:  Yes.  That would be great.

25        THE WITNESS:  I believe that says "main line."



1          MR. SCHWERDTFEGER:  Can we hang onto this?

2     Because it's very small on 346.

3          MR. McMANUS:  Yes.

4          MR. SCHWERDTFEGER:  Okay.  Great.

5     BY MR. McMANUS:

6        Q.  So what does, "No slope in main line" mean?

7        A.  This is in the area where the deficiencies had

8     occurred.  The concrete was removed.  And it was

9     determined that there was no slope.  And slope is

10    required.  I think for this job it's quarter inch per

11    foot.

12       Q.  Would no slope in the main line be in

13    compliance with the project specifications?

14       A.  No.

15       Q.  Would it be in compliance with the project

16    plans?

17       A.  No.

18       Q.  And do you think that -- was this work, the

19    lack of slope, as a result of work performed by

20    McCullough?

21          MR. CAULEY:  Objection.  Calls for speculation.

22    Lacks foundation.

23          THE WITNESS:  The problem with slope was caused

24    by driving over the pipe and -- the pipe had been

25    inspected and passed, and subsequently driven over and



PETE ALBERS                                    March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                    167

 1  damaged.  So it was damaged.

 2  BY MR. McMANUS:

 3      Q.  Besides Number 1, from 2 down to 24, are there

 4  any items here that were not installed by McCullough?

 5          MR. CAULEY:  Objection.  Lacks foundation.

 6  Calls for speculation.

 7          THE WITNESS:  It appears this is all sanitary

 8  sewer work, which is work that was performed by

 9  McCullough.

10  BY MR. McMANUS:

11      Q.  Okay.  So Number 2, "No vent for floor sink."

12  Is that the same issue we talked about before, or is

13  that different?

14      A.  Same.

15      Q.  So if I asked you the same questions, would

16  your answers be the same?

17      A.  Yes.

18      Q.  "No vent for trough sink."  I think that's

19  different.  Does that mean that the trough sink was

20  missing a vent that was required?

21      A.  I'd have to look at the specifications.  I

22  assume that there's a -- there's a vent adjacent to a

23  trough sink to allow the water to flow.

24          MR. McMANUS:  I'm pretty sure these have

25  already been marked, but just to be safe, we'll do 347.



1          (Exhibit 347 marked)

2    BY MR. McMANUS:

3        Q.   These are plumbing specifications for the

4    project?

5        A.   Uh-huh.

6        Q.   Can you take a look through those and let me

7    know if it helps you answer whether the missing vent was

8    in compliance with the specifications?

9        A.   It would be in compliance.  It needed a vent,

10   per plan.

11       Q.   Okay.  And specs?

12       A.   Yes.

13       Q.   Okay.

14       A.   Same answer whether it's in the specifications

15   or the plans.  I don't know which, but vents are

16   certainly required.

17       Q.   Okay.  What about "no deep trap"; what does

18   that mean?

19       A.   There were two types of traps that were

20   specified on the job.  And a deep trap was specified on

21   a lot of these floor drains.  It says that a deep trap

22   was required.

23       Q.   Would the lack of deep trap be in compliance

24   with the specifications?

25       A.   Would not in this case, no.



1      Q.  Would not be in compliance?  Would it be in

2   compliance with the plans?

3      A.  Would not be in compliance --

4      Q.  Okay.

5      A.  -- per plan.

6      Q.  Let's go down --

7      A.  That's an interesting note, though.  Is that --

8   is when a project like this is put together and an

9   inspector comes out to observe, and you observed the

10  general function that it has a vent and it has a trap

11  and it, it has, you know, appropriate grading in the

12  line, the specific trap required, and making sure that

13  that product is on site, is a function of the QC.

14         At the preparatory meeting, the QC brings all

15  the submittals, all the plans, all the specifications,

16  all the locations.  The process is announced.  And an

17  inspector may look and say, "Yep, we've got a trap."

18  And does he know that that trap is supposed to be a

19  elongated whiz-bang trap?

20         No.  He's going to look see if we're trapped

21  properly.

22         Now, the QC who should have reviewed all of

23  this in the plans, preparatory, initial, and follow-up

24  phase, should have determined that there was a component

25  that was -- you know, that was not there, so.



1          So if I was looking at that, "Yep, got a trap,

2     we're good.  Got a vent, beautiful."  Away we go.

3          Does it hold water?  You know, all the tests

4     are compliant.  But I think it's -- in fact, the same

5     thing with location, you know, there's a set of

6     responsibilities that goes to the QC that can cause a

7     lot of this grief, you know.  You can't -- it's -- they

8     submitted it.  Right?  They've acknowledged it.

9     Responsibility of the contractor, the QC to provide

10    these products, to illustrate these products,

11    demonstrate where they go, how far they go, where they

12    go.

13         An inspector is just going to just look, say,

14    "We've got a trap, let's go."  So this -- some of these

15    questions are QC related.

16       Q.  So Number 6, "Floor sink too low at FF."  I

17    believe -- does FF stand for finish floor?

18       A.  Yes.

19       Q.  So are you saying there that the floor sink was

20    not installed at the right elevation?

21         MR. CAULEY:  Objection.  Lacks foundation.

22    Calls for speculation.

23         THE WITNESS:  Yes.

24    BY MR. McMANUS:

25       Q.  Is that a yes?



PETE ALBERS                                          March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                          171

 1      A.  Yes.

 2      Q.  And with a floor sink being installed too low,

 3  would that be in compliance with the project

 4  specifications?

 5      A.  No.  That's the same one; right?  You're still

 6  on 6?

 7      Q.  Number 6.

 8      A.  Yes.

 9      Q.  It would be in compliance?

10      A.  Wouldn't -- no.

11      Q.  It would not be, okay.  Would it be in

12  compliance with the project plans?

13      A.  No.

14      Q.  If you had been performing a special inspection

15  at the time the floor sinks were being installed before

16  the pour of concrete, and you had noticed that one of

17  the floor sinks such as Number 6 was installed too low,

18  would you have noted that in your inspection report?

19          MR. SCHWERDTFEGER:  Objection.  Lacks

20  foundation.  Improper hypothetical.

21          THE WITNESS:  You probably wouldn't even see

22  it.  You wouldn't -- you may not even be on site at that

23  particular time.

24  BY MR. McMANUS:

25      Q.  But if you were?



 1          MR. SCHWERDTFEGER:  Same objections.

 2          THE WITNESS:  You know, I don't have a laser

 3   leveler -- laser level.  I mean, the obvious is if it

 4   was upside down, sideways, crossed up.  But as far as

 5   having a laser level to see if that is exactly at

 6   finished floor?  No.

 7   BY MR. McMANUS:

 8      Q.  You wouldn't have noted it?

 9      A.  No.  No, I wouldn't have known it.  We don't

10   have the equipment.  We don't have the -- we don't have

11   the equipment to -- back to responsibility of the

12   contractor to put it where it's supposed to be, you

13   know.

14          And, you know, a lot of this stuff was driven

15   over and was generally -- concrete gets poured.  You've

16   watched concrete get poured; right?

17      Q.  I have seen it.

18      A.  There's always a good likelihood that even if

19   it appeared from across the room that, "Oh, yeah, it

20   looks like it's in good shape."  But by the time that's

21   finished, may or may not be.  Not the obligation of the

22   inspector.

23      Q.  Okay.

24      A.  They don't -- I mean, you don't go over with a

25   level and see that it's in the right spot to begin with



1  level and plumb, square, and then after the concrete,

2  during concrete, in the process, you know.

3      Q.  Let's just go from 7 down to 24.

4      A.  7, 24.  Okay.

5      Q.  These are under the "Deficiencies."  Is there

6  any work here -- would you say any of this work when it

7  was "as is" before the correction, was it in compliance

8  the project specifications?

9      A.  One more time.

10     Q.  So for these Items 7 to 24 --

11     A.  7 to 24, got it.

12     Q.  -- prior to the corrective work that was

13  performed, were any of these work items in compliance

14  the project specifications?

15     A.  I think I'll take an exception at Number 9.

16     Q.  Okay.

17     A.  Number 9.  Where is that one located?

18        Hard to read this.  "Trough sink."

19        Anyway, let's talk about that anyway.  There

20  was a floor sink, or trough sink, and those are those

21  big troughs that we saw a picture of it earlier.  It's

22  probably four foot by two foot or three foot, something

23  like that.

24        And there are drains that go under equipment,

25  like, for example, the dishwasher, the major dishwasher



1   in the dish washing room.

2          Can't see where that is on the plan.

3          In that case the configuration for the room in

4   the location of that equipment had changed.  And the

5   changes, as far as I could see, were not documented in

6   the plan.  If this is the right trough we're talking

7   about.  This is an example as well.  They weren't

8   documented.  In other words, changes weren't brought to

9   the plans.  They weren't brought to anybody's attention.

10  Actually, it was kind of something that was overseen.

11         And as a result, the floor trough in the dining

12  room is in the wrong location.  And -- because the

13  equipment had changed.  And nothing was noted.  Nobody

14  knew about it.  And the plumber would have put it where

15  he had originally seen it on the plan.

16         Ultimately, that thing stayed where it was even

17  though it was in the wrong location.  And accepted it as

18  is.  So there's an example of -- and it's not unusual to

19  have a change like that overlooked and not processed,

20  and brought into the field, and brought -- ultimately

21  brought to the -- we run across -- that's why the due

22  diligence at management perspective, that flow of paper,

23  got to go all the way from -- all the way from the

24  office in -- over here in San Diego, where it will be

25  processed, you know, through the superintendent, through



1   the QC, and all the way to the field, so.

2       I don't know that that's the same one, but

3   there's a problem of management, and ultimate location

4   of that product, particularly.

5       So pretty much the way I look at this, the rest

6   of these were -- didn't meet specification.  With that

7   being said, there are some catastrophic problems, broken

8   pipes, unable to set them properly.  Can't finish the

9   tile to them.  All of those particular issues.  All of

10   the reasons that we removed those.

11       Now, the placement of a vent, the location of

12   a vent for a trough drain, all of these -- floor sinks

13   piped improperly, no vents.  They may have still -- the

14   water may still have flowed properly.

15       And the decision might have been made that

16   we're not even going to tear these up because of some

17   minor things.  It was only because of major disconnect,

18   pipe breakage, sloping pipe, unsloping pipe, water in

19   the line, all of those which ultimately led to make

20   these discoveries.  But it's not to say that these

21   systems would not have worked anyway.

22   Q.  So is your answer to my question that except

23   for Number 9, from 7 through 24 before the corrective

24   work was performed, those items were not in compliance

25   with the project specifications?



PETE ALBERS                                            March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                          176

1      A.  Not in compliance.

2      Q.  Not in compliance?

3      A.  Yes, not in compliance.

4      Q.  Thank you.  All right.  Last couple.

5          Are you going to testify as to how management

6  of the project by Halbert negatively impacted the

7  project over the course of various construction trades?

8          MR. SCHWERDTFEGER:  Objection.  Already

9  answered.

10         THE WITNESS:  Yeah.

11 BY MR. McMANUS:

12     Q.  What's your opinion?

13     A.  They were neglectful.

14     Q.  Of who?

15     A.  Of the trades.

16     Q.  Okay.

17     A.  Probably all.

18     Q.  How did Halbert's management negatively impact

19 the project?

20     A.  Inadequate personnel.

21     Q.  Who specifically?

22     A.  Inadequate quantity of superintendents, QC,

23 inspectors.  One guy doing seven disciplines.  Nobody

24 assigned, I don't think, to plumbing to begin with.

25 Specifications, I think, call for 12 people to perform



 1  that.

 2         And there was -- to go to this directly, there

 3  was -- the project had gone so long that they didn't

 4  have the personnel to manage it from an Army Corps.  So

 5  they took the retirees, and they brought these 90-day

 6  wanderers in here, every 90 days or so.  One of the guys

 7  came on board and he said he was literally ready to stop

 8  the project because it was unmanned.  This is not my

 9  opinion.  This is an opinion of an Army Corps personnel,

10  as their manager.

11         So he said there should have been -- there

12  should have been 12 people, and was really wanting to

13  stop the job.  And they said, "No, we're just going to

14  carry on."

15         I think a project of that magnitude would

16  probably need a project engineer, QC.  I don't know what

17  the specifications call for, but see what they need.

18  Maybe look in there.  Probably tell you who or what they

19  really needed.

20     Q.  Okay.

21     A.  They could have had a superintendent for each

22  building, you know.

23         And then there's -- if you look at the plumbing

24  components, different features of work, different --

25  there's like 12 different categories of work, and they



1  have one preparatory for all plumbing.

2        I would have a preparatory for cistern system.

3  That would be a separate -- separate one.  Right?

4  Separate for the gas piping.  I'd even have a separate

5  one for the Ansul system, and have a separate one.

6        But to have a generic preparatory system, which

7  is the basis of which Army Corps of Engineers builds.

8  It's the foundation.  But to have one for all of those

9  different types -- you could have one for waste.  You

10  could you have one for drains.  Granted, there's some of

11  them you could combine logically.  But I think that's --

12  I think that's lax.

13        And I don't remember one preparatory meeting

14  while I was there.  And I think the personnel would

15  probably -- I think they probably need a little more

16  experience.  This is based on talking to the subs.  I

17  wasn't there through a good part of it.  But observation

18  is they were neglectful in providing personnel to

19  manage, inspect, coordinate.

20        I went to a couple of coordination meetings,

21  and it was a -- well, it was a joke.

22        We had this guy yelling at everybody about

23  coming in and cleaning up, when the intent is to bring

24  all foremen together, take a specific area, and see how

25  they can coordinate.



1            I gave you an example.  In order to speed

2      through the project, the sprinkler pipe -- sprinkler

3      system wasn't put in -- typically, it would go in first,

4      hold it up high.  Get your -- put your drops in, mark

5      your drops, so the rest of the trades can work around it.

6            Well, they couldn't man it, or for some reason

7      they weren't there.  Don't know.  So they were brought

8      in at the very end of the project.  Right?  After --

9      this is in rough stage.  After the mechanical, the

10     plumbing, the piping, the gas lines, all that are in,

11     and it's like, "Well, let's put in the fire sprinkler."

12           Well, the case of unforeseen consequences,

13     right, fire sprinklers go up.  We can't -- then the

14     ceiling comes, and the ceiling can't go in at the level,

15     the height it's supposed to go in in Area B.  That whole

16     entire Area B.

17           Arbitrary decision at that point by the

18     superintendent is just drop the ceiling.  You know,

19     without consulting or whatever.  "Going to cover up my

20     mistakes."

21           And drop the -- you know, just drop the

22     ceiling.  As an example of out of sequence and no

23     coordination.  And the product suffering as a result.

24           I'll give you another one while I'm on my

25     soapbox.  There was a -- sorry.  There was a roll-up



1  door.  Right?  There's this rollup door.  And the

2  roll-up door is inside.  A little unusual.  Typically

3  roll-up doors are used to delineate indoor/outdoor.

4      Q.  I don't even know what a roll-up door is.

5      A.  It's a mechanical door that rolls up.

6          Make a long story shorter -- or longer, this

7  roll-up door had the MREs, this is a dining facility,

8  and they had all the MREs behind this door supposed to

9  be locked in place.  In the event there was some

10  catastrophe at DLI they would be able to disburse these.

11  But they were locked.

12         And the ceiling had already gone in.  I

13  determined the ceiling was going to go in, the T-bar

14  goes in, all that.  Then this guy comes in to do his

15  roll-up door.  Well, this roll-up door goes in where the

16  ceiling is.  The T-bar ceiling butting up against the

17  wall, like right here.  Right there.  And the roll-up

18  door goes on the outside of that where the T bar is laid.

19         And the installing contractor says, "That's not

20  where it shows.  I'm not supposed to put it there.  You

21  can't lock it.  I don't want to do that."

22         The superintendent says, "Put it right there.

23  Inside.  Since the T-bar ceiling is here, just put it on

24  the inside."

25         The guy says, "Well, I can do that, but you're



1  not going to be able -- it's not what it shows.  It's

2  not per plan.  It's not per specs.  It's not nothing, I

3  mean."

4          "You do it."

5          So he does it.  Commanded, demanded to do it.

6  Puts it in.

7          And we're all, it's like, "Now you can't lock

8  it."  Because the lock is inside.  And the electrical is

9  on the wrong side.

10         So they had to come back and change it, put it

11  on the outside.  Change -- you know, change the

12  electrical back.

13         So there was -- there's just a lot -- there's

14  just a ton of issues like that.

15     Q.  Did you observe Certified Air on site?

16     A.  I did.

17     Q.  Did you form any opinions of Certified Air?

18     A.  Yes.

19     Q.  Do you think Certified Air was competently

20  performing plumbing remediation work?

21     A.  Yes.

22     Q.  All right.

23     A.  He was -- yeah.

24         MR. McMANUS:  I'm done.  Thank you.

25         MR. CAULEY:  I don't have anything.

1          MR. SCHWERDTFEGER:  Okay.  I think we'll go

2    with standard stipulation.

3          MR. McMANUS:  Thank you for your time.

4          MR. SCHWERDTFEGER:  Turn-around as quickly as

5    we can.  I'll take a transcript.  Electronic is fine.  I

6    don't need a hard copy.

7          THE REPORTER:  Thank you.

8          Mr. Cauley, do you want a copy of the

9    transcript?

10         MR. CAULEY:  Yes.  I want a rough too.

11         (Standard Stipulation:  The reporter is

12   relieved of her duties under the code.  The original

13   transcript will be sent directly to counsel representing

14   the witness, who will forward the original transcript to

15   the witness; that the witness will review the transcript

16   and sign it under penalty of perjury within two weeks

17   from counsel's receipt thereof.  Counsel representing

18   the witness will notify all counsel, in writing, of any

19   changes made to the transcript after receiving the

20   transcript.  Counsel representing the witness will

21   retain custody of the original transcript.  If, for any

22   reason, the original transcript is not signed within the

23   time specified, a certified, unsigned copy can be used

24   for all purposes at trial.)

25         (The deposition concluded at 3:01 p.m.)



```
 1              REPORTER'S CERTIFICATION

 2

 3        I, Renee Kelch, a Certified Shorthand Reporter in

 4   and for the State of California, do hereby certify:

 5

 6        That the foregoing witness was by me duly sworn;

 7   that the deposition was then taken before me at the time

 8   and place herein set forth; that the testimony and

 9   proceedings were reported stenographically by me and

10   later transcribed into typewriting under my direction;

11   that the foregoing is a true record of the testimony and

12   proceedings taken at that time.

13

14        IN WITNESS WHEREOF, I have subscribed my name this

15   2nd day of April, 2019.

16

17

18        _____

19             Renee Kelch, CSR No. 5063

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

DEPOSITION ERRATA SHEET

Our Assignment No. J3775321

Case Caption:  McCullough Plumbing, Inc.

vs. Halbert Construction Company, Inc.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury
that I have read the entire transcript of
my Deposition taken in the above-captioned
matter or the same has been read to me, and
the same is true and accurate, save and
except for changes and/or corrections, if
any, as indicated by me on the DEPOSITION
ERRATA SHEET hereof, with the understanding
that I offer these changes as if still under
oath.

Signed on the _____ day of

_____, 20____ ,

_____

PETE ALBERS



1              DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change: _____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change: _____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change: _____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change: _____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change: _____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change: _____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change: _____

23

24  SIGNATURE:_____DATE_____

25          PETE ALBERS



PETE ALBERS                                          March 23, 2019
UNITED STATES vs HALBERT CONSTRUCTION                          186

1            DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change: _____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change: _____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change: _____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change: _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change: _____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change: _____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change: _____

23

24   SIGNATURE:_____DATE_____

25            PETE ALBERS

